**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| SEBASTIAN PHILLIPS, et. al, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No. 11-2021 (EGS) |
| v. | ) |
| | ) |
| RAYMOND E. MABUS, et. al, | ) |
| | ) |
| Defendants. | ) |
| | ) |

<u>**MEMORANDUM OPINION**</u>

Plaintiffs, Sebastian Phillips and the company he owns,
Marine Design Dynamics, Inc. (hereinafter "MDD"), bring suit
against various officials in the United States Navy as well as
certain of MDD's former employees.  Plaintiffs allege they were
effectively debarred from government contracting with the Navy
without notice and a hearing, in violation of their Fifth
Amendment due process rights.  Plaintiffs also allege a variety
of common law causes of action against MDD's former employees as
well as two government employees.  When this case was initially
filed plaintiffs moved for a temporary restraining order and
preliminary injunction against the federal defendants, seeking
to enjoin them from *de facto* debarring MDD from government
contracting.  On December 7, 2011, following a hearing on
plaintiffs' emergency motions, the plaintiffs and federal

defendants agreed and stipulated to a consent preliminary injunction.  Now pending before the Court are (1) the federal defendants' motion to dismiss, or in the alternative for summary judgment, (2) plaintiffs' motion to enforce the consent preliminary injunction, and (3) motions to dismiss filed by three of plaintiffs' former employees.  Upon consideration of the motions, the responses, and the replies thereto, the relevant caselaw and the record in this case as a whole, the motions will be **DENIED.**

## I.   FACTUAL AND PRODCEDURAL BACKGROUND[1]

Plaintiff Marine Design Dynamics, Inc., a District of Columbia-based government contractor, is a Naval Architecture firm specializing in ship energy conservation for the Navy and other government clients.  In 2006, MDD began working as a subcontractor to Computer Sciences Corporation ("CSC"), performing work under CSC's SeaPort e-prime contract with the Naval Sea Systems Command of the Department of the Navy ("NAVSEA"), contract number N001788-04-D-4030-EHO2.  Under CSC's NAVSEA contract, MDD performed work for the Navy's Operational Logistics Integration Program ("OPLOG") at its Carderock

---

[1] For purposes of ruling on a motion to dismiss, the factual allegations must be presumed true and liberally construed in favor of the plaintiff.  *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Therefore, unless stated otherwise, the facts set forth herein are taken from the Amended Complaint and its accompanying exhibits.

facility.  From 2006 through 2011, all the work MDD performed

for OPLOG was pursuant to this arrangement under the CSC

contract.  This work comprised most of MDD's government

contracting work, and plaintiffs derive all of their revenue and

income from government contracting.

In November 2009, MDD entered into a second contract, this

time as a prime contractor for the Navy, to provide engineering

and program management services to the energy conservation

program for the Combat Logistic Force ships of the Military

Sealift Command ("MSC").  That contract, number N00033-10-802,

specified a one year term, with an option for MSC to renew for

two additional years, until November 2012.

Between March and July of 2011, four key MDD employees who

had performed significant work on the OPLOG projects - Michael

Mazzocco, Volker Stammnitz, William Muras and Matthew Miller -

left MDD.  Plaintiffs allege that before leaving MDD, each of

the key employees solicited OPLOG management and arranged to

take the work they were performing for MDD with them when they

left.  At least two of the departing employees, Mazzocco and

Stammnitz, formed their own businesses to compete with MDD.

Plaintiffs allege that after leaving MDD, all four former

employees did, in fact, continue to perform the same work for

OPLOG as they had performed at MDD.  In addition, Mazzocco

allegedly spread rumors that MDD was double or triple billing

the government for its work.  Plaintiffs claim these rumors are false, and that moreover, they have not been given formal notice of the rumors or an opportunity to respond to them. Nevertheless, as a result of the rumors, the government began to deny plaintiffs work.  First, on April 13, 2011, plaintiffs were notified that OPLOG manager Charles Traugh was "pulling back" $700,000 of OPLOG work previously budgeted for MDD, under the CSC contract, in FY 2011.  Plaintiffs allege that this $700,000 was reallocated to others, including Mazzocco, Stammnitz, Muras, and Miller, who received the money after leaving MDD.

Shortly thereafter, on or about May 18, 2011, Mazzocco, Stammnitz, and Muras met in Boston with NAVSEA and OPLOG employees, including NAVSEA Chief Technology Officer Michael Bosworth, OPLOG program manager Traugh, and assistant program manager William Robinson.  Plaintiffs allege that during that meeting, Bosworth and Traugh, working with Mazzocco, Stammnitz and Muras, decided to eliminate MDD entirely from the OPLOG budget in Fiscal Year ("FY") 2012, and redirect plaintiffs' work to the departing or already departed MDD employees.  Plaintiffs allege that OPLOG's FY 2012 budget, developed by Traugh and Robinson, had included a minimum of $2.7 million for MDD.

During a meeting to review the OPLOG program on July 13, 2011, Bosworth implemented the decisions reached at the May 2011 meeting in Boston.  He instructed Traugh that OPLOG was to

4

immediately cease giving any OPLOG work to plaintiffs, and to continue the moratorium through at least FY 2012.  On July 28, 2011, Traugh met with plaintiff Phillips and informed him that OPLOG would not be tasking work to MDD for FY 2012 under the CSC prime contract or any existing prime contract.  Plaintiffs allege that they have been awarded no new work at OPLOG, through the CSC contract or any other contract, since July 2011.

Without any work to perform at OPLOG, MDD attempted to get additional work through other components of the Navy. Specifically, plaintiffs attempted to obtain work as a subcontractor to Gryphon Technologies, which has a prime contract with NAVSEA.  *See* Am. Compl. Exhibits O, P, Q; *see also* Fed. Defs.' Mot. to Dismiss or in the Alternative for Summ. J., Ex. C, Decl. of Kevin D. Baetsen ("Baetsen Decl."), Exs. 1-3. MDD's ability to obtain this work, however, was subject to NAVSEA appointing a government employee to serve as a Technical Point of Contact ("TPOC").  Initially, Tom Martin, director of the energy office at NAVSEA headquarters, agreed to serve as TPOC, but later informed other Navy personnel that he could not do so because he had been informed that there were problems "tracking the money" MDD had charged the government for its OPLOG work.  Martin explained that he had been "directed by [his] leadership not to be involved with any contract that includes MDD," regardless of whether the contract was to perform

OPLOG work or work for a different component of the Navy.  Am. Complaint ¶¶ 87, 89 (quoting Oct. 7, 2011 email from T. Martin).

Finally, MDD alleges that the defendants attempted to interfere with its existing contract with MSC (contract number N00033-10-802) before it was renewed for FY 2012 by, *inter alia*, attempting to divert work under that contract to former MDD employees.  These alleged attempts were unsuccessful; in the fall of 2011, MSC exercised its final one-year option on its contract with MDD, which will expire in November 2012.  Baetsen Decl. ¶ 4.

On November 16, 2011, Plaintiffs initiated this suit against several Navy officials as well as the four former MDD employees discussed above.  Plaintiffs moved for a temporary restraining order and preliminary injunction against the federal defendants only, alleging plaintiffs had been *de facto* debarred from government contracting without notice and a hearing in violation of their fifth amendment right to due process of law. Pls.' Mot. for Temp. Rest. Order at 4-5.  Following briefing on the motion, the Court held a hearing on December 7, 2011.  At the hearing's conclusion, the parties agreed and stipulated to the entry of a preliminary injunction.  *See* Order Granting Stipulated Prelim. Inj.; *see also* Minute Order of Dec. 7, 2012. In relevant part, the Stipulated Preliminary Injunction (1) enjoined the government from taking any additional action to

implement or spread the *de facto* debarment, (2) required the Navy to allow MDD to compete for new work and to continue performing contracts it was currently performing under the same standards applicable to other contractors, and (3) required the Navy to communicate the foregoing information to CSC and Gryphon. *See Id.*

Following the preliminary injunction proceedings, Plaintiffs filed an Amended Complaint. Count I asserts that the federal defendants violated plaintiffs' constitutional right to due process by blacklisting them for government contracting without procedural safeguards, and seeks declaratory and injunctive relief. Count II asserts the same claims against Bosworth and Traugh in their individual capacities and seeks damages of $2.5 million. Counts III – VIII assert breach of fiduciary duty and civil conspiracy against Mazzocco, Stammnitz, Muras, and Miller, and common law defamation against Mazzocco. Finally, Count IX alleges common law interference with contractual relations by Traugh and Robinson in their official and individual capacities. The federal defendants, as well as Mazzocco, Stammnitz, and Muras have moved to dismiss the Amended Complaint; the federal defendants have also moved in the alternative for summary judgment. Plaintiffs, for their part, have filed a motion to enforce the preliminary injunction. These motions are ripe for resolution by the Court.

## II.   STANDARD OF REVIEW[2]

On a motion to dismiss for lack of subject-matter
jurisdiction under Rule 12(b)(1), the plaintiff bears the burden
of establishing that the court has subject-matter jurisdiction.
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "The
court must address the issue of jurisdiction as a threshold
matter, because absent jurisdiction the court lacks the
authority to decide the case on any other grounds."  *Am. Farm
Bureau v. EPA*, 121 F. Supp. 2d 84, 91 (D.D.C. 2000).  Moreover,
because subject-matter jurisdiction relates to the Court's power
to hear the claim, the Court must give the plaintiff's factual
allegations closer scrutiny when resolving a Rule 12(b)(1)
motion than would be required for a Rule 12(b)(6) motion.
*Uberoi v. EEOC*, 180 F. Supp. 2d 42, 44 (D.D.C 2001).  In
resolving a motion to dismiss for lack of subject-matter
jurisdiction, the Court "may consider the complaint supplemented
by undisputed facts evidenced in the record, or the complaint
supplemented by undisputed facts plus the court's resolution of
disputed facts."  *Coal. For Underground Expansion v. Mineta*, 333
F.3d 193, 198 (D.C. Cir. 2003) (internal citations and quotation
marks omitted).

---

[2] This section addresses the standard of review for the motions
to dismiss, or in the alternative for summary judgment.  The
standard of review for plaintiff's motion for enforcement of the
stipulated preliminary injunction is addressed *infra*.

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted). While detailed factual allegations are not necessary, plaintiff must plead enough facts "to raise a right to relief above the speculative level." *Id.*

When ruling on a Rule 12(b)(6) motion, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002). The Court must construe the complaint liberally in plaintiff's favor and grant plaintiff the benefit of all reasonable inferences deriving from the complaint. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court must not accept plaintiff's inferences that are "unsupported by the facts set out in the complaint." Id. "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Though the Court must draw all justifiable inferences in favor of the non-moving party in deciding whether there is a disputed issue of material fact, "[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III. ANALYSIS

### A. Federal Defendants' Motion to Dismiss, or, in the Alternative, for Summary Judgment

The federal defendants move to dismiss plaintiffs' claims against them in Counts I, II, and IX of the Amended Complaint for lack of jurisdiction and failure to state a claim upon which relief can be granted.  In the alternative, the federal defendants argue that summary judgment should be granted on Counts I and II.

#### 1. Sovereign Immunity

Federal defendants argue that sovereign immunity bars plaintiff's claims in Count I against the federal defendants in their official capacities.  Fed. Defs.' Mot. to Dismiss or for

Summ. J. at 4-8 (hereinafter "Fed. Defs.' Mem."). The plaintiffs contend that the government has waived sovereign immunity for claims seeking non-monetary relief against the United States, its agencies and federal officers acting in an official capacity. Pls.' Opp'n to Fed. Defs.' Mot. to Dismiss at 27-28. Plaintiffs are correct. *See* 5 U.S.C. § 702; *see also P&V Enters. v. United States Army Corps of Eng'rs*, 466 F. Supp. 2d 134, 140-41 (D.D.C. 2006). In Count I of the Amended Complaint, plaintiffs seek only declaratory and injunctive relief, and their claims are against federal officers in their official capacities.[3] Accordingly, the waiver of sovereign immunity found in Section 702 of the APA applies to plaintiffs' claims against the federal defendants.

### 2. Sufficiency of Plaintiffs' Claims that a *De Facto* Debarment Occurred

Federal defendants also argue that plaintiffs cannot show the government's actions constituted *de facto* debarment in violation of the due process clause of the Fifth Amendment. Fed. Defs.' Mem. at 27-31. Defendants principally argue that no *de facto* debarment occurred for two reasons: (1) because MSC exercised an option on its contract with MDD on October 30,

---

[3] For the same reasons, federal defendants' assertion that plaintiffs may not allege *Bivens* claims against Mabus, Greenert, McCoy and Kaskin for the actions of Bosworth and Traugh on a theory of respondeat superior is irrelevant. Fed. Defs.' Mem. at 15-17. Plaintiffs do not bring *Bivens* claims against these four federal defendants. *See* Pls.' Opp'n at 30.

2011, which provided work for MDD until late 2012, plaintiffs did not lose *all* of their government work and accordingly were not debarred; and (2) in order to give rise to Fifth Amendment protections, *de facto* debarment must be based on charges of a lack of integrity, which, according to federal defendants, plaintiffs do not allege.

*De facto* debarment occurs when a contractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due process, namely, adequate notice and a meaningful hearing. *Trifax Corp. v. Dist. of Columbia*, 314 F.3d 641, 643-44 (D.C. Cir. 2003); *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001).  To demonstrate *de facto* debarment, plaintiffs must show "a systematic effort by the procuring agency to reject all of the bidder's contract bids.  Two options exist to establish a *de facto* debarment claim:  1) by an agency's statement that it will not award the contractor future contracts; or 2) by an agency's conduct demonstrating that it will not award the contractor future contracts." *TLT Constr.*, 50 Fed. Cl. at 215-16 (internal citations and quotations omitted).

Plaintiffs argue that they have adequately alleged both of these options, although they need allege only one to survive a motion to dismiss.  Pls.' Opp'n at 11.  First, Plaintiffs allege, and defendants do not dispute that two Navy officials,

Traugh and Bosworth, stated they would not permit plaintiffs to
work on any future contracts.  Am. Compl. ¶¶ 79-84; *see also*
Fed. Defs.' Mem. Ex. A, Traugh Decl. at ¶ 8 ("I decided, with
Mr. Bosworth's concurrence, that OPLOG would no longer use MDD
as a subcontractor starting with work funded from FY 2012
appropriations."); Ex. B., Bosworth Decl. at ¶ 7 ("I . . .
directed Charles Traugh . . . not to renew the association of
OPLOG with MDD starting in FY 2012.")  Plaintiffs allege that
these statements applied to their attempts to receive work at
OPLOG as well as other components of the Navy, as demonstrated
by NAVSEA employee Tom Martin's statement that "I have been
directed by my leadership not to be involved with any contract
that includes MDD," even if the contract had nothing to do with
OPLOG.  Am. Compl. ¶ 89.

Plaintiffs also argue they have alleged a *de facto*
debarment by the agency's conduct: namely, the Navy has taken
away MDD's existing work and refused to permit MDD to obtain
additional work in several instances.  First, in April 2011, the
Navy "pulled back" $700,000 that had been allocated to MDD for
subcontracting work with CSC during FY 2011.  Am. Compl. ¶¶ 56-
57.  Next, in July 2011 the Navy announced its intention not to
award MDD any more work under the CSC prime contract and to
prohibit MDD from receiving any more work from OPLOG under any
contract through FY 2012.  *Id.* ¶¶ 73-74, 78-79.  Plaintiffs

13

allege they have received no new work from OPLOG since summer 2011. *Id.* ¶ 83.   Third, the Navy also indicated, via emails dated September 15, 2011 and October 7, 2011, that MDD would not get any funding on any future contract or subcontract, whether through OPLOG or NAVSEA.   *Id.* ¶¶ 87-92.   The Navy also refused to appoint a TPOC, which is a condition precedent to obtaining this work.   *Id.*   Finally, Plaintiffs allege that federal defendants attempted to stop – albeit unsuccessfully – plaintiffs from performing the final year of work on plaintiffs' single remaining contract to perform work for the Navy.   *Id.* ¶ 94.   Plaintiffs allege that "all of their revenue and income derive from Federal Government contracts, primarily OPLOG and MSC contracts," and that defendants' actions threaten to put plaintiffs out of business.   Id. ¶ 95.

The Court agrees that plaintiffs have met their burden to allege a *de facto* debarment sufficient to survive a motion to dismiss.   First, plaintiffs have alleged multiple Navy officials stated that plaintiffs would not be awarded any future contracts.   As noted above, courts have found categorical statements that contractors will not be awarded any future contracts may amount to a *de facto* debarment.   *See TLT Constr. Corp.*, 50 Fed. Cl. at 215; *see also CRC Marine Servs. v. United States*, 41 Fed. Cl. 66, 84 (1988)(a contractor may allege *de facto* debarment by evidence of statements, by agency officials

14

or employees, that he would not be awarded any contract at the present or in the future); *Related Indus., Inc. v. United States*, 2 Cl. Ct. 517, 525 (1983)(same).

Second, plaintiffs have alleged that the agency's conduct amounts to a systematic effort to preclude it from future contracting.  In *Art-Metal USA, Incorporated v. Solomon*, this Court found that *de facto* debarment occurred when the government terminated one of the movant's contracts in its entirety and held in abeyance the awards of four additional contracts for which the contractor had submitted bids.  The plaintiff did not have to prove that it had lost 100% of its work to show *de facto* debarment; it was sufficient to show that the government's actions were aimed at the overall status of the plaintiff as a contractor, specifically at plaintiff receiving new contracts. 473 F. Supp. 1, 4, 5 n.7 (D.D.C. 1978).  Similarly, in *Leslie & Elliott Company v. Garrett*, this court found *de facto* debarment when the Navy refused to award plaintiff two contracts for which it had been the lowest bidder because the evidence showed the Navy "had determined that it should no longer do business with" the contractor at the submarine base.  732 F. Supp. 191, 196 (D.D.C. 1990).  Likewise, this Circuit has found that *de facto* debarment may lie where there has been exclusion from "virtually all government work for a fixed period of time," *Reeve Aleutian Airways, Incorporated v. United States*, 982 F.2d 594, 598 (D.C.

Cir. 1993) (citations and quotations omitted); or where the government's conduct "has the broad effect of largely precluding [plaintiffs] from pursuing" government work. *Trifax Corp.*, 314 F.3d at 644 (citation omitted).

Defendants contend that plaintiffs cannot show a *de facto* debarment as a matter of law because plaintiffs "were subsequently awarded work by the alleged debarring agency;" namely, on October 30, 2011, MSC exercised the final option of a three-year contract with MDD.  The MSC contract, which was initially awarded in 2009, will expire in November 2012.  Fed. Defs.' Mot. at 27-28, Baetsen Decl. ¶ 4.[4]

The present record is cloudy as to the extent of the Navy's disqualification of plaintiffs.  The facts currently before the court do not reveal whether MSC's exercise of the final option of its three year contract with MDD is tantamount to a new or "future" contract awarded after the alleged debarment, or, in the alternative, is effectively a continuation of a contract awarded in 2009, well before the alleged debarment.  Ultimately,

---

[4] Defendants point out that, under the Federal Acquisition Regulations, agencies may not exercise options on current contracts with contractors that have been debarred absent compelling circumstances.  Fed. Defs.' Reply at 9 (citing 48 C.F.R. § 9-405-1(b)(3)).  This provision is not dispositive here, as it only governs contractors who have been officially debarred.  Plaintiffs here have alleged *de facto* debarment, which rests on the claim that defendants have ignored their own regulations and are instead engaged in an unauthorized effort to preclude them from receiving future work.

development of these facts may be dispositive as to the *de facto* debarment claim.  However, at the motion to dismiss stage, when the Court must view all facts in the light most favorable to plaintiffs, the statements and actions alleged in the Amended Complaint make out a plausible claim to *de facto* debarment. While plaintiffs have not lost 100% of their contracting work, they have plausibly claimed that they have been barred from performing work on several contracts and thus have been broadly precluded from future work with the Navy.  Courts have often found that, while "[p]reclusion from a single contract is insufficient to establish *de facto* debarment," an allegedly broad based preclusion across multiple contracts (or, in this case, subcontracts) gives rise to a viable claim for *de facto* debarment.  *Highview Eng'g, Inc. v. United States Army Corps. of Eng'rs*, Case 3:08-647, 2012 U.S. Dist. LEXIS 45249, *20 (W.D. Ky. Mar. 30, 2012)(collecting cases); *see also Leslie & Elliott Co.*, 732 F. Supp. at 197; *Art-Metal*, 473 F. Supp. at 5. Accordingly, the Court concludes that plaintiffs have stated a claim of *de facto* debarment sufficient to survive a motion to dismiss.

The Court likewise rejects the federal defendants' claim that plaintiffs have not asserted a *de facto* debarment claim because they have not alleged they were barred from government contracting due to charges of fraud, dishonesty, or lack of

integrity. As this Circuit has held, individuals and
corporations have a due process liberty interest in avoiding the
damage to their reputation and business caused by the stigma of
broad preclusion from government contracting. *Reeve*, 982 F.2d
at 598; *see also Trifax*, 314 F.3d at 643-44. Assuming arguendo
that the broad preclusion from contracting must be based on
charges of fraud, dishonesty, or lack of integrity in order to
give rise to a protected liberty interest, the Court finds
plaintiffs have alleged such charges in this case.
Specifically, plaintiffs have alleged Bosworth and Traugh
decided to bar them from Navy work because of rumors that
plaintiffs were submitting fraudulent bills to the government.
Am. Compl. ¶¶ 52, 87-93. Indeed, Bosworth and Traugh provided
declarations in support of the government's motion to dismiss
stating that they decided to stop working with plaintiffs
because of their "lack of transparency." Fed. Defs.' Mem.,
Decl. of Charles Traugh at ¶ 8. Traugh and Bosworth assert that
MDD's invoices did not contain sufficient information "to
evaluate whether the price [the Navy] paid for [MDD's] work was
reasonable" and, despite repeated requests for more detail, MDD
refused to provide additional information. *Id.* at ¶¶ 6-7; see
also Fed. Defs.' Mem., Decl. of Michael Bosworth at ¶¶ 4-5.
Defendants' own statements confirm that concerns about

plaintiffs' honesty and integrity animated the decision to stop them from performing more government work.

### 3. Standing and Mootness

In their reply, defendants argue for the first time that plaintiffs lack standing under Article III.  Fed. Defs.' Reply at 2.  To satisfy Article III's standing requirements, a plaintiff must show that, at the time the suit is filed,

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000).  While the proof required to establish standing increases as the suit proceeds, at the motion to dismiss stage "general factual allegations of injury resulting from the defendant's conduct may suffice."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal citations and quotation marks omitted).

Reprising their arguments that plaintiffs have not been *de facto* debarred as a matter of law, the federal defendants claim plaintiffs have suffered no "injury in fact because they were not *de facto* debarred."  Fed. Defs.' Reply at 2.  For the reasons explained above, plaintiffs have stated a claim for *de facto* debarment.  The Court also rejects federal defendants'

claim that plaintiffs cannot show injury in fact because they have not presented evidence "that they attempted to get future contracts" after the alleged debarment, but "were prevented from doing so." *Id.* at 5.  A claim of *de facto* debarment may be justiciable absent the formality of plaintiffs bidding on and being denied future contracts after the alleged debarment.  *See Dynamic Aviation v. Dep't of Interior*, 898 F. Supp. 11, 13 (D.D.C. 1995) (where possession of pilot and aviation credentials was a condition precedent to performing government work, and plaintiff's credentials had been revoked, plaintiff need not show he had bid on government work after the revocation to present a justiciable controversy).  In this case, Plaintiffs allege that as a result of their *de facto* debarment, they lost $700,000 of work they had already been allocated in FY 2011, over $2.5 million of future work which had been set aside for MDD in OPLOG's FY 2012 budget, and an additional future subcontract with Gryphon Technologies.  These alleged losses clearly constitute an injury in fact for the purposes of Article III standing.

Defendants also argue that plaintiffs' injuries are not redressable because, even if they were *de facto* debarred, they are not currently entitled to receive any contract work.  Fed. Defs.' Reply at 7-9.  As discussed *supra*, this argument is premature; plaintiffs have alleged that they lost work to which

they were entitled, which is all that is required at the
pleading stage.  *Lujan*, 504 U.S. at 561.  Moreover, even
assuming arguendo defendants are correct, this does not
necessarily deprive plaintiffs of standing to seek prospective
injunctive or declaratory relief.  Indeed, plaintiffs have
already received a preliminary injunction which, *inter alia*,
enjoins defendants from taking any further action to preclude
plaintiffs from contracting, and rescinds certain actions they
had taken to that effect.  This injunction, however, only
remains in place pending a final determination of the merits of
the action.  13 James Wm. Moore, et. al, Moore's Federal
Practice, § 65.20 (3d ed. 1997).  Moreover, plaintiffs have
alleged a likelihood of future violations of their rights by the
defendants, and accordingly have standing to pursue a
declaratory judgment.  Am. Compl. ¶¶ 83, 89, 95, 98; *see also*
*Fair Employment Council of Greater Washington v. BMC Mktg.*
*Corp.*, 28 F.3d 1268, 1273 (D.C. Cir. 1994).

Finally, the complaint is not moot.  Federal defendants'
mootness argument rests solely on the assertion that they have
taken action to change their conduct after the lawsuit was
filed, mainly, that they have complied with the consent
Stipulated Preliminary Injunction.  Fed. Defs.' Reply at 9-10.
Defendants cannot rely on their voluntary cessation of the
challenged conduct as a basis for mootness unless "subsequent

events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth,* 528 U.S. at 189 (citations omitted). Defendant has provided no evidence on this point; indeed, notwithstanding the preliminary injunction, the declarations of Charles Traugh and Michael Bosworth do not indicate that OPLOG or NAVSEA will consider plaintiffs for any future work. Accordingly, defendants have not satisfied their "heavy burden of persuading" the court that the challenged conduct cannot reasonably be expected to recur. *Id.*

### 4. Federal Tort Claims Act

In Count IX of the Amended Complaint, plaintiffs allege Traugh and Robinson tortiously interfered with their contractual relations, their prospective contractual relations, and their prospective advantageous relationships. Specifically, they allege that Traugh and Robinson:

- Induced MDD's key employees to breach their fiduciary duties to MDD, by taking its work and its business opportunities;
- Prevented MDD from performing task orders under the CSC contract, and redirected funds allocated for MDD under that contract;
- Interfered with other contracts of MDD's, such as its contract with the MSC;
- Published defamatory statements about MDD to injure plaintiffs in their trade or business.

Am. Compl. ¶ 195. In response, the federal defendants filed a certification pursuant to the Westfall Act, 29 U.S.C § 2679,

stating that Traugh and Robinson were acting within the scope of their employment during the incidents alleged by plaintiffs, and that the United States should therefore be substituted as sole defendant in lieu of Traugh and Robinson.   The federal defendants then moved to dismiss Count IX, arguing that plaintiffs' claims against the United States are excluded from the Federal Tort Claims Act's ("FTCA") waiver of sovereign immunity and that plaintiffs failed to exhaust their administrative remedies under the FTCA.   In their opposition to defendants' motion, plaintiffs have requested discovery in order to contest whether Traugh's and Robinson's actions were, in fact, within the scope of their employment.   For the following reasons, the Court concludes that plaintiffs have met their burden to obtain limited discovery on the scope of Robinson's and Traugh's employment.

The Westfall Act provides that federal officials are immune from state tort lawsuits for money damages if the employee was "acting within the scope of employment during the alleged incident."   *Haddon v. United States*, 68 F.3d 1420, 1422-23 (D.C. Cir. 1995).

> Upon certification by the Attorney General that the
> defendant employee was acting within the scope of his
> office or employment at the time of the incident out of
> which the claim arose, any civil action or proceeding
> commenced upon such a claim in a United States district
> court shall be deemed an action against the United States .

> . . . and the United States shall be substituted as the
> party defendant.

28 U.S.C. § 2679(d)(1).  The Attorney General's certification

constitutes *prima facie* evidence that the employee was acting

within the scope of his employment, and once the certification

has been made, the plaintiff challenging the certification has

the burden of "alleging facts that, if true, would establish

that the defendants were acting outside the scope of their

employment." *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir.

2003).  As this Circuit has explained, "if a plaintiff meets

this pleading burden, he may, if necessary, attain limited

discovery to resolve any factual disputes over jurisdiction."

*Wuterich v. Murtha*, 562 F.3d 375, 381 (D.C. Cir. 2009) (internal

citations omitted); *see also Stokes*, 327 F.3d 1210, 1213 (the

certification does not have "any particular evidentiary weight,"

therefore, if plaintiff alleges "a material dispute as to the

scope issue, the district court must resolve it[.]" (internal

citations omitted)).

In order to determine whether a federal employee was acting

within the scope of his employment, the Court must apply the law

in the state in which the alleged tort occurred.  *Id.* at 1214.

District of Columbia law is drawn from the Restatement (Second)

of Agency.  *Id.*  The Restatement provides in pertinent part:

> Conduct of a servant is within the scope of employment if,
> but only if, (a) it is of the kind he is employed to

perform; (b) it occurs substantially within the authorized
time and space limits; (c) it is actuated, at least in
part, by a purpose to serve the master; and (d) if force is
intentionally used by the servant against another, the use
of force is not unexpected by the master.

Restatement (Second) of Agency § 228(1).  The second, third and
fourth elements are irrelevant here because plaintiffs do not
contest that the alleged events occurred substantially within
authorized time and space limits or were actuated, in some part,
with the purpose to serve the master, nor do they allege the use
of force.  The plaintiffs do, however, attempt to rebut the
United States' scope-of-employment certification under the first
prong of the Restatement test, claiming "it is difficult to
understand that the [actions described in paragraph 195 of the
Amended Complaint] could be considered to be related to the work
Robinson and Traugh were employed to perform."  Pls.' Opp'n at
33.

To qualify as conduct of the kind they were employed to
perform, Robinson's and Traugh's actions must have either been
"of the same general nature as that authorized" or "incidental
to the conduct authorized."  Restatement (Second) 229.  The
current record sheds little light on the duties Traugh and
Robinson are authorized to perform.  In the Amended Complaint,
plaintiffs assert that Traugh, in his capacity as OPLOG program
manager, and/or Robinson, in his capacity as OPLOG's assistant
program manager, had the authority to, *inter alia*, (1) oversee

25

plaintiffs' work, (2) review and approve their "deliverables" and invoices, (3) develop OPLOG's budget and allocate funds to various contractors, and (4) block any contractor from contracting to perform work on OPLOG projects.  Am. Compl. ¶¶ 29-31, 73, 82.

However, in their opposition to the federal defendants' motion to dismiss, plaintiffs take a contrary position.  They assert that Traugh (and presumably his assistant Robinson), have limited, if any authority to (a) oversee OPLOG funding to government contractors and ensure it is well and prudently spent; (b) request that prime contractors replace employees or subcontractors, or assign follow-on tasks to current employees or subcontractors; or (c) ensure that the work performed by government contractors and subcontractors conforms to contract requirements.  *See* Pls.' Opp'n to Fed. Defs.' Mem., Ex. B., Decl. of Sebastian Phillips, ¶¶ 28-31, 39.  Plaintiffs assert that most or all of this authority is vested in either the prime contractors for whom MDD works or in the Navy's contracting officers, not Traugh or Robinson.[5]  *Id.*  Traugh maintains that he

---

[5] It is worth noting that other documents provided by the Navy seem to provide at least some support for these assertions. Specifically, the memorandum issued by NAVSEA in response to the Consent Preliminary Injunction provides, in relevant part, that the Navy's Seaport-e contracts, which include the contracts with CSC and Gryphon at issue in this case, "do not permit Command personnel to direct a prime contractor to select, or decline to select, a given subcontractor for a given item of work.  Other

is authorized to perform all of these duties, but, other than his declaration, has provided no evidence to support his assertions.  *See* Fed. Defs.' Mem., Ex. A., Traugh Decl.

The Court is troubled by plaintiffs' contradictory characterizations of the scope of Traugh's and Robinson's employment.  Nevertheless, plaintiffs have alleged facts in their opposition to the Motion to Dismiss that, taken as true, could rebut the Attorney General's certification.  Accordingly, plaintiffs will be allowed to conduct limited discovery on the scope-of-employment issue.  The federal defendants' motion to dismiss Count XI on grounds of sovereign immunity and failure to exhaust under the FTCA is therefore denied without prejudice to refiling at the appropriate time.

### 5. Qualified Immunity

In Count II of the Amended Complaint, plaintiffs sue Traugh and Bosworth in their individual capacity for the *de facto* debarment.  Qualified immunity is "a defense that shields officials from suit if their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011) (internal citations omitted).  To

---

contractual direction may be issued only by cognizant contracting officers."  *See* Pls.' Mot. to Enforce Stip. Prelim. Inj. at Ex. K, Mem. from NAVSEA Commander K.M. McCoy to NAVSEA and Naval Service War Center, Dec. 20, 2011.

determine whether an official is entitled to qualified immunity, the Court must consider whether the facts, viewed in the light most favorable to plaintiffs, establish a violation of a constitutional right, and if so, whether that right was clearly established at the time of the alleged violation. *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009). "An official enjoys protection from a lawsuit where his conduct is objectively reasonable in light of existing law. Conversely, an officer is not shielded where he could be expected to know that certain conduct would violate statutory or constitutional rights." *Brown v. Fogle*, 819 F. Supp. 2d 23, 28-29 (D.D.C. 2011)(quoting *Farmer v. Moritsugu*, 163 F.3d 610, 613 (D.C. Cir. 1998)(internal quotation marks omitted)).

As set forth above, *de facto* debarment of a government contractor without due process and on grounds of dishonesty, fraud or lack of integrity violates the Fifth Amendment. Traugh and Bosworth contend, however, that (1) their job duties permitted them to terminate all of MDD's work with OPLOG, bar it from obtaining new work with OPLOG, and refuse to appoint a TPOC for MDD to obtain work via NAVSEA based on their concerns that MDD was not charging a reasonable price or providing the best value to the government, and (2) their actions did not bar plaintiff from obtaining any and all additional work for the Navy, and therefore did not constitute *de facto* debarment. Fed.

28

Defs.' Mem. at 12-15.[6]  Federal Defendants' framing of Traugh's

and Bosworth's actions highlights the factual disputes that

prevent dismissal of Count II on grounds of qualified immunity.

The resolution of these questions, specifically, defendants'

authority to bar MDD from performing future work at OPLOG, as

well as the breadth of MDD's preclusion from government

contracting, depend on development of the facts, and the Court

must accept the truth of the plaintiffs' factual allegations on

a motion to dismiss.  Accordingly, the Court will deny

defendants' Rule 12(b)(6) motion to dismiss on the ground of

qualified immunity.

---

[6] Traugh and Bosworth also contend that plaintiffs'
constitutional rights are not clearly established.  They claim
there is no authority specifically permitting subcontractors, as
opposed to prime government contractors, to allege *de facto*
debarment, or holding that a government official other than a
contracting officer or a "senior official" may effect a *de facto*
debarment.  Fed. Defs.' Mem. at 12.  These claims are
unpersuasive.  *See*, *e.g.*, 48 C.F.R. § 9.405-2 (subcontractors
are impacted by debarments; once a contractor has been debarred,
it is effectively prohibited from serving as a subcontractor on
government contracts); *see also Highview Eng'g v. Hawkins*, Case
08-647, 2010 U.S. Dist. LEXIS 75102 (July 26, 2010)(finding
plaintiff stated a claim of *de facto* debarment by project
manager and attorney).  Moreover, plaintiffs need not identify
factually indistinguishable precedent in order to defeat a claim
of qualified immunity.  "The facts of such cases need not be
materially similar, but have only to show that the state of the
law [at the time of the incident] gave [the officer] fair
warning that [his alleged misconduct] ... was unconstitutional."
*Bame*, 637 F.3d at 384 (internal citations and quotations
omitted)(alterations in original).

### 6. Summary Judgment

Federal defendants have presented material outside the pleadings, and the Court has considered those materials. Accordingly, the Court will treat the motion as one for summary judgment in the alternative. *See Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). As a general matter, summary judgment is premature unless all parties "have had a full opportunity to conduct discovery." *Liberty Lobby*, 477 U.S. at 257. After reviewing the parties' filings, and for the reasons explained above, the court concludes that the factual record is not sufficiently developed to allow a determination as to whether genuine issues of material fact exist. Accordingly, the defendants' motion for summary judgment is denied without prejudice to refiling at the appropriate time, in order to permit plaintiffs the benefit of discovery.

### 7. Conclusion

For the foregoing reasons, the Court concludes plaintiffs have stated a claim for *de facto* debarment in Count I. Further, because of the factual allegations presented by plaintiffs at this state of the litigation, the court cannot find, as a matter of law, that the qualified immunity defense is properly asserted as to Count II or that substitution of the United States and dismissal under the FTCA is appropriate as to Count IX.

Accordingly, the Federal Defendants' motion to dismiss or, in the alternative, for summary judgment is **DENIED.**

### B. Plaintiffs' Motion to Enforce Stipulated Preliminary Injunction

#### 1. Factual Background and the Parties' Positions

As discussed *supra*, on December 7, 2011, the parties agreed and stipulated to a Consent Preliminary Injunction. Plaintiffs argue that defendants have refused to comply with the terms of the injunction. They seek to have this Court enforce its terms and hold the federal defendants in contempt.

The terms of the Consent Preliminary Injunction enjoin the Navy as follows.

(1) Federal defendants are enjoined from taking any action to implement, enforce, or spread to any agency of the federal government the de facto debarment of plaintiffs from contracting.

(2) Federal defendants are required to allow Marine Design Dynamics, Inc. ("MDD") to compete for, and if awarded, receive and perform contracts, subcontracts, task orders, task instructions and orders under indefinite quantity contracts, in the same manner and under the same standards applicable to other contractors and subcontractors, unless and until debarment or suspension proceedings are properly initiated, or until further order of this Court, including but not limited to the following:

(a) Plaintiffs' subcontract under the Navy's prime contract with Computer Sciences Corporation ("CSC") pursuant to its SEAPORT-e contract, N00178-04-D-4030-EH02. The government shall appoint a Technical Point of Contact between Operational Logistics Integration Program ("OPLOG") and CSC for this purpose.

(b) Successor contracts to MDD's prime contract with

31

Military Sealift Command ("MSC"), N00033-10-C-8002, which is expected to expire November 1, 2012.

(c) Federal Defendants shall communicate to CSC and Gryphon Technologies, rescinding any guidance or instruction that work was to be removed from or not given to MDD, in effect restoring the status quo ante.[7] Federal Defendants shall appoint a Technical Point of Contact between Naval Sea Systems Command of the Department of the Navy ("NAVSEA"), MSC and Gryphon Technologies for this purpose.

(3) Federal defendants are required to allow MDD to maintain and perform its existing contracts, subcontracts, task orders, task instructions and orders under indefinite quantity contracts, in the same manner and under the same standards applicable to other contractors, unless and until debarment or suspension proceedings are properly initiated, or until further order of this Court, including but not limited to the following:

(a) Plaintiffs' existing prime contract with MSC, N00033-10-C-8002.

(b) Plaintiffs' existing subcontract under the Navy's prime contract with CSC pursuant to its SEAPORT-e contract, N00178-04-D-4030-EH02.

In response to the Consent Preliminary Injunction, the Navy took the following actions.  First, on December 20, 2011, defendant Vice Admiral McCoy, NAVSEA's Commander, sent a memorandum from NAVSEA's counsel, Sophie Krasik, with the Consent Preliminary Injunction attached, to NAVSEA's Contracts Directorate, NAVSEA's Ship Engineering Directorate (where

---

[7] This sentence was crafted by the parties in off the record discussions and the parties inserted it into the Stipulated Preliminary Injunction at the end of the hearing.  Tr. of Oral Argument at 70-71.

Bosworth is employed) and the Naval Surface Warfare Center (under whose command OPLOG falls).  Defs.' Opp'n to Pls.' Mot. to Enforce at 4.  The memorandum explains the Consent Preliminary Injunction and directs Navy employees to "maintain a position of strict neutrality toward MDD, neither encouraging nor interfering with: (1) the efforts of MDD to obtain work from prime contractors; or (2) prime contractors' decision whether or not to subcontract with MDD . . . The injunction is consistent with the Navy's SeaPort-e prime contracts, which do not permit Command personnel to direct a prime contractor to select, or decline to select, a given subcontractor for a given item of work.  Other contractual direction may be issued only by cognizant contracting officers."  *See* Pls.' Mot. to Enforce, Ex. K.

Second, on December 16, 2011, Michael Kistler, the Executive Director in the NAVSEA Engineering Directorate, issued an email designating Chris Cable as TPOC for any MSC work ordered through a Seaport-e prime contractor, including but not limited to Gryphon Technologies, and Charles Traugh as TPOC for any OPLOG work.  Plaintiffs immediately objected to the choice of Traugh, and in response the Navy replaced him with another NAVSEA employee, Greg Doerrer.  Pls.' Mot. to Enforce at 6; Fed. Defs.' Opp'n at 14.

Third, on December 20, 2011, Lindsay Alexander, Contracting Officer for CSC and Gryphon Technologies, the two SeaPort-e prime contractors from whom MDD alleged it had been precluded from receiving subcontracting work, sent CSC and Gryphon a letter enclosing the Consent Preliminary Injunction and explaining, *inter alia*, that MDD must have the same opportunity to compete for and perform work as any other contractor.  The letter also states, in relevant part, "the terms of your prime task order do not permit most Navy personnel to issue direction to you to select, or decline to select, a given subcontractor for a given item of work or to issue any other contractual direction.  Rather, only contracting officers may issue contractual direction, and that direction cannot contradict the terms of the court order."   Pls.' Mot. to Enforce, Exs. M, N.[8]

Plaintiffs argue none of these actions comply with the Consent Preliminary Injunction.  According to Plaintiffs, the Navy's actions are deficient in three respects.  First, they claim the Navy's communications with its own personnel as well as CSC, Gryphon and Alion "distort" the terms of the preliminary injunction and convey a negative impression of plaintiffs.

---

[8] The Navy also sent this letter to one additional company, Alion Science and Technology Corporation.  In the letter to Alion, Lindsay Alexander explained that the Consent Preliminary Injunction only required communication to CSC and Gryphon, but "because Alion holds a [prime contract] substantially identical to those of CSC and Gryphon, we are informing you as well of this aspect of the court order."  *Id.* Ex. L.

Pls.' Mot. to Enforce at 8-14.  Second, they claim the Navy did

not appoint a "suitable" TPOC for the OPLOG work, first, by

appointing defendant Traugh, and then, upon plaintiffs'

objection, replacing him with defendant Greg Doerrer, who has

not been accused of any wrongdoing but who "was present at the

[July 13, 2011] meeting at which" Bosworth instructed Traugh to

terminate MDD's work for OPLOG in 2012.  *Id.* at 6.  Finally,

plaintiffs claim that the Navy has not restored "the status quo

ante" by awarding MDD subcontracting work with CSC, at OPLOG, or

with Gryphon, at NAVSEA/MSC.  According to plaintiffs, MDD was

"scheduled to receive $2.7 in OPLOG work in FY 2012" and "was in

the final stages of being awarded a $5.529 M contract with the

MSC under a subcontract with Gryphon." *Id.* at 5.  Plaintiffs

request the Court fine the Navy, award attorneys' fees, and

order the Navy to (1) prohibit the Navy from disseminating any

communications regarding this litigation without plaintiffs'

consent; (2) appoint a "suitable" TPOC, and (3) "restore the

status quo ante" with respect to OPLOG and MSC work.  Pls.'

Proposed Order Granting Motion to Enforce.

The Navy responds that it has not violated the terms of the

injunction.  The government notes that all of its communications

to Navy personnel and government contractors provided a copy of

the Stipulated Preliminary Injunction as an attachment, thereby

enabling every recipient to review the Order's terms.  Fed.

Defs.' Opp'n at 16-19.  It also asserts that the letters explaining the Injunction accurately conveyed the Navy's responsibilities under the Order. *Id.*  With respect to appointment of a TPOC for OPLOG work, the Navy points out the Injunction "only directed the Navy to appoint a TPIC for OPLOG work; it did not . . . grant Plaintiffs any voice in the appointment." *Id.* at 14.  Nevertheless, at plaintiffs' request it replaced Traugh with Doerrer "who is also an OPLOG employee but is not in a subordinate or supervisory position to Mr. Traugh." *Id.*

Finally, the government points out that restoration of "the status quo ante" does not require plaintiffs to be awarded additional work with CSC or a new subcontract with Gryphon Technologies.  The government claims that "plaintiffs nowhere assert, nor can they, that MDD had an actual contract terminated or a pending award withheld because of the alleged debarment." *Id.* at 6.  With respect to work to be performed for OPLOG under a subcontracting agreement with CSC, the government points out that "performance under the [CSC] contract does not commence until the contractor receives a delivery order . . . plaintiff MDD did not have a delivery order to perform Fiscal Year 2012 work under its . . . contract with CSC." *Id.* at 6, n.4.  "A company's placement in the budget" for FY 2012, which is all that MDD alleged had occurred with respect to its award of OPLOG

work, "does not guarantee work for that company." *Id.* at 7. Likewise, the government asserts that MDD had not been awarded a contract to perform MSC work under a subcontract with Gryphon; indeed, federal defendants argue that the government had not even agreed upon the scope of work to be done under any proposed subcontract. *Id.* at 7-9. The Navy therefore argues that:

> The status quo ante of each of the alleged debarments found the parties far from ready to enter into any sort of contractual arrangement. Rather, MDD was *eligible* for prime contracts and subcontracts, a very different status . . . . Restoring the status quo ante therefore meant restoring MDD's eligibility to compete, which is just what the Navy did.

*Id.* at 11.

### 1. Discussion

An order granting injunctive relief is enforceable by the district court's power of contempt. *See Gunn v. Univ. Comm. to End War in Viet Nam*, 399 U.S. 383, 389 (1970). A contempt finding is proper where "the putative contemnor has violated an order that is clear and unambiguous" and the violation of an order is "proved by clear and convincing evidence." *Armstrong v. Executive Office of the President, Office of Admin.*, 1 F.3d 1274, 1289 (D.C. Cir. 1993) (citation and internal quotation marks omitted). "In the context of civil contempt, the clear and convincing standard requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred."

*Breen v. Tucker*, 821 F. Supp. 2d 375, 383 (D.D.C. 2011)
(citations and internal quotation marks omitted).

In this case, neither party argues that the Stipulated
Consent Preliminary Injunction they reached is ambiguous; the
parties only dispute whether the Navy violated the Order.
*Armstrong*, 1 F.3d at 1289. The Court concludes the government
has not. The stipulated injunction requires the government
allow MDD <u>to compete for, and if awarded</u>, perform work for the
Navy. Stip. Prelim. Inj. ¶ 2. It also requires the government
to allow MDD to maintain and perform <u>its existing work</u> in the
same manner and under the same circumstances applicable to other
contractors. *Id.* ¶ 3. The Stipulated Injunction does not
purport to define the work MDD has been or would be awarded,
except to identify one contract on which the parties agreed MDD
had been awarded work in FY 2011 (the CSC contract) and one in
which it had been awarded work continuing in FY 2012 (MDD's
prime contract with MSC).

It may be that the plaintiffs will be able to establish
that they had been awarded, or all-but-awarded, additional work
for OPLOG or MSC, and that they would have received such work
but-for the *de facto* debarment. However, no requirement that
the Navy or the contractors give plaintiffs this work is plain
on the face of the Stipulated Preliminary Injunction. *See,
e.g.*, *United States v. Armour & Co.*, 402 U.S. 673, 681-2 (1971)

("the [stipulated injunction] must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.")[9]

Plaintiffs' arguments that the government violated the Consent Preliminary Injunction by its allegedly misleading communications with Navy personnel and government contractors, and by failing to appoint a "suitable" TPOC likewise fail. While plaintiffs may wish the government's communications had been worded differently, they describe the substance of the Stipulated Injunction and, indeed, plaintiff does not dispute that a true and correct copy of the Injunction was provided as an attachment. Likewise, while the Court agrees that the government's initial appointment of Traugh as TPOC was at best, imprudent, the government has since replaced him with Greg

---

[9] Plaintiffs rely on a phrase the parties added to the Injunction during off the record discussions -- "in effect restoring the status quo ante," -- to justify their position that the Navy is required to award MDD additional OPLOG and MSC work. Plaintiffs' argument is meritless. The sentence in which the phrase appears reads as follows: "Federal Defendants shall communicate to CSC and Gryphon Technologies, rescinding any guidance or instruction that work was to be removed from or not given to MDD, in effect restoring the status quo ante." Stip. Prelim. Inj. ¶ 2(c). Read in context, this requires the Navy to tell CSC and Gryphon that the Navy had withdrawn any objection to MDD, a requirement the Navy has fulfilled. It does *not* state that CSC or Gryphon had contracted, or would have contracted, with MDD for present or future work but for the Navy's instructions not to use MDD.

Doerrer, an OPLOG employee who has not been charged by plaintiffs with any wrongdoing.

Based on the foregoing, the Court concludes that plaintiffs have not met their burden to show, by clear and convincing evidence, that the Navy violated the Stipulated Preliminary Injunction.   Accordingly, the Motion to Enforce is **DENIED**.

### C. MDD's Former Employees' Motions to Dismiss

Three of MDD's four former employees named in this action have filed motions to dismiss.  *See* Motions to Dismiss by Michael Mazzocco, Volker Stammnitz, and William Muras.  The Amended Complaint alleges breach of fiduciary duty and civil conspiracy as to each of them.  Am. Compl. Counts III, IV, V, and VIII.  Additionally, the Amended Complaint asserts a common law defamation claim against Mazzocco.  *Id.* Count VII.  The Court will address each cause of action in turn.

### 1. Breach of Fiduciary Duty

Employees, particularly managers and officers, "owe an undivided and unselfish loyalty to the corporation" during the term of their employment, "such that there shall be no conflict between duty and self-interest." *Mercer Management Consulting v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996) (internal citations and quotation marks omitted); *see also Gov't Relations v. Howe*, Case No. 05-1081, 2007 U.S. Dist. LEXIS 4952, *33 (D.D.C. Jan. 24, 2007); *PM Servs. Co. v. Odoi Assoc., Inc.*, Case

No. 03-1810, 2006 U.S. Dist. LEXIS 655, *84 (D.D.C. Jan. 4, 2006). Although an agent may "make arrangements or plans to go into competition with his principal before terminating his agency," he may only do so "provided no unfair acts are committed or injury done [to] his principal." *Mercer*, 920 F. Supp. at 233 (citation omitted). Specifically, in preparing to compete, an employee may not engage in "misuse of confidential information, solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees." *Furash & Co. v. McClave*, 130 F. Supp. 2d 48, 54 (D.D.C. 2001) (citing *Mercer*, 920 F. Supp. at 233). "The ultimate determination of whether an employee has breached his fiduciary duties to his employer by preparing to engage in a competing enterprise must be grounded upon a thoroughgoing examination of the facts of the particular case." *Id.* (internal citations omitted).

As a general rule, an employee's fiduciary duty ends upon termination of the employment relationship. *Draim v. Virtual Geosatellite Holdings, Inc.*, 631 F. Supp. 2d 32, 40 (D.D.C. 2009). "An agent after termination of his employment, in the absence of an agreement to the contrary, may compete with his former principal." *United States Travel Agency, Inc. v. World-Wide Travel Service Corp.*, 235 A.2d 788, 789 (D.C. 1967).

41

Plaintiffs allege that Mazzocco, Stammnitz, and Muras breached their fiduciary duty of loyalty to MDD both during and for a year after their employment, during which they were allegedly subject to a non-compete agreement. Am. Compl. ¶¶ 34-36 and Exs. A-C, MDD Employee Handbook and Code of Business Conduct. All three employees were senior officers and key employees at MDD. Am. Compl. ¶¶ 33, 128-29, 146-47, 159-60. All three employees resigned from MDD in the spring of 2011; Mazzocco and Stammnitz formed independent companies to compete with plaintiffs either during or immediately following their employment with MDD. Am. Compl. ¶¶ 47-51, 62-65. Plaintiffs principally allege that Mazzocco violated his fiduciary duties as follows:

- "Confirmed" with Robinson, before leaving MDD in March 2011, that he would be able to continue performing the same work for OPLOG, and in the same position, after leaving MDD, thus soliciting MDD's customers and business opportunities. Am. Compl. ¶¶ 44-45, 139.

- Signed an agreement in February 2011 on behalf of his new company, Alytic, Inc., with a competitor of MDD to exchange proprietary information, thus competing with MDD while still employed there and misusing its confidential and proprietary information. Am. Compl. ¶¶ 49, 140.

- Solicited other employees to resign their positions with MDD and join him at OPLOG, thus leading to a "mass resignation" of plaintiffs' employees. Am. Compl. ¶ 139.

- Attended a meeting with Muras, Stammnitz, and Navy officials in Boston in May 2011, at which he worked to have plaintiffs removed from OPLOG's 2011 and 2012

budget in order to obtain plaintiffs' work for
himself, thus soliciting MDD's customers and business
opportunities during the term of his alleged non-
compete agreement.  Am. Compl. ¶¶ 68-88, 138-39.

Plaintiffs' allegations regarding Stammnitz and Muras are
very similar.  Plaintiffs primarily allege that both solicited
MDD's customers and business opportunities at OPLOG while they
were employed with MDD, as well as during the term of their non-
compete agreements, by (1) arranging to continue performing the
same work for OPLOG after leaving MDD, while still employed with
MDD; and (2) attending the Boston meeting, at which they worked
to exclude MDD from OPLOG's 2011 and 2012 budgets in order to
obtain plaintiffs' work for themselves, also while still
employed with MDD.  Am. Compl. ¶¶ 59-64, 66, 68-77, 152-55, 164-
67.

The defendants argue that these allegations are
insufficient.  They claim they had no binding non-compete
contract with MDD, therefore plaintiffs cannot state a claim for
any of their actions after they resigned from MDD.  *See* Muras
Mot. to Dismiss at 9, Stammnitz Mot. to Dismiss at 7-9, Mazzocco
Mot. to Dismiss at 6-8.  They also claim plaintiffs cannot show
proximate cause between the alleged breach and plaintiffs'
injuries, because the Navy, not MDD's former employees, made the
decisions to remove work from plaintiffs.  Muras Mot. to Dismiss

at 6-7, Stammnitz Mot. to Dismiss at 11-12, Mazzocco Mot. to
Dismiss at 8-9.[10]

---

[10] Stammnitz additionally argues that the claim against him
should be dismissed on abstention grounds because plaintiffs
filed a substantially identical counterclaim in Stammnitz'
pending Superior Court lawsuit against the MDD and Sebastian
Phillips.  The Court will not dismiss on this basis. Federal
district courts have a "virtually unflagging obligation... to
exercise the jurisdiction given them." *Colorado River Water
Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976).
In determining whether a case is appropriate for Colorado River
abstention, the Court's task "is to ascertain whether there
exist 'exceptional' circumstances, the 'clearest of
justifications,' that can suffice... to justify the surrender of
that jurisdiction," *Moses H. Cone Mem'l Hosp. v. Mercury Constr.
Corp.*, 460 U.S. 1, 25-26 (1983) (citations omitted); see also
*Handy v. Shaw*, *Bransford, Veilleux & Roth*, 325 F.3d 346, 348
(D.C. Cir. 2003) ("A district court's authority to dismiss a
case within its jurisdiction in favor of parallel local court
proceedings is limited.").  The Supreme Court has articulated
six factors that a district court must consider in deciding
whether the circumstances of a particular case are exceptional:
(1) whether one court has first assumed jurisdiction over
property; (2) the inconvenience of the federal forum; (3) the
desirability of avoiding piecemeal litigation; (4) the order in
which jurisdiction was obtained by the concurrent forums, (5)
the source of the law that will provide the rules of the
decision; and (6) the adequacy of the state court proceeding to
protect the rights of the parties, see *Moses H. Cone*, 460 U.S.
at 24-26. A district court's analysis of the above factors
should not be mechanical, but rather the district court should
carefully balance the factors that apply to the given case,
"with the balance heavily weighted in favor of the exercise of
jurisdiction." *Id.* at 16.  The Court finds that none of the
factors weighs strongly in favor of abstention. Because this
case does not involve jurisdiction over property, and because
both the federal and state forums are located in the District of
Columbia and are thus equally convenient, the first and second
factors are neutral. The third factor is the avoidance of
piecemeal litigation.  In analyzing the problem of piecemeal
litigation, courts must "look beyond the routine inefficiency
that is the inevitable result of parallel proceedings to
determine whether there is some exceptional basis for requiring
the case to proceed entirely in state court," such as severe

Plaintiffs have clearly stated a claim for breach of
fiduciary duty.  Even assuming *arguendo* that plaintiffs had no
enforceable non-compete agreement with the employees after the
termination of employment, the Amended Complaint contains
factual allegations that Mazzocco, Stammnitz, and Muras all
solicited MDD's customers and business opportunities while they
were still employed by MDD.  Plaintiffs have also alleged that
they suffered damages – namely, loss of OPLOG work in 2011 and
2012 – as a proximate cause of their former employees' actions.
To establish proximate cause, the plaintiffs must allege that

prejudice to one of the parties. *Johns v. Rozet*, 770 F. Supp.
11, 15 (D.D.C. 1991) (citations omitted).  The Court is not
persuaded that parallel litigation would severely prejudice
defendant in this case, particularly because the plaintiffs have
indicated a willingness to dismiss their counterclaims in the
Superior Court case and where the Superior Court Judge has
demonstrated sensitivity to the burdens of duplicative
discovery.  *See* Pls.' Opp'n to Stammnitz Mot. at 14-16;
Stammnitz' Suppl. Reply, Ex. B, Order of Superior Court Judge
Craig Iscoe.  The fourth factor, the order in which the courts
obtained jurisdiction, is neutral because neither case has
progressed beyond the early stages. The fifth factor, the source
of law, does not weigh in favor of abstention because state law
issues do not govern all claims in this lawsuit, and the state
law claims alleged do not appear to involve novel or complex
legal issues. See *Rozet*, 770 F. Supp. at 16. Finally, the sixth
factor, the adequacy of the Superior Court to protect the rights
of the parties, does not weigh in favor of abstention. Although
the issues between plaintiffs and Stammnitz turn on local law,
this action is the only one where all of MDD's former employees
have been joined, and accordingly this Court is in a better
position to comprehensively protect plaintiffs' interests, and
no worse a position to protect Stammnitz's interests. Having
balanced the relevant factors, with the balance heavily weighted
in favor of the exercise of jurisdiction, the Court has
determined that this case does not present "exceptional
circumstances" that would justify abstention.

"there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Convit v. Wilson*, 980 A.2d 1104, 1125 (D.C. 2009).  Here, plaintiffs contend that Mazzocco, Stammnitz, and Muras deprived plaintiff MDD of work by (1) soliciting OPLOG to take work away from MDD and take it for themselves after leaving MDD, and (2) working with OPLOG officials to change existing budgets, in order for Mazzocco, Stammnitz, and Muras to take the work that had previously been allotted to plaintiffs.  As a direct result, plaintiffs allege, they lost over $2.5 million in Fiscal Year 2012.  At this preliminary stage, plaintiffs have clearly met their burden to plead proximate cause.  Accordingly, the Motions to Dismiss Counts III, IV and V will be **DENIED.**

### 2. Civil Conspiracy

Civil conspiracy is not an underlying tort, but only a means for establishing vicarious liability for an underlying tort.  *Paul v. Howard Univ.*, 754 A.2d 297, 310 n.27 (D.C. 2000).  Plaintiffs allege that Mazzocco, Stammnitz, Muras and Miller conspired to breach their fiduciary duties to MDD "by the elimination of Plaintiff MDD from the OPLOG FY 2012 budget, and the solicitation of MDD's . . . client, OPLOG[.]"  Am. Compl. ¶ 188.  Mazzocco, Stammnitz, and Muras argue that plaintiffs have

failed to plead the existence of a civil conspiracy with
particularity.[11]   The Court disagrees.

To establish a *prima facie* case of civil conspiracy,
plaintiffs must show (1) an agreement between two or more
persons (2) to participate in an unlawful act, and (3) an injury
caused by an unlawful overt act performed by one of the parties
to the agreement in furtherance of the common scheme. *Paul*, 754
A.2d at 310 (citation omitted).   Plaintiffs must plead the
elements of conspiracy with particularity; "bald speculation or
a conclusory statement that individuals are co-conspirators is
insufficient to establish" a claim for conspiracy.   *3M Co. v.
Boulter*, 842 F. Supp. 2d 85, 112 (D.D.C. 2012) (internal
citations omitted).

Plaintiffs have met their burden to plead a conspiracy
between their former employees.   Plaintiffs allege the following

---

[11]   Additionally, Mazzocco and Stammnitz claim immunity under the
"intracorporate immunity" doctrine, in which an entity, its
officers and agents are presumed to act as a single enterprise
and may not be found to have conspired with one another. *Wesley
v. Howard Univ.*, 3 F. Supp. 2d 1, 3 (D.D.C. 1998). Assuming the
doctrine applies here, where the employees were allegedly
conspiring *against* the corporation, intracorporate immunity may
be overcome when the employees act outside the scope of their
employment. *Weaver v. Gross*, 605 F. Supp. 210, 214-15 (D.D.C.
1985).   Plaintiffs have alleged facts in their Amended Complaint
suggesting that Mazzocco, Stammnitz and Muras were acting
outside the scope of their employment and pursuing their
personal interests by conspiring to take clients and business
opportunities for themselves and away from MDD.   Accordingly,
defendants' motion to dismiss on the basis of intracorporate
immunity is denied.

facts in support of their claim that the employees agreed to leave MDD and to take MDD's business for themselves in their new ventures.  First, when plaintiff Phillips asked Mazzocco, the first employee to leave MDD, whether he was taking other employees with him, he responded "not initially."  Am. Compl. ¶ 45.  Second, in the following months, three additional employees left MDD to "join" Mazzocco.  *Id.* ¶ 55.  Third, the departing employees needed funding for their new ventures, so they obtained "help" from Defendants Robinson and Traugh to obtain the $700,000 "pull-back" from MDD's FY 2011 budget and all of the money from MDD's FY 2012 budget, with money from both fiscal years to be reallocated to MDD's former employees.  *Id.* ¶ 56-58; 68-77.  Fourth, the departing employees all met in Boston where they agreed, with Bosworth, Traugh, and Robinson, to eliminate MDD's funding for FY 2012 and prepare a new budget in which the former employees would receive the work instead.  *Id.* ¶ 68-77.  Taking these allegations and all reasonable inferences therefrom as true, plaintiffs have stated a plausible claim of civil conspiracy.

### 3. Defamation

Finally, Mazzocco moves to dismiss Count VII, in which plaintiffs seek damages for defamation.  Plaintiffs allege that Mazzocco spread rumors to OPLOG and MSC that plaintiffs had double and triple billed OPLOG for services rendered to OPLOG,

that these statements were false, and that the statements injured plaintiffs in their profession.  Am. Compl. ¶¶ 179-186.

In order to state a claim for defamation, a plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement concerning the plaintiff; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Jankovic v. Int'l Crisis Group*, 494 F.3d 1080, 1088 (D.C. Cir. 2007).  Mazzocco argues, unsuccessfully, that the defamation claim should be dismissed.

Mazzocco first claims plaintiffs did not plead sufficient factual allegations to support a defamation claim.  Mazzocco Mot. to Dismiss at 10-11.  Not so.  The Amended Complaint alleges that Mazzocco spread false rumors "amongst the OPLOG community, including OPLOG's management and Plaintiff MDD's customers on its prime contract with the Military Sealift Command, that Plaintiff MDD was double billing, and even triple billing, the government on OPLOG projects."  Am. Compl. ¶¶ 52-53.  The Amended Complaint further alleges that these false statements caused plaintiffs to lose their government contracting work.  The plaintiffs clearly allege defamatory

statements.  *See Jankovic*, 494 F.2d at 1091 ("a statement is
defamatory if it tends to injure the plaintiff in his trade,
profession or community standing.") (citation omitted).

Second, Mazzocco claims that even if he made these
statements, they are covered by the "common interest privilege."
Mazzocco Mot. to Dismiss at 11-12.  The common interest
privilege protects otherwise defamatory statements made "(1) in
good faith, (2) on a subject in which the party communicating
has an interest, or . . . honestly believes he has a duty to a
person having a corresponding interest or duty, (3) to a person
who has such a corresponding interest."  *Mastro v. Potomac Elec.
Power Co.*, 447 F.3d 843, 858 (D.C. Cir. 2006).  However, the
privilege does not exist unless "the publisher believes, with
reasonable grounds, that his statement is true." *Altimont, Inc.
v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 290 (D.C. 1977)
(citation omitted).  In this case, plaintiffs have alleged that
Mazzocco did not believe these statements were true because he
"knew from his previous employment" with MDD that the statements
were "false," but made them "for the purpose of damaging his
prior employer'[s] reputation as an honest Government contractor
for reasons of personal malice and unlawful competitive
advantage."  Am. Compl. ¶ 54.  Accordingly, Mazzocco's assertion
of the common interest privilege fails at the motion to dismiss
stage.  For the same reasons, the Court rejects Mazzocco's

claims that the statements were true and therefore not defamatory, and/or that he was not "at least negligent" in publishing the statements.  Mazzocco Mot. to Dismiss at 12-14.

Accordingly, the Court will **DENY** Mazzocco's motion to dismiss Count VII of the Amended Complaint.

## IV.  CONCLUSION

For the foregoing reasons, the Court will deny the Federal Defendants' Motion to Dismiss or in the Alternative for Summary Judgment, the Plaintiffs' Motion to Enforce the Stipulated Preliminary Injunction, Michael Mazzocco's Motion to Dismiss, Volker Stammnitz's Motion to Dismiss, and William Muras's Motion to Dismiss.  An appropriate Order will accompany this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**
**           United States District Judge**
**           September 30, 2012**