**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

SEBASTIAN PHILLIPS, *et al.*,

              Plaintiffs,

v.

RICHARD V. SPENCER,[1]
Secretary of the Navy, *et al.*,

              Defendants.

No. 11-cv-02021 (EGS)

## MEMORANDUM OPINION

Plaintiff Sebastian Phillips ("Mr. Phillips"), a Naval
Architect, and his architecture and engineering firm, Plaintiff
Marine Design Dynamics, Inc. ("MDD"), allege that they have been
effectively debarred from future government contracts with the
United States Department of the Navy since 2011. Plaintiffs sued
the Secretary of the Navy, the Chief and Deputy Chief of Naval
Operations, and four officials of the Naval Sea Systems Command
("NAVSEA") and Operational Logistics Integration Program
("OPLOG") (collectively, the "Federal Defendants"). Plaintiffs
contend that the Federal Defendants violated the Fifth Amendment
to the United States Constitution by blacklisting MDD from
government contracting without due process. The Federal
Defendants deny these allegations, listing several contracts and

---

[1] Richard V. Spencer has been automatically substituted as the
lead defendant in this case. *See* Fed. R. Civ. P. 25(d).

government work awarded by the Navy to MDD as proof against any alleged *de facto* debarment. Plaintiffs do not dispute that MDD received more than $14 million in contracts, purchase orders, delivery orders, and funding modifications between 2011 and 2016. Rather, Plaintiffs argue that they were *de facto* debarred from competing for OPLOG work and Military Sealift Command ("MSC") work. Plaintiffs also assert common-law tort claims against four former MDD employees and two Navy officials.

Pending before the Court are the parties' motions: (1) the Federal Defendants' Renewed Motion to Dismiss, or in the alternative, for Summary Judgment as to Counts I, II, and IX; (2) Plaintiffs' Motion for Partial Summary Judgment as to Count I; (3) the parties' cross-motions for summary judgment as to Counts VI and VIII against Defendant Matthew Miller ("Mr. Miller"); and (4) Plaintiffs' Motion for Entry of Order for Summary Judgment. Upon careful consideration of the parties' submissions, the applicable law, and the entire record, the Court concludes that: (1) Plaintiffs have not met the high standard of proving *de facto* debarment, and Defendants Charles Traugh ("Mr. Traugh") and Michael Bosworth ("Mr. Bosworth") are entitled to qualified immunity; (2) Plaintiffs' tort claims against Defendant William Robinson ("Mr. Robinson") and Mr. Traugh fall under the Federal Tort Claims Act; (3) Plaintiffs have not met their burden of demonstrating that

Mr. Robinson and Mr. Traugh were acting outside the scope of their employment; thus, the United States will be substituted as the defendant as to the tort claims asserted against Mr. Traugh and Mr. Robinson pursuant to the Westfall Act; (4) the United States has not waived its sovereign immunity for the tort claims against Mr. Robinson and Mr. Traugh; (5) the undisputed facts demonstrate that Mr. Miller did not breach his fiduciary duty owed to MDD; and (6) Plaintiffs' civil conspiracy claim as to Defendant Miller fails as a matter of law. Accordingly, the Court **GRANTS** the Federal Defendants' Renewed Motion to Dismiss, or in the alternative, for Summary Judgment as to Counts I, II, and IX, and **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to Count I. The Court **DENIES AS MOOT** Plaintiffs' Motion for Entry of Order for Summary Judgment. Finally, the Court **GRANTS** Defendant Miller's Motion for Summary Judgment as to Counts VI and VIII, and **DENIES** Plaintiffs' Motion for Summary Judgment as to Counts VI and VIII.

## I. Background

The Court assumes the parties' familiarity with the factual background and the long history of this litigation, which are set forth in the Court's two prior opinions. *See Phillips v. Mabus*, 894 F. Supp. 2d 71 (D.D.C. 2012) ("*Phillips I*"); *see also Phillips v. Mabus*, 319 F.R.D. 36 (D.D.C. 2016) ("*Phillips II*"). The following facts—drawn from the parties' submissions—are

undisputed, except where indicated.

### A. MDD's Work for the Navy

In 2005, Mr. Phillips, a Naval Architect, formed MDD. Am. Compl., ECF No. 42 at 4 ¶ 6.[2] MDD is a Naval architecture and marine engineering firm based in the District of Columbia. *See, e.g.*, *Phillips I*, 894 F. Supp. 2d at 77. Mr. Phillips serves as MDD's president and chief executive officer. Fed. Defs.' Statement of Material Facts Not in Genuine Dispute ("SOMF"), ECF No. 88 at 3 ¶ 2. The firm specializes in ship energy conservation, and it primarily serves as a government contractor and subcontractor for the Navy and its components. *Phillips I*, 894 F. Supp. 2d at 77-78; *see also* Def. Miller's Opp'n, ECF No. 133 at 1-2 (noting that MDD's website lists contracts valued at more than $44 million).[3] Relevant here is MDD's government contracting work under a subcontract with Computer Sciences Corporation ("CSC") and a contract with the MSC.

### 1. MDD and CSC Subcontract

Between 2006 and 2011, MDD was one of the subcontractors for CSC, *see* Am. Compl., ECF No. 42 at 6 ¶ 23, and CSC was one

---

[2] When citing electronic filings throughout this Opinion, the Court cites to the ECF page number, not the page number of the filed document.

[3] The Court takes judicial notice of the representations made on MDD's website at www.marinedd.com. *See Mundo Verde Pub. Charter Sch. v. Sokolov*, 315 F. Supp. 3d 374, 381 n.3 (D.D.C. 2018) ("The court may take judicial notice of representations made on Plaintiff's website.").

of the contractors supporting the Navy's OPLOG. Fed. Defs.'
SOMF, ECF No. 88 at 4 ¶ 10. The Navy, through its SeaPort-e
program, awarded CSC a contract to provide support services to
NAVSEA.[4] Decl. of Robert C. Beaubien ("Beaubien Decl."), ECF No.
88-1 at 2-3 ¶¶ 2-3. Under that contract, CSC and MDD entered
into "a firm-fixed price, indefinite-delivery, indefinite
quantity [sub]contract under which MDD provided services only
when it received a task order from CSC to do so." *Id.* at 3 ¶ 4.
In turn, MDD subcontracted AirClean Technologies, Inc.
("AirClean"), a company based in Seattle, Washington, to assist
MDD with its work under the CSC-MDD subcontract. Decl. of
Sebastian Phillips ("Phillips Decl."), ECF No. 94-1 at 3 ¶¶ 13-
15. The period of performance for the CSC-MDD subcontract
commenced on June 18, 2009 and ended on April 4, 2014. Fed.
Defs.' Ex. B, ECF No. 88-2 at 12.

As CSC's senior program manager, Robert C. Beaubien
("Mr. Beaubien") was CSC's contract monitor for MDD, and his
duties consisted of, *inter alia*, managing its subcontractors'
performance and payments under CSC's contract with NAVSEA. Fed.
Defs.' SOMF, ECF No. 88 at 4 ¶ 11. The CSC-MDD subcontract

---

[4] NAVSEA is "the largest of the Navy's five system commands. With
a fiscal year budget of nearly $30 billion, NAVSEA accounts for
nearly one quarter of the Navy's entire budget." *About NAVASEA*,
Naval Sea Systems Command, U.S. Navy,
https://www.navsea.navy.mil/Who-We-Are/ (last visited May 28,
2019).

provided that "CSC [was] under no obligation to issue any Task Orders" to MDD. Fed. Defs.' Ex. B, ECF No. 88-2 at 6. It also stated that "[t]he value for services to be provided by [MDD] will be specified in each Task Order" and that "in no way obligates CSC to award Task Orders under this Agreement . . . ." *Id.* at 5.

Based on NAVSEA's instructions, CSC distributed the OPLOG work to subcontractors like MDD. *See* Beaubien Decl., ECF No. 88-1 at 3 ¶ 5. Mr. Beaubien oversaw MDD's services to OPLOG. Fed. Defs.' SOMF, ECF No. 88 at 4 ¶ 11. OPLOG's program manager, Mr. Traugh, contacted Mr. Beaubien regarding the OPLOG work, and Mr. Traugh provided "informal" guidance on how CSC should distribute the OPLOG work. Beaubien Decl., ECF No. 88-1 at 3 ¶ 5. In 2011, Mr. Traugh "directed all OPLOG projects, including those which Plaintiffs were subcontractors to, and coordinated directly with the Navy." Pls.' SOMF, ECF No. 107 at 5 ¶ 13. Mr. Traugh and NAVSEA's chief technology officer, Mr. Bosworth, had the authority to manage the programs concerning OPLOG's relationship with Plaintiffs. *See, e.g.*, *id.* at 5 ¶ 12; Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 40 n.25 (citing *Phillips I*, 894 F. Supp. 2d at 86 n.5).

On behalf of MDD, Mr. Phillips submitted a monthly package of status reports and invoices to Mr. Beaubien, and Mr. Beaubien sent MDD's package to OPLOG's program manager, Mr. Traugh, for

his approval. Fed. Defs.' SOMF, ECF No. 88 at 9 ¶ 33. Mr. Traugh
and OPLOG's assistant program manager, Mr. Robinson, managed
OPLOG's funding, planned the expenditures of those funds for
various tasks, and assigned certain tasks to MDD. *Id.* at 9 ¶¶
31-32. MDD's three employees—Defendants Michael Mazzocco
("Mr. Mazzocco"), Volker Stammnitz ("Mr. Stammnitz"), and
William Muras ("Mr. Muras")—performed the OPLOG work, and they
discussed task assignments with Mr. Traugh and Mr. Robinson. *See*
Fed. Defs.' SOMF, ECF No. 88 at 9 ¶ 34.

Prior to fiscal year 2012, after receiving an e-mail from
Mr. Phillips in April 2011 about the status of a "new task"
order for OPLOG work, Mr. Beaubien responded that the task was
under "[c]ompliance [r]eview." *Id.* at 5 ¶ 14. Mr. Beaubien also
stated that Mr. Traugh "wants me to reduce [MDD's] allocation by
$700[,000]" in order "to fund these other new start-ups." E-mail
from Mr. Beaubien, CSC, to Mr. Phillips (Apr. 13, 2011), Pls.'
Ex. G, ECF No. 42-1 at 58. In May 2011, CSC issued MDD a task
order modification for OPLOG work in the amount of $1,707,522,
noting that it reflected a "$700,000 deobligation underway."
Fed. Defs.' SOMF, ECF No. 88 at 5-6 ¶ 17. In June 2011, CSC
issued MDD another task order modification for OPLOG work in the
amount of $1,192,522, which established the final funding for
fiscal year 2011. *Id.* at 6 ¶ 18. CSC disbursed the remainder of
the $700,000 reallocation to its own employees and other

subcontractors, such as Gryphon Technologies and D&K Engineering. Beaubien Decl., ECF No. 88-1 at 5 ¶ 7.

From March 2011 to June 2011, MDD's three senior-level employees who worked on OPLOG projects under the CSC-MDD subcontract resigned from the firm. *E.g.*, Pls.' SOMF, ECF No. 107 at 6 ¶¶ 15-16, 7 ¶ 22; Pls.' SOMF, ECF No. 113 at 5 ¶¶ 5, 7; Am. Compl., ECF No. 42 at 5-6 ¶¶ 15-16, 6 ¶ 17. In March 2011, Mr. Mazzocco, MDD's Vice President of Operations, departed the firm to work as an independent subcontractor, *see* Pls.' SOMF, ECF No. 107 at 6 ¶ 16, and he eventually started his own company, Alytic, Inc., that performed OPLOG work, Beaubien Decl., ECF No. 88-1 at 5 ¶ 7. Mr. Stammnitz left his position as MDD's Vice President of Systems Engineering in June 2011, and Mr. Muras left his position as MDD's Director of Energy Programs, Financial Analysis and Planning in that same month. *See* Am. Compl., ECF No. 42 at 5-6 ¶¶ 16-17. In August 2011, CSC hired Mr. Stammnitz and Mr. Muras to perform OPLOG work. Beaubien Decl., ECF No. 88-1 at 5 ¶ 8.

Before their departures and at some point in May 2011, "the Navy arranged for a multi-day meeting in Boston[,]" Massachusetts "to discuss the OPLOG energy conservation program . . . ." Def. Muras' Answer, ECF No. 80 at 9 ¶ 68. MDD's two employees—Mr. Stammnitz and Mr. Muras—and MDD's former employee—

Mr. Mazzocco—attended the meeting with the Navy officials.[5] An e-mail states that Mr. Bosworth of NAVSEA directed OPLOG's program manager, Mr. Traugh, to end the contract with MDD. Mem. from Steven R. Southard, NAVSEA (July 19, 2011), Pls.' Ex. D, ECF No. 42-1 at 48 ("Southard Memorandum"). That directive was memorialized in a memorandum:

> On 13 July 2011, during a review of the Operational Logistics Program, in the presence of Mr. Greg Doerrer, Mr. William Robinson, and me, Mr. Michael Bosworth directed Mr. Charles Traugh to terminate the contract of [MDD] and not to resume it in Fiscal Year 2012. This action is due to reasons discussed at the meeting.

*Id.* Soon thereafter, litigation ensued.

After the filing of this lawsuit, Plaintiffs and the Federal Defendants agreed and stipulated to a consent preliminary injunction, requiring, among other things, "the Navy to allow MDD to compete for new work and to continue performing contracts it was currently performing under the same standards applicable to other contractors." *Phillips I*, 894 F. Supp. 2d at

---

[5] Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras admit that the meeting in Boston took place in May 2011. *E.g.*, Def. Muras' Answer, ECF No. 80 at 6 ¶ 40 ("Muras admits that he and others attended a meeting held in Boston on May 2011 convened by the Navy to discuss a variety of issues" and that Mr. Phillips did not attend the meeting.); Def. Mazzocco's Answer, ECF No. 81 at 5 ¶ 40 ("[I]t is admitted that a meeting took place in May of 2011 in Boston attended by the defendants Mazzocco, Stammnitz, and several OPLOG employees."); Def. Stammnitz's Answer, ECF No. 82 at 2 (admitting that "[Mr. Stammnitz] attended a meeting of OPLOG in Boston in May 2011 . . . .").

78. As a result, the Navy appointed an OPLOG employee as a technical point of contact between CSC and OPLOG so that MDD could receive OPLOG work under the CSC-MDD subcontract. *Id.* at 78, 90-92. In December 2011, counsel for the Navy issued a memorandum, stating that "the Court's [O]rder require[s] all personnel of this Command to . . . neither encourag[e] nor interfer[e] with: (1) the efforts of MDD to obtain work from prime contractors; or (2) prime contractors' decisions whether or not to subcontract with MDD." Mem. from Sophie A. Krasik, Counsel, U.S. Dep't of the Navy (Dec. 16, 2011) (footnote omitted), Pls.' Ex. K, ECF No. 54-3 at 18; *see also* Fed. Defs.' SOMF, ECF No. 88 at 7 ¶ 24. At Plaintiffs' request, the Navy eventually appointed Mr. Doerrer, an OPLOG employee, as the technical point of contact for any OPLOG work because Plaintiffs had not charged him with any wrongdoing. *Phillips I*, 894 F. Supp. 2d at 90-92.

### 2. MSC Contract

In November 2009, MDD entered into a contract with the Navy as the prime contractor for MSC's energy conservation program.[6] Pls.' SOMF, ECF No. 107 at 5 ¶ 11. That contract provided for a

---

[6] MSC is "the leading provider of ocean transportation for the Navy and the Department of Defense, operating approximately 125 ships daily around the world." *Organization*, Military Sealift Command, U.S. Navy, https://www.msc.navy.mil/organization/ (last visited May 28, 2019).

one-year term with options to renew through November 2012. *Phillips I*, 894 F. Supp. 2d at 77; *see also* Fed. Defs.' Ex. G, ECF No. 88-7 at 3. In October 2011, MSC ultimately exercised the second and final option, extending the contract with MDD to November 1, 2012. Fed. Defs.' Ex. G, ECF No. 88-7 at 2-3; *see also* Fed. Defs.' SOMF, ECF No. 88 at 6 ¶¶ 21-22.

Prior to that renewal, an MSC employee who worked with MDD forwarded Mr. Phillips an e-mail from a NAVSEA employee. *See* E-mail from Thomas Martin, NAVSEA, to René Fry, MSC (Sept. 15, 2011), Pls.' Ex. R, ECF No. 42-1 at 79 ("Martin E-mail"). It states that "my boss [Mr.] Bosworth has dictated that no funding be sent to MDD in support of OPLOG in FY12. Apparently there was a problem with tracking the money. The work itself was fine." *Id.* In October 2011, the same MSC employee forwarded Mr. Phillips another e-mail from the same NAVSEA employee, which states that "I have been directed by my leadership to not be involved with any contract that includes MDD. Therefore, I cannot be the [technical point of contact]." E-mail from Thomas Martin, NAVSEA, to René Fry, MSC (Oct. 7, 2011), Pls.' Ex. S, ECF No. 42-1 at 80. Nonetheless, MSC issued a contract modification to MDD on October 31, 2011. Fed. Defs.' SOMF, ECF No. 88 at 6 ¶ 22.

Between 2012 and 2014, MDD avers that it submitted seven bids for competitive solicitations for contracts with the Navy

and MSC, and that MDD was awarded one of those contracts after it filed a post-award protest. Pls.' SOMF, ECF No. 107 at 10 ¶ 36. Following MDD's protest of MSC's refusal to issue a solicitation as a "single-award, small-business set-aside," *id.* at 9 ¶ 32, the Government Accountability Office ("GAO") and the Small Business Administration ("SBA") concluded that MSC did not adequately perform market research to determine if the solicitation should have been set aside for small businesses, *id.* at 9 ¶ 33. In May 2013, the MSC Ombudsman Report concluded that MSC did not give MDD a "fair opportunity to compete for this government contract award . . . ." *Id.* at 10 ¶ 35; *see also* Pls.' Ex. E, ECF No. 107-5 at 2-7.

Despite MDD's setbacks in government contracting with MSC, MSC awarded MDD an indefinite-delivery, indefinite quality contract with a maximum value of more than $2 million in September 2012. Fed. Defs.' Reply, ECF No. 104-1 at 6. In June 2013, MSC awarded MDD a task order under MDD's SeaPort-e contract with NAVSEA. *Id.*; *see also* Def. Miller's Opp'n, ECF No. 123 at 14. Additionally, MDD received a task order from MSC on May 23, 2014, and MSC awarded MDD another task order on the same day. Def. Miller's Opp'n, ECF No. 123 at 14-15.

### 3. MDD's Contracts from the Navy and Its Components

MDD has continued to receive work and funds from the Navy over the course of this litigation. Beginning in 2011, the Navy

and its components awarded MDD new contracts, contract options, modifications, task orders, and payments. *See, e.g.*, Fed. Defs.' SOMF, ECF No. 88 at 5, 7 ¶¶ 16, 23, 25-26; Fed. Defs.' Reply, ECF No. 104-1 at 5-6. MDD also received work from MSC and OPLOG's parent activity. *See* Fed. Defs.' Opp'n, ECF No. 124 at 5-10 (listing work awarded to MDD from November 2013 to July 2016). On August 21, 2014, MDD was awarded a NAVSEA contract in the amount of $14,483,912.86. Fed. Defs.' Notice to the Court, ECF No. 118 at 1; *see also* Def. Miller's Opp'n, ECF No. 123 at 14.[7] On that same day, MDD received work under a contract from the Naval Surface Warfare Center, Carderock Division—OPLOG's parent activity. Fed. Defs.' Opp'n, ECF No. 124 at 6-7.

---

[7] The Court takes judicial notice of the SeaPort Enhanced Task Order Award Report located on the Navy's website. *See, e.g.*, *SeaPort Enhanced Task Order Award Report*, U.S. Navy, https://buy.seaport.navy.mil/SeaPort/rpt_CR_ViewScheduledReports.asp?ReportName=SeaPortETOAward (last visited May 29, 2019) (listing contracts awarded to MDD and other awardees); Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033 (C.D. Cal. 2015) ("[T]he court can take judicial notice of [p]ublic records and government documents available from reliable sources on the Internet, such as websites run by governmental agencies." (internal quotation marks and citation omitted)). The Court **GRANTS** Mr. Miller leave to file his Supplemental Reply Memorandum in Support of his Motion for Summary Judgment, ECF No. 106, and his Supplemental Memorandum in Support of His Motion for Summary Judgment, ECF No. 117. *See Idas Res. N.V. v. Empresa Nacional De Diamantes De Angola E.P.*, No. CIV A 06-00570 ESH, 2006 WL 3060017, at *4 n.1 (D.D.C. Oct. 26, 2006) (granting party leave to file certain supplemental submissions).

**B. MDD and Defendant Matthew Miller**

In February 2010, MDD hired Mr. Miller, and he performed OPLOG and MSC work as a Marine Engineer until his resignation in July 2011. *See, e.g.*, Pls.' SOMF, ECF No. 113 at 5 ¶¶ 6-7; Decl. of Matthew Miller ("Miller Decl."), ECF No. 123-1 at 1 ¶¶ 1-2, 2 ¶ 6; Am. Compl., ECF No. 42 at 6 ¶ 18. Most of Mr. Miller's work at MDD consisted of providing engineering and program management services to MSC's Energy Conservation Program. Def. Miller's SOMF, ECF No. 87 at 15 ¶ 5. Mr. Miller devoted a small percentage of his time to the CSC subcontract, providing services to OPLOG. *Id.* at 15 ¶ 6. His work included creating MDD's Statement of Work ("SOW") for OPLOG work. *See* Miller Decl., ECF No. 123-2 at 3 ¶ 17; *see also* Pls.' SOMF, ECF No. 113 at 7-8 ¶¶ 22-23.

Mr. Miller was an "at-will" employee who never signed MDD's employee handbook (the "MDD Employee Handbook").[8] *See* Def. Miller's Mot. for Summ. J., ECF No. 87 at 8; *see also* Miller Decl., ECF No. 98 at 4 ¶ 3. Mr. Miller admits that he signed the "Terms and Conditions of Employment," which contains a confidentiality provision. Def. Miller's Reply, ECF No. 99 at 6;

---

[8] Mr. Miller did not sign the two versions of the MDD Employee Handbook. *See* Pls.' Ex. A, ECF No. 42-1 at 2-18; *see also* Pls.' Ex. B, ECF No. 42-1 at 19-42. The first version was revised in February 2009, Pls.' Ex. A, ECF No. 42-1 at 5, and the second version was revised in September 2010, Pls.' Ex. B, ECF No. 42-1 at 20.

*see also* Pls.' Ex. 1, ECF No. 113-1 at 2 ("[W]hile serving as a MDD employee, we request that you not assist any person or organization in competing with MDD, in preparing to compete against MDD or in hiring any employees away from MDD.").

During his employment with MDD, Mr. Miller and Mr. Mazzocco, at some point in 2010, created two versions of a PowerPoint presentation for the formation of a new company. *E.g.*, Miller Decl., ECF No. 123-2 at 2 ¶ 6; Pls.' SOMF, ECF No. 113 at 6 ¶¶ 12-13. The new company aimed to provide energy conservation products to prospective partners in the industry. Pls.' Ex. H, ECF No. 94-8 at 21; *see also* Pls.' Ex. G, ECF No. 94-7 at 15. The first version was a business proposal for "East Coast Energy Engineering," and the revised version was a business proposal for "East Coast Energy Management, Inc." *Compare* Pls.' Ex. H, ECF No. 94-8 at 1, *with* Pls.' Ex. G, ECF No. 94-7 at 1. Both versions listed the "Government" and "Commercial" as bullet points for the new company's "Long Term (1 Year)" goals. *Compare* Pls.' Ex. H, ECF No. 94-8 at 6, *with* Pls.' Ex. G, ECF No. 94-7 at 6.

Touting the education and work experience of Mr. Miller and Mr. Mazzocco, the revised version of the business proposal (the "Proposed Business Plan") states that the new company will be "founded by two graduates from United States Military and Merchant Marine Academies. [Mr. Miller and Mr. Mazzocco] have

15

over 20 years of engineering experience and have been applying [their] skills to reducing the US Navy's fuel consumption." Pls.' Ex. H, ECF No. 94-8 at 21. The Proposed Business Plan estimates that forty hours per week would be devoted to MDD, and a total of fifty-six hours per week would be spent on the new company. *Id.* at 11. The new company never operated as a business enterprise or generated any revenue. Suppl. Decl. of Matthew Miller ("Miller Suppl. Decl."), ECF No. 100-1 at 1 ¶¶ 2-3.

At MDD, Mr. Miller worked with Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras. While Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras attended the meeting in Boston in May 2011 with the Navy officials, Mr. Miller did not attend that meeting because he was working on an assignment for MDD. Miller Decl., ECF No. 123-2 at 2 ¶ 11. After resigning from MDD in July 2011, Mr. Miller worked for AirClean for four months, and AirClean solicited CSC to work as a subcontractor for Merrill-Dean Consulting, Inc. ("Merrill-Dean"), based on Merrill-Dean's pre-existing contract with CSC. *See* Miller Decl., ECF No. 98 at 6 ¶¶ 16-18; *see also* Pls.' SOMF, ECF No. 113 at 7 ¶ 21. At some point, Mr. Miller drafted a SOW for AirClean to provide services to CSC, relying on a version of MDD's SOW for OPLOG work from the bidding process. *See, e.g.*, Pls.' SOMF, ECF No. 113 at 7 ¶¶ 22-23; Miller Decl., ECF No. 123-2 at 3 ¶ 17. As an AirClean employee, Mr. Miller did not perform any work for MSC, Def. Miller's SOMF, ECF No. 87 at 16 ¶

19, and he left AirClean in December 2011, *id.* at 16 ¶ 21.

In January 2012, CSC hired Mr. Miller, and he worked there before joining MSC. Beaubien Decl., ECF No. 88-1 at 5 ¶ 8. Mr. Miller worked as a Mechanical Engineer at CSC from January 2012 until March 2012. Pls.' SOMF, ECF No. 113 at 8 ¶ 27. On March 12, 2012, he accepted a position at MSC as a Mechanical Engineer. Miller Decl., ECF No. 123-2 at 3 ¶ 20; *see also* Def. Miller's SOMF, ECF No. 87 at 17 ¶ 25.

### C. Procedural History

On November 16, 2011, Plaintiffs filed the present action against seven Navy officials and four former MDD employees. *See generally* Compl., ECF No. 1. Following a hearing on Plaintiffs' emergency motions for a temporary restraining order and preliminary injunction, the Court granted the parties' Stipulated Preliminary Injunction on December 7, 2011. *Phillips I*, 894 F. Supp. 2d at 76; Order, ECF No. 30 (Dec. 7, 2011). Under the terms of the Stipulated Preliminary Injunction, the Federal Defendants were enjoined from taking any actions to implement, enforce, or spread to any federal agency the *de facto* debarment of Plaintiffs from government contracting. *Phillips I*, 894 F. Supp. 2d at 88-89.

On January 3, 2012, Plaintiffs filed the Amended Complaint, asserting nine claims against the eleven defendants. *See* Am. Compl., ECF No. 42 at 29-49 ¶¶ 99-199. Count I asserts that the

Federal Defendants violated Plaintiffs' constitutional right to due process under the Fifth Amendment by blacklisting them from government contracting without procedural safeguards, and it seeks declaratory and injunctive relief. *Id.* at 29-34 ¶¶ 99-121. Count II asserts the same claims against Mr. Traugh and Mr. Bosworth in their individual capacities and it seeks damages of $2.5 million. *Id.* at 34-35 ¶¶ 122-26. Counts III-VIII assert breach of fiduciary duty and civil conspiracy claims against Mr. Mazzocco, Mr. Stammnitz, Mr. Muras, and Mr. Miller, and a common-law defamation claim against Mr. Mazzocco. *Id.* at 35-46 ¶¶ 127-92. Count IX alleges common-law interference with contractual relations by Mr. Traugh and Mr. Robinson in their official and individual capacities. *Id.* at 47-49 ¶¶ 193-200.

On September 30, 2012, the Court denied the following motions: (1) the Federal Defendants' motion to dismiss, or in the alternative for summary judgment, (2) Plaintiffs' motion to enforce the Stipulated Preliminary Injunction, and (3) the motions to dismiss filed by Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras. *Phillips I*, 894 F. Supp. 2d at 76. After the parties engaged in settlement discussions and limited discovery on the issues relevant to Counts II and IX, the parties did not reach a resolution. *Phillips II*, 319 F.R.D. at 37.

Thereafter, the parties engaged in full rounds of briefing on the pending motions: (1) Plaintiffs' motion for partial

summary judgment as to Count I, *see generally* Pls.' Mot. for Partial Summ. J., ECF No. 107; (2) the Federal Defendants' renewed motion to dismiss, or in the alternative, for summary judgment as to Counts I, II, and IX, *see generally* Fed. Defs.' Renewed Mot. to Dismiss or, in the Alt. for Summ. J. ("Fed. Defs.' Mot. to Dismiss"), ECF No. 88; and (3) Plaintiffs' Motion for Entry of Order for Summary Judgment, *see generally* Pls.' Mot. for Entry of Order for Summ. J., ECF No. 132. Mr. Miller and Plaintiffs filed cross-motions for summary judgment as to Counts VI and VII. *See* Def. Miller's Mot. for Summ. J., ECF No. 87; *see also* Pls.' Mot. for Summ. J., ECF No. 113.[9] These motions are ripe and ready for the Court's adjudication.

## II. Legal Standard

### A. Motion to Dismiss under Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) "presents a threshold challenge to the Court's jurisdiction," and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder*, 626 F. Supp. 2d 30, 32 (D.D.C. 2009) (citation and internal quotation marks omitted). "It is to

---

[9] On November 4, 2016, this Court denied the Federal Defendants' motion to strike Plaintiffs' motion for partial summary judgment, and Mr. Miller's motions to strike Plaintiffs' summary judgment motion as to the claims against him. *Phillips II*, 319 F.R.D. at 40. The Court afforded the parties with the opportunity to fully brief the motions for summary judgment. *Id.*

be presumed that a cause lies outside [a federal court's] limited jurisdiction," *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), unless the plaintiff can establish by a preponderance of the evidence that the Court possesses jurisdiction, *see, e.g.*, *United States ex rel. Digital Healthcare, Inc. v. Affiliated Comput.*, 778 F. Supp. 2d 37, 43 (D.D.C. 2011) (citation omitted). Thus, the "plaintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim." *Id.* (citation and internal quotation marks omitted)).

A motion to dismiss for lack of jurisdiction may be presented as either a facial or factual challenge. *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 173 (D.D.C. 2016). "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (citation and internal quotations marks omitted). When a defendant makes a facial challenge, the Court must accept the allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the

Court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

### B. Motions for Summary Judgment under Rule 56

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted). "To defeat summary judgment, the non-moving party must 'designate specific facts showing that there is a genuine issue for trial.'" *James Madison Project v. CIA*, 344 F. Supp. 3d 380, 386 (D.D.C. 2018) (quoting *Celotex Corp.*, 477 U.S. at 324).

In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts

that are not genuinely disputed. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citation omitted); *see also James Madison Project*, 344 F. Supp. 3d at 386 ("A dispute is 'genuine' only if a reasonable fact-finder could find for the non-moving party; a fact is 'material' only if it is capable of affecting the outcome of the litigation." (citations omitted)). The Court "analyzes the underlying facts and inferences in each party's motion in the light most favorable to the non-moving party." *James Madison Project*, 344 F. Supp. 3d at 386 (citing *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 247 (1986)).

## III. Analysis

As stated by Plaintiffs, the "crux of this lawsuit" is whether Plaintiffs have been *de facto* debarred from competing for any OPLOG and MSC work. Pls.' Surreply, ECF No. 109 at 3; *see also* Pls.' Opp'n, ECF No. 101 at 21 ("MSC has implemented the *de facto* debarment and has refused to allow MDD to be awarded or perform *any* new contracts.") (emphasis added).[10] In moving for summary judgment as to Counts I and II,[11] the Federal

---

[10] The Court observes that the Amended Complaint alleges *de facto* debarment in two ways: (1) the "OPLOG Debarment;" and (2) the "NAVSEA Debarment." Am. Compl., ECF No. 42 at 30-34 ¶¶ 100-121; *see also* Pls.' Reply, ECF No. 130 at 1 ("Plaintiffs allege that the Navy's [OPLOG] and the [NAVSEA] *de facto* debarred Plaintiffs from government contracting . . . .").

[11] In its previous Opinion, the Court held that Plaintiffs sufficiently stated claims in the Amended Complaint as to Counts

Defendants argue that Plaintiffs cannot establish *de facto* debarment with respect to the OPLOG and MSC work, and that, without a showing of *de facto* debarment, there is no violation of their constitutional rights to due process under the Fifth Amendment. *See* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 16. For the reasons explained below, the Court agrees with the Federal Defendants.[12]

Next, the Federal Defendants move to dismiss Count IX—the

___

I and II to survive a motion to dismiss. *Phillips I*, 894 F. Supp. 2d at 82-88. The Court declined to treat the motion as one for summary judgment in the alternative as to those claims because the parties had not developed the factual record at that time. *Id.* at 88. The Court concludes that the parties have adequately developed the record, and that the parties' motions as to Count I and II present no genuinely disputed material facts that would preclude a grant of summary judgment.

[12] Pursuant to Federal Rule of Civil Procedure 12(b)(6), the Federal Defendants move to dismiss the claims against the Secretary of the Navy, the Chief of Naval Operations, the Deputy Chief of Naval Operations, and the Commander of NAVSEA "to the extent Plaintiffs are attempting to bring *Bivens* claims against these individuals for the actions of [Mr.] Bosworth and [Mr.] Traugh," Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 35-36, arguing that Plaintiffs have not pled any facts demonstrating that these high-level Navy officials were personally involved in the alleged *de facto* debarment, *id.* at 36. This Court in *Phillips I* observed that Plaintiffs do not bring *Bivens* claims against these four high-level Navy officials. 894 F. Supp. 2d at 80 n.3; *see also Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388, 397 (1971). Plaintiffs make clear that they "do not rely on that theory of respondeat superior as the basis of its claims against these Federal Defendants." Pls.' Opp'n, ECF No. 101 at 35. The Court therefore need not address the Federal Defendants' *Bivens* argument. *See Phillips I*, 894 F. Supp. 2d at 80 n.3; *see also Liff v. Office of Inspector Gen. for U.S. Dep't of Labor*, 881 F.3d 912, 919 (D.C. Cir. 2018) (concluding that "no *Bivens* remedy is available for [*de facto* debarment] claims" because "Congress has provided significant remedies for disputes

tort claims asserted against Mr. Traugh and Mr. Robinson—for lack of jurisdiction on four grounds: (1) those claims fall under the Westfall Act, 28 U.S.C. § 2679, *id.* at 36-37; (2) the evidence shows that both federal employees were acting within the scope of their employment during the alleged incidents, and the United States should be substituted as the sole defendant as the Federal Tort Claims Act ("FTCA") does not authorize suits against federal officials, *id.* at 37-42; (3) Plaintiffs have failed to exhaust their administrative remedies before bringing a lawsuit under the FTCA, *id.* at 42-44; and (4) the United States has not waived its sovereign immunity for the FTCA claims, *id.* at 44-47. For the reasons explained below, the Court agrees with the Federal Defendants.[13]

Finally, Mr. Miller moves for summary judgment with respect to Counts VI and VIII, arguing that he did not breach his fiduciary duty owed to MDD because he had a right to compete

---

between contractors and the government entities that engage them, as well as for persons aggrieved by the government's collection, maintenance, and dissemination of information").

[13] The Court does not address the issue of whether Plaintiffs are entitled to attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, *see* Pls.' Mot. for Partial Summ. J., ECF No. 107 at 39-43, because the Court denies Plaintiffs' cross-motion for summary judgment as to Count I and grants the Federal Defendants' motion as to Counts I and II. *See United States ex rel. Atlas Copco Compressors LLC v. RWT LLC*, No. CV 16-00215 ACK-KJM, 2017 WL 2177968, at *9 (D. Haw. May 17, 2017) (denying plaintiff's summary judgment motion and declining to address the issue of whether plaintiff was entitled to attorneys' fees).

with MDD after his resignation, and that Plaintiffs' failure to demonstrate that he breached his fiduciary duty means that Plaintiffs cannot establish his liability under a theory of civil conspiracy. *See generally* Def. Miller's Mot. for Summ. J., ECF No. 87. The Court agrees.

The Court examines each motion separately, first considering the alleged *de facto* debarment, next considering the tort claims asserted against Mr. Robinson and Mr. Traugh, and concluding with the torts claims asserted against Mr. Miller.

### A. The Federal Defendants Are Entitled to Summary Judgment as to Count I (*De Facto* Debarment); Mr. Bosworth and Mr. Traugh Are Entitled to Summary Judgment as to Count II (Violation of Clearly Established Rights)

In the first round of briefing, Plaintiffs argue that genuine issues of material fact exist as to Count I and II, *see* Pls.' Opp'n, ECF No. 101 at 5-6, because, *inter alia*: (1) Plaintiffs have continued to be effectively debarred from receiving OPLOG work, *see id.* at 9-10; and (2) the "OPLOG *de facto* debarment of MDD" has extended to NAVSEA and MSC, *see id.* at 11. The Federal Defendants respond that Plaintiffs acknowledge that they received new contracts, contract options, contract modifications, and contract funding from the Department of the Navy during the alleged debarment, *see* Fed. Defs.' Reply, ECF No. 104-1 at 2, but "[Plaintiffs] discount their significance." *Id.*

In the second round of briefing, Plaintiffs contend that they are entitled to summary judgment as a matter of law with respect to Count I because no genuine issue of material fact exists, Pls.' Mot. for Partial Summ. J., ECF No. 107 at 1, arguing that "they continue to be the subject of *de facto* debarment by [the] Federal Defendants[,]" *id.* at 2. Plaintiffs' argument in the first round of briefing that genuine issues of material fact exist as to Count I is therefore moot. In response, the Federal Defendants argue that Plaintiffs cannot demonstrate the existence of *de facto* debarment, pointing out that Plaintiffs ignore "twenty-nine contracts, delivery orders, purchase orders, and funding modifications that the [Department of the Navy] has awarded [MDD] since . . . September 2013 . . . ." Fed. Defs.' Opp'n, ECF No. 124 at 5. The Federal Defendants point to a NAVSEA contract awarded to MDD in the amount of $14,483,912.86 on August 21, 2014, *see* Fed. Defs.' Notice, ECF No. 118 at 1, arguing that said contract in addition to other contracts, options, and modifications serve as further evidence that there was no *de facto* debarment, *see id.* at 2.

### 1. Plaintiffs Have Failed to Meet the High Standard to Prove *De Facto* Debarment

*De facto* debarment occurs when a contractor or a subcontractor has, for all practical purposes, been suspended or blacklisted from working with a government agency without due

26

process, namely, adequate notice and a meaningful hearing.

*Phillips I*, 894 F. Supp. 2d at 81 (citations omitted). The
United States Court of Appeals for the District of Columbia
Circuit ("D.C. Circuit") has held:

> [W]hen the Government effectively bars a
> contractor from virtually *all* Government work
> due to charges that the contractor lacks
> honesty or integrity, due process requires
> that the contractor be given notice of those
> charges as soon as possible and some
> opportunity to respond to the charges before
> adverse action is taken.

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953,
955–56 (D.C. Cir. 1980) (emphasis added); *see also Reeve
Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C.
Cir. 1993) ("[T]he typical debarment [is a] ban on contracting
for 'virtually all government work' for a fixed period of time .
. . ." (citations omitted)).

The standard for proving *de facto* debarment is high. *E.g.*,
*Pub. Warehousing Co. K.S.C. v. Def. Supply Ctr. Phila.*, 489 F.
Supp. 2d 30, 45 n.13 (D.D.C. 2007); *Highview Eng'g, Inc. v. U.S.
Army Corps of Eng'rs*, 864 F. Supp. 2d 645, 649 (W.D. Ky. 2012)
("*Highview II*") ("Plaintiffs must meet a high standard when
seeking to prove a *de facto* debarment claim."). To prevail on
their motion for partial summary judgment as to Count I,
Plaintiffs must demonstrate that there is no genuine dispute of
a material fact as to: a "systematic effort by the procuring

agency to reject *all* of the bidder's contract bids." *TLT Constr. Corp. v. United States*, 50 Fed. Cl. 212, 215 (2001) (emphasis added) (citation omitted). The Court can find *de facto* debarment based on either: (1) "a statement that the agency will not award a contract to the disappointed bidder in the future"; or (2) "the conduct of the agency." *Leslie & Elliott Co. v. Garrett*, 732 F. Supp. 191, 195 (D.D.C. 1990); *see also TLT Constr. Corp.*, 50 Fed. Cl. at 215-16. "A Federal agency may debar a person . . . ." 2 C.F.R. § 180.800; *see also Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:08-CV-647-S, 2010 WL 2106664, at *5 (W.D. Ky. May 24, 2010) ("*Highview I*") ("[N]o individual person debars a contractor. Rather, the [U.S. Army] Corps [of Engineers] takes such actions as an entity.").[14]

As the Federal Defendants observe, *see* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 27 n.12, "[p]reclusion from a single contract is insufficient to establish *de facto* debarment."

---

[14] Congress has defined the term "Federal agency" as "the executive departments, the judicial and legislative branches, the *military departments*, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but [the term] does not include any contractor with the United States." 28 U.S.C. § 2671 (emphasis added). The Department of the Navy is one of the "military departments." 50 U.S.C. § 3004 (defining the term "Department of the Navy" and listing its operating forces); *see also GAF Corp. v. United States*, 818 F.2d 901, 906 n.15 (D.C. Cir. 1987) (noting that the Department of the Navy is a federal agency).

*Highview II*, 864 F. Supp. 2d at 653.[15] The Court must grant the
Federal Defendants' motion for summary judgment where Plaintiffs
"though perhaps injured in some respects, cannot demonstrate
*broad* preclusion from government contracting, as the law of this
[C]ircuit requires . . . ." *Trifax Corp. v. District of
Columbia*, 314 F.3d 641, 642 (D.C. Cir. 2003) ("*Trifax II*")
(emphasis added); *see also* Mem. Op., *Trifax Corp. v. District of
Columbia*, No. 98-cv-2824 (GK) (D.D.C. Nov. 2, 2001), ECF No. 166
at 19 ("*Trifax I*") (granting defendant's motion for summary
judgment and finding that "Plaintiff has suffered no broad
preclusion because it cannot demonstrate that its business has
been 'seriously affected' or 'destroyed'").

The undisputed facts do not demonstrate that Plaintiffs
have been *de facto* debarred on a systematic basis from
government contracting work in violation of the Due Process
Clause of the Fifth Amendment because Plaintiffs cannot

---

[15] Courts agree that a plaintiff cannot establish a systematic
effort of *de facto* debarment from a single incident. *See, e.g.*,
*Nat'l Career Coll., Inc. v. Spellings*, 371 F. App'x 794, 796
(9th Cir. 2010) ("This single incident is insufficient to prove
a de facto debarment."); *Redondo-Borges v. U.S. Dep't of Hous. &
Urban Dev.*, 421 F.3d 1, 9 (1st Cir. 2005) ("A single incident is
insufficient to establish a pattern or practice of exclusion
(and, thus, to establish even a de facto debarment)."). In *TLT
Constr. Corp.*, the court found that the disqualification of two
projects did not establish a systematic pattern of *de facto*
debarment where "the Army awarded [the plaintiff] two contracts,
"albeit smaller and of a different nature . . . ." 50 Fed. Cl.
at 216.

establish that the Navy has effectively debarred MDD from virtually *all* government work. It is uncontested that Plaintiffs have received millions of dollars in government contracting work from the Navy and its components since 2011, and that MDD has been awarded new contracts, contract options, contract modifications, and task orders through 2016. *See, e.g.*, Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 15; Pls.' Opp'n, ECF No. 101 at 11; Fed. Defs.' Reply, ECF No. 104-1 at 3-7; Fed. Defs.' Notice, ECF No. 118 at 1-2; Fed. Defs.' Opp'n, ECF No. 124 at 3, 5-10; Pls.' Reply, ECF No. 130 at 3; Def. Miller's Opp'n, ECF No. 123 at 14-15; Pls.' Reply, ECF No. 129 at 4. Plaintiffs do not deny their receipt of this work. *See* Pls.' Reply, ECF No. 130 at 3. There is also no dispute that a contract modification constitutes government work, and the parties agree that a modification of a contract is not a new contract. *See, e.g.*, Pls.' Opp'n, ECF No. 101 at 15; Fed. Defs.' Reply, ECF No. 104-1 at 11. Relying on *Art-Metal USA, Inc. v. Solomon*, 473 F. Supp. 1, 4-5 (D.D.C. 1978), Plaintiffs argue that "[r]eceipt of *any* government contract is not proof that Plaintiffs have not been victimized by a debarment." Pls.' Reply, ECF No. 130 at 3 (emphasis in original); *see also* Pls.' Surreply, ECF No. 109 at 5. Plaintiffs' reliance on *Art-Metal USA, Inc.*, however, is misplaced.

In *Art-Metal USA, Inc.*, the General Services Administration

("GSA") summarily cancelled the plaintiff-contractor's file cabinet contract in its entirety following a series of newspaper articles that described the plaintiff-contractor's alleged abuses in its contract dealings with GSA. 473 F. Supp. at 3. The plaintiff-contractor also claimed that GSA "suspended all further contracts[,]" "ceased doing business with [the plaintiff,]" and failed to issue "purchase orders on existing contracts . . . ." *Id.* at 5 n.7. In granting the plaintiff-contractor's motion for preliminary injunction, the court found that GSA debarred the plaintiff-contractor for an "indefinite period" because GSA terminated the contract and held in abeyance the awards of four additional contracts for which the plaintiff-contractor had submitted bids. *Id.* at 4.

Here, the undisputed facts demonstrate the opposite. The Navy and its components did not stop doing business with MDD. MDD competed for and received OPLOG and MSC work under additional contracts and contract options that the Navy and its components did not hold in abeyance. *See, e.g.*, Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 17; Fed. Defs.' Reply, ECF No. 104-1 at 5-7, 10; Fed. Defs.' Opp'n, ECF No. 124 at 5-10. Furthermore, the record does not support Plaintiffs' contention that "MDD has received *no* work orders or contracts from CSC for OPLOG or *any other agency contract*." Pls.' Opp'n, ECF No. 101 at 3-4 (emphasis added). While it is undisputed that CSC did not issue

task orders to MDD in fiscal year 2012, *see, e.g.*, Pls.' Mot. for Partial Summ. J., ECF No. 107 at 12; Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 22-26, the lack of work orders under the CSC subcontract alone is insufficient to prove *de facto* debarment. *See Trifax II*, 314 F.3d at 643-44. Indeed, the D.C. Circuit has made clear that facts showing that a contractor "won some and lost some" government contracting work is "more than sufficient to preclude a reasonable jury from finding [that the contractor was] broadly precluded from government contracting . . . ." *Id.* at 644-45 (citation omitted).

Trifax II* is instructive. In that case, the D.C. Circuit held that a plaintiff-contractor failed to show that it was effectively debarred from bidding on government contracts where the record demonstrated that the plaintiff-contractor "won some and lost some" in bidding and obtaining government contracts. *Id.* at 644 (citation omitted). There, "the District [of Columbia] declined to renew at least two contracts" with the plaintiff-contractor after the District's Office of Inspector General ("OIG") issued a report about the plaintiff-contractor's alleged misconduct. *Id.* at 645. One of the District's contracting agencies later awarded the plaintiff-contractor a new contract, but the plaintiff-contractor subsequently failed to win two other federal contracts through the bidding process. *Id.* For one of the bids, "the United States Comptroller General

formally prohibited the contracting agency from penalizing [the plaintiff-contractor] for the OIG report"; and a local agency wrote a favorable letter of recommendation about the plaintiff-contractor for another bid. *Id.* The D.C. Circuit concluded that a reasonable jury could not have found that the plaintiff-contractor was broadly precluded from government contracting. *Id.*

The situation here is indistinguishable: "[T]he undisputed facts show that Plaintiff[s] '***won some and lost some***' in retaining and bidding on government contracts" following the Southard Memorandum and the Martin E-mail. Mem. Op., *Trifax I*, ECF No. 166 at 14 (emphasis added). Furthermore, Plaintiffs have not presented evidence demonstrating that the Navy has "seriously affected" or "destroyed" their ability to obtain contracts in their field. *Trifax II*, 314 F.3d at 644. Notwithstanding the fact that MDD did not receive task orders under the CSC subcontract in fiscal year 2012, Plaintiffs do not dispute that the Navy awarded MDD other contracts. Those awards provide undisputed evidence demonstrating that Plaintiffs were not *de facto* debarred. *See Nat'l Career Coll., Inc.*, 371 F. App'x at 796 ("When a party is debarred, that party cannot seek to enter into *any* contract with *any* federal agency." (emphasis in original)).

Plaintiffs' argument that they were effectively debarred

from receiving MSC contracting work is unavailing. *See* Pls.'
Mot. for Partial Summ. J., ECF No. 107 at 28. Plaintiffs argue
that modifications of existing contracts do not constitute
opportunities for future government contracting work from OPLOG
and MSC. Pls.' Opp'n, ECF No. 101 at 15-16. Acknowledging that
MSC exercised its final option on MDD's contract, *id.* at 11,
Plaintiffs contend that "MSC simply removed the vast majority of
planned task orders," *id.* at 14, and "redirect[ed] work to the
other NAVSEA [indefinite delivery, indefinite quantity]
contracts[,]" *id.* at 15. Plaintiffs contend that they continued
to be "deprived of access to additional small business
opportunities" in 2012 and 2013, *id.* at 12, because MSC never
responded to MDD's inquiry about a certain "single-award, small-
business set aside," *id.* (citing Pls.' Exs. D, E, & F, ECF No.
101 at 136-43). And Plaintiffs point out that the GAO decision,
SBA findings, and MSC Ombudsman Report indicate that the Federal
Defendants *de facto* debarred them from government work. *See*
Pls.' Mot. for Partial Summ. J., ECF No. 107 at 30-32. However,
Plaintiffs are in the same position as the plaintiff-contractor
in *Trifax II*: they failed to win some contracts, but they also
won some. *See* 314 F.3d at 644; *see also Bannum, Inc. v. Samuels*,
221 F. Supp. 3d 74, 87 (D.D.C. 2016) ("Merely showing that the
plaintiff 'won some and lost some in retaining and bidding on
government contracts' is insufficient." (quoting *Trifax II*, 314

F.3d at 644)).

Plaintiffs' argument—that the alleged statements made by two individuals prove *de facto* debarment—is equally unavailing. *See* Pls.' Mot. for Partial Summ. J., ECF No. 107 at 26. Plaintiffs contend that *de facto* debarment exists based on the following two statements: (1) "Mr. Michael Bosworth directed Mr. Charles Traugh to terminate the [CSC] [sub]contract of [MDD] and not to resume it in Fiscal Year 2012[,]" Pls.' Mot. for Partial Summ. J., ECF No. 107 at 27; and (2) "Mike Bosworth has dictated that no funding be sent to MDD in support of OPLOG in FY12[,]" *id.* at 28. "[I]t is true that a statement that the agency will not award a contract to the disappointed bidder in the future will support a claim of *de facto* debarment . . . ." *Leslie & Elliott Co.*, 732 F. Supp. at 195. But it is also true that preclusion from a single contract is insufficient to establish *de facto* debarment even if a plaintiff can show a statement from an agency that the agency would not award the plaintiff a future contract. *Highview II*, 864 F. Supp. 2d at 653.

The parties agree that individuals cannot debar a contractor. *See, e.g.*, Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 29 (citing *Highview I*, 2010 WL 2106664, at *5); Pls.' Opp'n, ECF No. 101 at 28 (same). As such, the Federal Defendants argue that Mr. Bosworth and Mr. Traugh were two employees who "could

not be held to know that the decision to discontinue a subcontracting relationship on a single program would be tantamount to instituting a *de facto* debarment" because, *inter alia*, they were program managers and engineers "rather than warranted contracting officers." Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 33-34. Plaintiffs disagree. Pls.' Opp'n, ECF No. 101 at 33 (citing *Highview Eng'g, Inc. v. U.S. Army Corps of Eng'rs*, No. 3:08-CV-647-S, 2010 WL 2961182, at *2 (W.D. Ky. July 26, 2010) (denying a motion to dismiss because "the statements alleged in the complaint make out a plausible [*de facto* debarment] claim as to the first path to relief" because "[i]f proved, these statements could plausibly be interpreted to mean that the Corps would not award any future contracts to Hawkins or his businesses.")). Neither party disputes that "courts have previously held that statements alleged in a complaint to be *made by project managers* make out a plausible claim as to constitute a statement that the agency will no longer awarded a subcontractor future contracts." Pls.' Opp'n, ECF No. 101 at 33 (emphasis in original); *see also* Pls.' Mot. for Partial Summ. J., ECF No. 107 at 28-29. In fact, this Court found that Plaintiffs met their burden to allege *de facto* debarment to survive a motion to dismiss based, in part, on certain employees' statements. *Phillips I*, 894 F. Supp. 2d at 81-82. At the summary judgment stage, however, Plaintiffs must meet the

"high standard" to prove *de facto* debarment. *Highview II*, 864 F.
Supp. 2d at 649.

Both parties rely on *Highview II*. *See* Pls.' Mot. for
Partial Summ. J., ECF No. 107 at 29-30; *see also* Fed. Defs.'
Mot. to Dismiss, ECF No. 88 at 15, 30. *Highview II* is not
binding precedent, but the Court finds the reasoning in *Highview
II*—a decision granting summary judgment in favor of a federal
agency—persuasive. In that case, the plaintiff and his company
argued that they were effectively debarred from working with the
Army Corps of Engineers without due process. *Highview II*, 864 F.
Supp. 2d at 648. The plaintiff and his business partner
submitted a wetlands mitigation bank proposal to the federal
agency, and the agency's program manager met with the
plaintiff's business partner to express her concerns with
working with the plaintiff. *Id.* at 647. The business partner
interpreted the program manager's sentiments as if "she did not
want any wetlands mitigation bank proposals in which [the
plaintiff] played a role." *Id.* The business partner also
interpreted her "comments and mannerisms to indicate that [the
plaintiff] was being 'blacklisted' by the [agency]." *Id.* at 651.
The plaintiff relied on the program manager's alleged comments,
along with his business partner's notes and e-mail about the
meeting, to estblish *de facto* debarment. *Id.* at 649. The court
noted that the details of the meeting were "not entirely

clear[,]" but "[the business partner] was *not* told that 'the [agency] wanted no proposals in which [the plaintiff] played a role.'" *Id.* (emphasis in original).

The court granted the federal agency's motion for summary judgment and found that "[t]here was nothing stated or demonstrated by the Corps indicating that it would not grant [the plaintiff] future contracts, beyond the one contract then before it." *Id.* at 652. The court reasoned that the business partner admitted that the program manager's statement was not a quote, that it was his opinion that the agency was blacklisting the plaintiff, and that the program manager never told him that the Corps would not approve the proposal. *Id.* at 652-53. The court determined that the plaintiff could not establish *de facto* debarment through an agency statement that it would not award future contracts. *Id.* at 653. The court explained that even if the plaintiff could have proven that he was prevented from obtaining the contract with the Corps because he was removed from the project with his business partner, "such a finding would be insufficient to carry the day." *Id.* at 653. The court concluded that "[t]here [was] simply no evidence . . . of a systematic effort by the agency to reject all of the plaintiffs' contract bids." *Id.* (collecting cases).

As the present case closely resembles *Highview II*, the Court reaches the same outcome. Like the details from the

meeting between the business partner and the agency's program

manager in *Highview II*, the details from the meeting referenced

in the Southard Memorandum are not entirely clear. *Compare* Pls.'

Mot. for Partial Summ. J., ECF No. 107 at 15-16, *with* Beaubien

Decl., ECF No. 88-1 at 4 ¶ 5 ("At no time, however, did

Mr. Traugh or any other OPLOG, NAVSEA, or Department of the Navy

employee ask me to refuse to permit MDD to quote or perform

subtask under CSC's contract with NAVSEA or any other

contract."). Even if Plaintiffs could prove that Mr. Bosworth

directed the termination of the MDD's subcontract relationship

with CSC, the record does not support Plaintiffs' contention

that "the Southard Memorandum is a statement in writing

purporting that Federal Defendants would not use Plaintiffs for

*FY12 contracts* . . . ." Pls.' Mot. for Partial Summ. J., ECF No.

107 at 29 (emphasis added). The Southard Memorandum states that

the single subcontract would be terminated and "not to resume

[the subcontract] in Fiscal Year 2012." *Id.* at 16. As the court

indicated in *Highview II*, a program manager's statement does not

mean that the federal agency would no longer grant future

contracts to MDD. 864 F. Supp. 2d at 652-53. Even if Plaintiffs

could prove that they were precluded from the CSC subcontract in

fiscal year 2012 based on e-mail conversations, *see* Pls.' Mot.

for Partial Summ. J., ECF No. 107 at 30, Plaintiffs cannot

establish *de facto* debarment based on preclusion from the single

subcontract. *See Highview II*, 864 F. Supp. 2d at 653.

Finally, Plaintiffs cannot prove *de facto* debarment through the Navy's conduct. *See Leslie & Elliott Co.*, 732 F. Supp. at 195. The parties do not dispute that MDD has received millions of dollars in contracts and other government work. *See* Fed. Defs.' Opp'n, ECF No. 124 at 3, 5-11; *see also* Pls.' Reply, ECF No. 130 at 3. Rather, Plaintiffs argue that the "evidence of contracts awarded to Plaintiffs" is "irrelevant to a determination of whether Plaintiffs were subject of a *de facto* debarment as a result of the OPLOG or MSC Debarments." Pls.' Reply, ECF No. 130 at 3. Plaintiffs maintain that the MSC Ombudsman Report shows that MSC did not provide MDD with a fair opportunity for awards under proposed MSC contract solicitations. Pls.' Opp'n, ECF No. 101 at 23-27. Plaintiffs' arguments are unavailing.

MDD's other contracts and work from the Navy and its components are relevant because Plaintiffs must prove a systematic effort by the Navy to reject *all* of MDD's contract bids. *See, e.g.*, *Highview II*, 864 F. Supp. 2d at 649; *TLT Const. Corp.*, 50 Fed. Cl. at 215-16. Plaintiffs have failed to do so. Contrary to Plaintiffs' assertion, the Federal Defendants have not admitted that their "conduct has established the continuing *de facto* debarment of Plaintiffs" in violation of the Stipulated Preliminary Injunction. Pls.' Opp'n, ECF No. 101 at 27. Rather,

the record demonstrates that the Federal Defendants have
complied with the Stipulated Preliminary Injunction, requiring
the Federal Defendants to allow MDD "to compete for, and if
awarded, receive and perform contracts, subcontracts, task
orders, task instructions and orders under indefinite quantity
contracts, in the same manner and under the same standards
applicable to other contractors and subcontractors . . . ."
*Phillips I*, 894 F. Supp. 2d at 89. The Court therefore finds
that MDD's receipt of contracts from the Navy and its components
are relevant. Because Plaintiffs cannot establish that they were
*de facto* debarred on a systematic basis, the Court **DENIES**
Plaintiffs' motion for partial summary judgment as to Count I,
and **GRANTS** the Federal Defendant's motion for summary judgment
as to Count I.[16]

### 2. Mr. Traugh and Mr. Bosworth Are Entitled to Qualified Immunity

Having found that the Federal Defendants are entitled to
summary judgment as to Count I, the Court next turns to the
issue of whether Mr. Traugh and Mr. Bosworth are entitled to
qualified immunity as to Count II. Plaintiffs sue Mr. Traugh and

---

[16] Because the Court denies Plaintiffs' Motion for Partial
Summary Judgment as to Count I, the Court need not reach
Plaintiffs' requests for: (1) declaratory and injunctive relief;
(2) sanctions against the Federal Defendants for alleged
violations of the Stipulated Preliminary Injunction; and (3) an
award of attorneys' fees and costs under the Equal Access to
Justice Act.

Mr. Bosworth in their individual capacities for the alleged *de
facto* debarment. *Phillips I*, 894 F. Supp. 2d at 79, 87. The
parties do not dispute that Mr. Traugh, as OPLOG's program
manager, and Mr. Bosworth, as NAVSEA's Acting Chief Technology
Officer, were government employees acting in their discretionary
functions. Indeed, "[g]overnment officials performing
discretionary functions are protected by qualified immunity and
cannot be liable for damages unless they violate 'clearly
established statutory or constitutional rights of which a
reasonable person would have known.'" *Townsend v. United States*,
236 F. Supp. 3d 280, 323 (D.D.C. 2017) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Federal Defendants argue that Mr. Traugh and
Mr. Bosworth are entitled to qualified immunity because "a
reasonable Government employee could not be held to know that
the decision to discontinue a subcontracting relationship on a
single program would be tantamount to instituting a *de facto*
debarment . . . on an agency-wide basis." Fed. Defs.' Mot. to
Dismiss, ECF No. 88 at 34. Plaintiffs contend that Mr. Traugh
and Mr. Bosworth violated Plaintiffs' "clearly established
rights"; therefore, both government employees are not entitled
to qualified immunity. *See* Pls.' Opp'n, ECF No. 101 at 31-32.

Whether a government official may enjoy qualified immunity
is a close question to be resolved within this Court's sound

discretion. *Bame v. Dillard*, 637 F.3d 380, 384 (D.C. Cir. 2011).

"Qualified immunity depends upon the answers to two questions:

(1) Did the officer's conduct violate a constitutional or statutory right? If so, (2) was that right clearly established at the time of the violation?" *Jones v. Kirchner*, 835 F.3d 74, 84 (D.C. Cir. 2016); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("[C]ourts may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law, without resolving the often more difficult question whether the purported right exists at all.").

"For a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Daugherty v. Sheer*, 891 F.3d 386, 390 (D.C. Cir. 2018) (citations and internal quotation marks omitted), *cert. denied*, 139 S. Ct. 1294 (2019). "[T]he touchstone remains whether the 'contours of the right are clear to a reasonable officer.'" *Id.* (quoting *Reichle*, 566 U.S. at 665). "This standard does not 'require a case directly on point.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see also Bame*, 637 F.3d at 384 ("[W]e look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view—if there is one." (citation and internal quotation marks omitted)). "The proponent of [the] purported right has the 'burden to show that the particular right in question . . . was

clearly established' for qualified-immunity purposes."
*Daugherty*, 891 F.3d at 390 (quoting *Dukore v. District of*
*Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015)).

The Court is persuaded that Plaintiffs have a "clearly
established" constitutional right of freedom from *de facto*
debarment. The D.C. Circuit has recognized that *de facto*
debarment of a government contractor without due process and on
grounds of dishonesty, fraud or lack of integrity violates the
Fifth Amendment. *See, e.g.*, *Taylor v. Resolution Trust Corp.*, 56
F.3d 1497, 1506 (D.C. Cir. 1995) ("[G]overnment action
precluding a litigant from future employment opportunities will
infringe upon his constitutionally protected liberty interests
only when that preclusion is either sufficiently formal or
sufficiently broad."); *Old Dominion Dairy Prods., Inc.*, 631 F.2d
at 955. Accordingly, the question before the Court is whether
the government officials violated Plaintiffs' clearly
established right. *See Phillips I*, 894 F. Supp. 2d at 88 n.6.
The United States Supreme Court has instructed that "[e]ven if
the plaintiff's complaint adequately alleges the commission of
acts that violated clearly established law, the defendant is
entitled to summary judgment *if discovery fails to uncover*
*evidence sufficient to create a genuine issue as to whether the*
*defendant in fact committed those acts*." *Mitchell v. Forsyth*,
472 U.S. 511, 526 (1985) (emphasis added).

Here, discovery has not "uncover[ed] evidence sufficient to create a genuine issue as to whether" Mr. Traugh and Mr. Bosworth violated Plaintiffs' constitutional rights. *Id.* After this Court denied the Federal Defendants' motion to dismiss with regard to qualified immunity, the parties engaged in discovery on the issue of qualified immunity. *See Phillips II*, 319 F.R.D. at 39; *see also Phillips I*, 894 F. Supp. 2d at 88. Despite that discovery, Plaintiffs rely heavily on the allegations in the Amended Complaint to support their contention that Mr. Bosworth and Mr. Traugh are not entitled to qualified immunity. *See* Pls.' Opp'n, ECF No. 101 at 32-33. However, other than a self-serving declaration, *see* Phillips Decl., ECF No. 101 at, 48-52, and the two statements in the Southard Memorandum and the Martin E-mail, *see* Pls.' Mot. for Partial Summ. J., ECF No. 107 at 16-17, Plaintiffs have not uncovered evidence to support their allegation that Mr. Bosworth or Mr. Traugh ordered the Navy to blacklist MDD from *all* future government contracts.

The qualified immunity analysis ends with Plaintiffs' failure to demonstrate that Mr. Bosworth and Mr. Traugh's conduct violated Plaintiffs' rights. *See Gallup Org. v. Scully*, No. CIV.A. 03-849 CKK, 2005 WL 3213963, at *3 (D.D.C. Oct. 5, 2005) ("Because Plaintiffs' iterated facts do not demonstrate that Defendant's actions violated Plaintiffs' constitutional rights, the Court shall grant Defendant's Motion for Summary

Judgment without proceeding further with the qualified immunity analysis." (footnote omitted)). Because Plaintiffs did not demonstrate a constitutional violation, the Court need not assess whether Plaintiffs have presented evidence demonstrating that Mr. Bosworth and Mr. Traugh would have known that they violated Plaintiffs' clearly established rights. *See id.* at *3 n.5. The Court therefore finds that Mr. Bosworth and Mr. Traugh are entitled to qualified immunity because there is no genuine issue of material fact as to whether they, in fact, *de facto* debarred Plaintiffs. *See Mitchell*, 472 U.S. at 526. Accordingly, the Court **GRANTS** the Federal Defendants' motion for summary judgment as to Count II.

### B. Dismissal Is Warranted as to Count IX (Interference with Contractual Relations, Prospective Contractual Relations and Prospective Advantageous Economic Relationship) against Mr. Robinson and Mr. Traugh

The Court next considers the issue of whether Plaintiffs have met their burden of proving that Mr. Robinson and Mr. Traugh were acting outside of the scope of their employment to rebut the Federal Defendants' certification under the Westfall Act, 28 U.S.C. § 2679. *See* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 37. In its prior Opinion, the Court permitted limited discovery on the scope-of-employment issue, finding that Plaintiffs met their burden for such discovery. *Phillips I*, 894 F. Supp. 2d at 85. The Federal Defendants contend that the

evidence from discovery shows that Mr. Robinson and Mr. Traugh were acting within the scope of their employment because they were performing their duties as OPLOG's program manager and assistant program manager, respectively, when they engaged in the alleged misconduct. *See* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 37–42.

> 1. **The United States Will Be Substituted as the Defendant Pursuant to the Westfall Act Since Mr. Traugh and Mr. Robinson Acted Within the Scope of Their Employment**

"The Federal Employees Liability Reform and Tort Compensation Act of 1988, 28 U.S.C. § 2679, commonly referred to as the Westfall Act, 'accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties.'" *Bannum*, 221 F. Supp. 3d at 81 (quoting *Osborn v. Haley*, 549 U.S. 225, 229 (2007)). Where, as here, the Attorney General or the Attorney General's delegate certifies that "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose" then the immunity is triggered, and "any civil action or proceeding commenced upon such a claim in a United States district court shall be deemed an action against the United States . . . and the United States shall be substituted as the party defendant." 28 U.S.C.

§ 2679(d)(1); *see also Bannum*, 221 F. Supp. 3d at 81 (citing *Jacobs v. Vrobel*, 724 F.3d 217, 219–20 (D.C. Cir. 2013)).

As this Court explained in *Phillips I*:

> The Attorney General's certification constitutes *prima facie* evidence that the employee was acting within the scope of his employment, and once the certification has been made, the plaintiff challenging the certification has the burden of "alleging facts that, if true, would establish that the defendants were acting outside the scope of their employment."

894 F. Supp. 2d at 85 (quoting *Stokes v. Cross*, 327 F.3d 1210, 1215 (D.C. Cir. 2003)). Because Plaintiffs have challenged the certifications filed by United States Attorney's Office on behalf of Mr. Robinson and Mr. Traugh, the Court must resolve the scope-of-employment issue. *See Jacobs*, 724 F.3d at 221.

To determine whether Mr. Robinson and Mr. Traugh were acting within the scope of their employment, the Court will apply District of Columbia law, the location in which the alleged torts occurred. *Phillips I*, 894 F. Supp. 2d at 86 (citing *Stokes*, 327 F.3d at 1214).[17] "District of Columbia law,

---

[17] The parties rely on District of Columbia law in their submissions to the Court. *See, e.g.*, Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 37–42; Pls.' Opp'n, ECF No. 101 at 36; Def. Miller's Mot. for Summ. J., ECF No. 87 at 10; Pls.' Opp'n, ECF No. 94 at 11; Fed. Defs.' Mot. for Summ. J., ECF No. 88 at 41; Pls.' Mot. for Summ. J., ECF No. 113 at 23, 28. Accordingly, the Court will apply District of Columbia law to Plaintiffs' common-law claims. *See Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 13 F. Supp. 3d 62, 67 n.2 (D.D.C. 2014) (applying District of Columbia law because "[b]oth parties cite

which the parties agree applies in this case, defines the scope of employment in accordance with the Restatement (Second) of Agency (1958) ('Restatement')." *Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009). The first prong of Section 228(1) of the Restatement is pertinent here: "[c]onduct of a servant is within the scope of employment if, but only if . . . it is of the kind he is employed to perform . . . ." Restatement (Second) of Agency § 228(1)(a); *see also Phillips I*, 894 F. Supp. 2d at 86 ("The second, third and fourth elements are irrelevant here because [P]laintiffs do not contest that the alleged events occurred substantially within authorized time and space limits or were actuated, in some part, with the purpose to serve the master, nor do they allege the use of force.").

To qualify as conduct of the kind they were employed to perform, Mr. Robinson and Mr. Traugh's actions must have either been "of the same general nature as that authorized" or "incidental to the conduct authorized." Restatement (Second) of Agency § 229(1). Here, the Federal Defendants point to Mr. Traugh and Mr. Robinson's annual performance evaluations, job descriptions, and e-mail communications with MDD's employees

District of Columbia law and thus appear to agree that such law applies."); *see also Young v. District of Columbia*, 107 F. Supp. 3d 69, 82 n.8 (D.D.C. 2015) ("The Court applies the law of the forum state—in this instance, the District of Columbia—when adjudicating common law claims.").

to show that their conduct was the kind that they were employed to perform. Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 38-40. As OPLOG's program manager, Mr. Traugh was expected to "demonstrate[] [an] ability to identify, plan, *resource, staff, monitor and support technical programs* in the areas of technology assessment, development, selection and transition to Navy/Marine Corp craft, ships and ship systems." Fed. Defs.' Ex. L, ECF No. 88-12 at 2 (emphasis added). An assessment from Mr. Traugh's supervisor states, in part, that "he provided direction to all OPLOG projects and provided direct interface with the OPNAV N42 customer." *Id.* at 3. And Mr. Robinson's role involved "[leading] several efforts within the Operations Logistics (OPLOG) program and act[ing] as the Deputy Program Manager." Fed. Defs.' Ex. M, ECF No. 88-13 at 3. Mr. Robinson "led the OPLOG EnCon program, defining and refining *investment* and execution plan projected to *save the customer* $350M over the FYDP." *Id.* (emphasis added).

Plaintiffs do not dispute Mr. Traugh and Mr. Robinson's annual performance evaluations and job descriptions. *See generally* Pls.' Opp'n, ECF No. 101. Neither do Plaintiffs contest that the e-mail communications among Mr. Traugh, Mr. Robinson, and MDD's employees demonstrate that Mr. Traugh and Mr. Robinson managed OPLOG's funding. *See* Fed. Defs.' Reply, ECF No. 104-1 at 21; *see also* Pls.' Resp. to Fed Defs.' SOMF,

ECF No. 101-1 at 12 ¶ 31. Rather, Plaintiffs argue that
Mr. Traugh and Mr. Robinson's statements indicate that "they
redirected funds allocated for MDD contracts and interfered with
said contracts, to ensure MDD did not receive subcontracts from
prime contractors." Pls.' Opp'n, ECF No. 101 at 39. Plaintiffs
contend that Mr. Traugh and Mr. Robinson "actively discouraged
people from working with Plaintiffs on Navy subcontracts, by
making false and defamatory statements to OPLOG and MSC to the
effect that MDD's billing reflected a lack of transparency and
responsiveness." *Id.* at 40. Plaintiffs reiterate that
Mr. Robinson and Mr. Traugh "published false statements
regarding MDD's billing practices to ensure MDD did not receive
subcontracts from prime contractors." *Id.* But Plaintiffs' own
assertions regarding Mr. Traugh and Mr. Robinson's statements
regarding MDD's purported funding and billing issues fall
squarely within the scope of Mr. Traugh and Mr. Robinson's
employment as OPLOG's program manager and assistant program
manager, respectively, because they were tasked with monitoring
the funds for the various programs. *See, e.g.*, Fed. Defs.' Ex.
L, ECF No. 88-12 at 2-3; Fed. Defs.' Ex. M, ECF No. 88-13 at 3.

Plaintiffs' contention—that Mr. Robinson and Mr. Traugh
"communicated the false statements to OPLOG prime contractors
and directed that they not work with MDD"—misses the mark. Pls.'
Opp'n, ECF No. 101 at 40. Plaintiffs focus on the "nature of the

tort." *Weinberg v. Johnson*, 518 A.2d 985, 992 (D.C. 1986) (citation omitted). The D.C. Circuit has instructed that "[t]he proper [scope-of-employment] inquiry . . . 'focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that was originally undertaken on the employer's behalf.'" *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006) (quoting *Weinberg*, 518 A.2d at 992).

In *Ballenger*, the D.C. Circuit affirmed a district court's decision that a Member of Congress acted within the scope of his employment when he made certain statements about a non-profit organization to a reporter during a telephone conversation. *Id.* at 661. There, the plaintiff-organization argued that the congressman's "allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform." *Id.* at 664 (emphasis in original). In rejecting that argument, the D.C. Circuit made clear that "[t]he appropriate question, then, is whether that telephone conversation—not the allegedly defamatory sentence—was the kind of conduct [the congressman] was employed to perform." *Id.* The D.C. Circuit held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties'" and the congressman's "allegedly defamatory statement

was incident to the kind of conduct he was employed to perform."
*Id.* at 664-65. The same is true here.

The Court is persuaded that Mr. Robinson and Mr. Traugh's involvement in managing OPLOG's budget and work fell within the scope of their duties. As in *Ballenger*, Mr. Robinson and Mr. Traugh's "allegedly defamatory statement[s] [about MDD were] incidental to the kind of conduct they were employed to perform" as OPLOG's program manager and assistant program manager, respectively. 444 F.3d at 664-65. It is undisputed that Mr. Robinson and Mr. Traugh oversaw OPLOG funding. *See* Pls.' Resp. to Fed. Defs.' SOMF, ECF No. 101-1 at 12 ¶ 31. Furthermore, Mr. Robinson and Mr. Traugh's participation in the tasks assigned to MDD and their attendance at the meeting in Boston were consistent with their roles of managing OPLOG's relationships with contractors and subcontracts, and addressing any issues with OPLOG's budget. *See id.* at 12 ¶ 32. Indeed, it is undisputed that Mr. Traugh approved MDD's work as part of his duties to monitor the programs. *See id.* at 13 ¶ 33; *see also* Fed. Defs.' Ex. L, ECF No. 88-12 at 2-3. The Court therefore finds that Plaintiffs have failed to rebut the presumption in the Westfall Act certifications, and the Court also finds that the record demonstrates that Mr. Robinson and Mr. Traugh were acting within the scope of their employment. Accordingly,

pursuant to the Westfall Act, the Court substitutes the United States as the sole defendant as to Count IX.[18]

### 2. The Court Lacks Jurisdiction Over Plaintiffs' Tort Claims

Having substituted the United States as the defendant with respect to Count IX, "the suit is governed by the Federal Tort Claims Act ('FTCA') and is subject to all of the FTCA's exceptions for actions in which the [g]overnment has not waived sovereign immunity." *Wuterich*, 562 F.3d at 380. Under the FTCA, Plaintiffs cannot assert certain claims against the government, *see* 28 U.S.C. § 2680, and the FTCA imposes administrative exhaustion and filing requirements for administrative claims, 28 U.S.C. § 2401(b). The Federal Defendants correctly state that "the exhaustion requirement mean[s] that Plaintiffs were required to submit an administrative claim to the Department of the Navy" and "Plaintiffs have offered no evidence, nor have they even asserted, that they have presented a claim under the FTCA to the Department of the Navy regarding the alleged conduct of [Mr.] Robinson and [Mr. Traugh]." Fed. Defs.' Mot. to

---

[18] In a footnote, the Federal Defendants argue that Mr. Robinson and Mr. Traugh are entitled to "official immunity" for their discretionary acts. *See* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 42 n.28. Plaintiffs do not respond to this argument. *See generally* Pls.' Opp'n, ECF No. 101. The Court need not address the Federal Defendants' "official immunity" argument because the United States will be substituted as the defendant with respect to Count IX pursuant to the Westfall Act.

Dismiss, ECF No. 88 at 43. Plaintiffs argue that the FTCA is "inapplicable." Pls.' Opp'n, ECF No. 101 at 41. The Court disagrees.

The claims in Count IX of the Amended Complaint as to Mr. Robinson and Mr. Traugh fall under an exception to the FTCA. *See, e.g.*, 28 U.S.C. § 2680(h); Am. Compl., ECF No. 42 at 47-48 ¶ 195; Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 46-47 (summarizing the tort allegations as to Mr. Robinson and Mr. Traugh: "(a) induced employees to work for OPLOG; (b) prevented Plaintiff MDD from having the opportunity to quote or perform any task orders; (c) redirected funds on the [CSC] contract; and (d) interfered with other contracts such as Plaintiff MDD's contract with the [MSC]").[19] As stated by the Federal Defendants, "these claims 'arise out of' the interference with prospective contract rights and, therefore, fall squarely within the scope of Section 2680(h)." Fed. Defs.' Mot. to Dismiss, ECF No. 88 at

---

[19] Section 2680(h), in relevant part, provides:

> Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights: *Provided*, [t]hat, with regard to acts or omissions of investigative or law enforcement officers of the United States Government, the provisions of this chapter and section 1346(b) of this title shall apply to any claim arising, on or after the date of the enactment of this proviso, out of assault, battery, false imprisonment, false arrest, abuse of process, or malicious prosecution.

28 U.S.C. § 2680(h) (emphasis in original).

47 (collecting cases); *see also Simpkins v. Shalala*, 999 F.
Supp. 106, 119 (D.D.C. 1998) ("The common law torts alleged by
plaintiff arise out of the actions of federal employees
performing their official duties."). The United States has not
waived its sovereign immunity with respect to Plaintiffs' tort
claims. *See Upshaw v. United States*, 669 F. Supp. 2d 32, 44
(D.D.C. 2009) (dismissing tort claim for lack of subject matter
jurisdiction because it "[arose] out of . . . libel, slander,
misrepresentation, [or] deceit" (quoting 28 U.S.C. § 2680(h)));
*see also* Fed. Defs.' Mot. to Dismiss, ECF No. 88 at 47 (stating
that "the United States has not waived its sovereign immunity").
The Court therefore finds that it lacks subject matter
jurisdiction over Plaintiffs' tort claims. Accordingly, the
Court **GRANTS** the Federal Defendants' motion to dismiss Count IX,
and that count is **DISMISSED**.

### C. Cross-Motions for Summary Judgment as to Count VI (Breach of Fiduciary Duty) and Count VIII (Civil Conspiracy) against Defendant Matthew Miller

Plaintiffs assert two claims against Mr. Miller: (1) breach
of fiduciary duty and (2) civil conspiracy. Am. Compl.,
ECF No. 42 at 43-44 ¶¶ 169-78, 46 ¶¶ 187-92. According to
Plaintiffs, Mr. Miller breached his fiduciary duty to MDD by:
(1) leaving MDD to work for AirClean to compete with MDD, Am.
Compl., ECF No. 42 at 43 ¶ 174; (2) using "confidential and
proprietary information of [MDD] he obtained while still

employed at [MDD] in violation of his non-compete/non-solicitation agreement with [MDD]," *id.*; (3) "failing and refusing to act in the best interest of [MDD]," *id.* at 44 ¶ 175, and (4) "acting . . . in his own personal interest in matters relating to his employment by [MDD][,]" *id.* Plaintiffs also allege that Mr. Miller conspired with MDD's former employees—Mr. Muras, Mr. Stammnitz, and Mr. Mazzocco—by eliminating MDD from OPLOG's fiscal year 2012 budget and soliciting MDD's principal client, OPLOG "during the period of their non-solicitation/non-compete obligation." *Id.* at 46 ¶ 188. Plaintiffs maintain that Mr. Miller's actions were inconsistent with the confidentiality, non-solicitation, and non-compete clauses contained in the MDD Employee Handbook. *See, e.g.*, Am. Compl., ECF No. 42 at 9-11 ¶¶ 34-36, 44 ¶ 177; Pls.' Mot. for Summ. J., ECF No. 113 at 12-15, 27.

Before the Court addresses each tort claim in turn, the Court must determine the threshold issue of whether the MDD Employee Handbook created a binding employment contract between Mr. Miller and MDD.

### 1. The MDD Employee Handbook Did Not Create a Binding Contract

Plaintiffs argue that Mr. Miller was bound by the clauses contained in the MDD Employee Handbook. *See, e.g.*, Pls.' Opp'n, ECF No. 94 at 13; Pls.' Statement of Genuine Issues of Material

Fact ("SOMF"), ECF No. 94 at 18 ¶ 4; Am. Compl., ECF No. 42 at 10-11 ¶¶ 34-36. Specifically, Plaintiffs argue that the MDD Employee Handbook was binding on "employees who wished to remain employed to its terms, and the non-compete/non-solicitation agreement contained therein . . . ." Pls.' SOMF, ECF No. 94 at 18 ¶ 4. Mr. Miller contends that he had no contractual obligations to MDD because: (1) he never signed the MDD Employee Handbook; (2) he was not subject to the clauses contained therein; and (3) MDD disclaimed any express or implied contract therein. Def. Miller's Mot. for Summ. J., ECF No. 87 at 10; *see also* Def. Miller's Reply, ECF No. 99 at 5-6.

The issue of "[w]hether a contract exists is a question of law for the Court to resolve." *Dawson v. Wash. Metro. Area Transit Auth.*, 256 F. Supp. 3d 30, 33 (D.D.C. 2017). Under District of Columbia law, "[f]or an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound." *Georgetown Entm't Corp. v. District of Columbia*, 496 A.2d 587, 590 (D.C. 1985). "[T]he party asserting the existence of a contract has the burden of proof on that issue." *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995).

As a matter of District of Columbia law, "an implied contract may arise from the language of an employee handbook or manual . . . ." *Smith v. Union Labor Life Ins. Co.*, 620 A.2d

265, 269 (D.C. 1993) (citing *Wash. Welfare Ass'n, Inc. v. Wheeler*, 496 A.2d 613, 615 (D.C. 1985)); *see also Strass v. Kaiser Found. Health Plan of Mid-Atl.*, 744 A.2d 1000, 1011 (D.C. 2000) (recognizing that "contractual rights may arise from language in employee manuals" and "employers can effectively disclaim any implied contractual obligation arising from such provisions"). "[I]n the absence of an express contract, a court may imply a contract from the course of the parties' conduct." *Grunseth v. Marriott Corp.*, 872 F. Supp. 1069, 1073 (D.D.C. 1995), *aff'd*, 79 F.3d 169 (D.C. Cir. 1996).

The law in this District makes clear that employers "may effectively disclaim any implied contracts." *Smith*, 620 A.2d at 269 (quoting *Goos v. Nat'l Ass'n of Realtors*, 715 F. Supp. 2, 4 (D.D.C. 1989)). "The legal effect of such a disclaimer is, in the first instance, a question for the court to decide." *Id.*; *see also Grove v. Loomis Sayles & Co., L.P.*, 810 F. Supp. 2d 146, 150 (D.D.C. 2011) ("[H]andbook language that is 'rationally at odds' with a disclaimer can render a disclaimer ineffective . . . ." (quoting *Strass*, 744 A.2d at 1013)). In *Goos*, the court found that an employee handbook did not create an implied contract between an employee and her employer where the disclaimers stated "[t]his handbook does not constitute an employment contract in whole or in part" and "you are considered to be an employee-at-will." 715 F. Supp. at 4.

The same is true here. The MDD Employee Handbook states: "*This handbook is not a contract*, *express or implied*, guaranteeing employment for any MDD specific duration and either you or MDD may terminate this relationship at any time, for any reason with or without cause or notice." Pls.' Ex. A, ECF No. 42-1 at 5 (emphasis added); *see also* Pls.' Ex. B, ECF No. 42-1 at 19. The unsigned "Acknowledgment Receipt of Employee Handbook" contains the same language. *Compare* Pls.' Ex. A, ECF No. 42-1 at 2, *with* Pls.' Ex. B, ECF No. 42-1 at 19. As Mr. Miller points out, "such a proviso renders the handbook 'unenforceable at law.'" Def. Miller's Mot. for Summ. J., ECF No. 87 at 10 (quoting *Martin v. Arc of D.C.*, 541 F. Supp. 2d 77, 85 (D.D.C. 2008) (citation omitted)). Plaintiffs take issue with this statement of the law, arguing that Mr. Miller's cited "cases apply to the characterization of an employee as either at-will or for-cause." Pls.' Opp'n, ECF No. 94 at 12-13, n.13 (citing *Martin*, 541 F. Supp. 3d at 85; *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 747 (D.C. Cir. 1998)). Contrary to Plaintiffs' position, however, employment status is relevant to the question of whether the language in a handbook establishes contractual obligations: "Even if the employer has provided its employees with an employee handbook, the handbook is not enforceable as an employment contract if it disclaims the establishment of contractual obligations and explicitly provides

that employment may be terminated at-will." *Grove*, 810 F. Supp. 2d at 149 (collecting cases).

Further, Plaintiffs fail to argue that the disclaimer is ineffective, nor do they point to any provisions in the MDD Employee Handbook that are "rationally at odds" with the disclaimer. *See Grove*, 810 F. Supp. 2d at 150-51. In *Grove*, the court found that a handbook did not give rise to enforceable contractual rights where there was an express disclaimer. *Id.* at 151. There, a certain provision in the handbook was "expressly made subject to 'management's reasonable discretion' . . . and the word 'encourages' [was] permissive, not mandatory language." *Id.* at 150-51. The court found that the provision could not be considered as "rationally at odds" with the disclaimer because "such permissive language in a personnel manual is, as a matter of law, insufficient to create contractual rights." *Id.* at 151 (citing *Perkins v. Dist. Gov't Emps. Fed. Credit Union*, 653 A.2d 842, 843 (D.C. 1995)).

Here, the MDD Employee Handbook contains similar language that indicates it cannot be construed to be a contract. For example, the MDD Employee Handbook provides that "*[t]he policies in this manual are guidelines only* and are subject to change at the *sole discretion* of [MDD], as are all other policies, procedures, benefits, or other programs of MDD." Pls.' Ex. A, ECF No. 42-1 at 5 (emphasis added). It explicitly states that

"[l]etters, benefit or policy statements, performance appraisals, *employee handbooks* or other employee communications *should not be interpreted as a contractual relationship*." Pls.' Ex. B, ECF No. 42-1 at 23 (emphasis added). In a letter to MDD employees, MDD's President states: "We encourage you to review this handbook carefully and use it as a *valuable resource* to understanding the company." Pls.' Ex. A, ECF No. 42-1 at 3 (emphasis added); *see also* Pls.' Ex. B, ECF No. 42-1 at 20. Viewed as a whole, the language—i.e. "[t]*he policies stated in this manual are guidelines only*"—is consistent with the language that disclaims any express or implied contracts in the MDD Employee Handbook. Pls.' Ex. B, ECF No. 42-1 at 19 (emphasis added). The Court therefore finds that the MDD Employee Handbook expressly disclaims any express or implied contracts.

Finally, the Court is not persuaded that Mr. Miller assented to the terms in the MDD Employee Handbook. "Mutual assent to a contract, often referred to as a 'meeting of the minds,' is most clearly evidenced by the terms of a signed written agreement, but such a signed writing is not essential to the formation of a contract." *Davis v. Winfield*, 664 A.2d 836, 838 (D.C. 1995). "The purpose of a signature is simply to demonstrate mutual assent to a contract, but that may be shown instead, or in addition, by the conduct of the parties." *Id*.

It is undisputed that Mr. Miller never signed the MDD

Employee Handbook. *See, e.g.*, Def. Miller's Mot. for Summ. J.,
ECF No. 87 at 10; Pls.' Opp'n, ECF No. 94 at 12-13; Pls.' Mot.
for Summ. J., ECF No. 113 at 23. Citing no authority to support
their position, Plaintiffs argue that Mr. Miller "[a]gree[d] to
the clauses contained in the MDD Employee Handbook as "a
condition of employment." Pls.' Opp'n, ECF No. 94 at 13; *see
also* Phillips Decl., ECF No. 94-1 at 1 ¶ 4. But that argument
has been foreclosed by D.C. Circuit precedent. *See Bailey v.
Fed. Nat'l Mortg. Ass'n*, 209 F.3d 740, 746 (D.C. Cir. 2000)
(holding that "[t]here was no 'meeting of the minds'" where an
employee never said anything to his employer to indicate his
assent to a policy and never signed any agreement). In *Bailey*,
the D.C. Circuit rejected an employer's argument that an
employee showed his assent to a policy when he continued to work
for the employer because the employee "did nothing whatsoever to
embrace the employer's proposal." *Id.*

The record does not demonstrate that Mr. Miller's conduct
indicates his assent to the provisions in the MDD Employee
Handbook. While Plaintiffs do not explicitly raise the
"condition of employment" argument in their cross-motion for
summary judgment, *see generally* Pls.' Mot. for Summ. J., ECF No.
113, Plaintiffs argue that "[Mr.] Miller confirmed that he fully
read and comprehended the employee handbook, that he understood
his obligations to MDD and his contingencies of employment, and

63

that he would abide by the confidentiality covenants provided."
*Id.* at 12 (citing Phillips Decl., ECF No. 94-1 at 1-2 ¶¶ 4-6).
Plaintiffs then repeat that argument: "[Mr. Miller] was
presented with MDD's employee handbook advising him of the
fiduciary capacity and he confirmed he understood its terms,
which required confidentiality of proprietary information and
prohibited solicitation and direct competition." *Id.* at 23-24.

The Court cannot agree with Plaintiffs on this point
because the record does not support their contentions. *See,
e.g.*, Pls.' Ex. A, ECF No. 42-1 at 2 (showing an unsigned
"Acknowledgement Receipt of Employee Handbook"); Pls.' Ex. B,
ECF No. 42-1 at 19 (same); E-mail from Amanda R. Jones, MDD, to
Mr. Miller (Apr. 12, 2011), Pls.' Ex. D, ECF No. 94-4 ("You
didn't sign the previous handbook."); Miller Decl., ECF No. 98
at 4 ¶ 3 (stating that he never signed the MDD Employee
Handbook). Besides a self-serving declaration, *see* Phillips
Decl., ECF No. 94-1 at 1-2 ¶¶ 4-6, there is no evidence
demonstrating that Mr. Miller assented to the terms in the MDD
Employee Handbook. *See, e.g.*, *Gen. Elec. Co. v. Jackson,* 595 F.
Supp. 2d 8, 36 (D.D.C. 2009)(observing that when a
"declaration is self-serving and uncorroborated," it is "of
little value at the summary judgment stage"); *Fields v. Office
of Johnson*, 520 F. Supp. 2d 101, 105 (D.D.C. 2007) ("Self-
serving testimony does not create genuine issues of material

fact, especially where that very testimony suggests that corroborating evidence should be readily available."). Accordingly, the Court finds that the MDD Employee Handbook was not a binding contract, and that Mr. Miller was not bound by the clauses contained therein.

### 2. Mr. Miller Is Entitled to Summary Judgment on the Breach of Fiduciary Duty Claim

The Court next addresses the elements of Plaintiffs' breach of fiduciary duty claim,[20] concluding that undisputed material facts support summary judgment in favor of Mr. Miller. Under District of Columbia law, a claim for breach of fiduciary duty

---

[20] Plaintiffs assert that an "agent owes a duty of good faith" to a principal. Pls.' Opp'n, ECF No. 94 at 11 (citation omitted). Mr. Miller acknowledges that "[u]nder District of Columbia law, every contract is deemed to contain an implied covenant of good faith and fair dealing that means that neither party shall do anything that would deny the right of the other party to receive the fruits of the contract." Def. Miller's Opp'n, ECF No. 123 at 4 (citing *Paul v. Howard Univ.*, 754 A.2d 297, 310 (D.C. 2000)). "[S]uch a claim cannot be made by an at-will employee because there is no contract to provide a basis for the covenant." *Paul*, 754 A.2d at 310 n.28. Mr. Miller argues that "[P]laintiffs cannot proceed against [him] on the basis that any of his conduct breached this implied covenant of good faith and fair dealing." Def. Miller's Opp'n, ECF No. 123 at 4. To the extent that Plaintiffs seek to assert a claim for breach of the implied covenant of good faith and fair dealing, this Court will not address the claim because Plaintiffs do not assert that claim in the Amended Complaint. *See Coulibaly v. Tillerson*, 273 F. Supp. 3d 16, 39 n.30 (D.D.C. 2017) (declining to address a claim that was not asserted in the complaint); *see also District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("[A] party may not amend its complaint or broaden its claims through summary judgment briefing.").

requires the Plaintiffs to show that Mr. Miller: "(1) owed plaintiff[s] a fiduciary duty; (2) the defendant breached that duty; and (3) the breach proximately caused injury to the plaintiff[s]." *Gadaire v. Orchin*, 197 F. Supp. 3d 5, 8-9 (D.D.C. 2016) (quoting *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 118-19 (D.D.C. 2012)); *see also Mawalla v. Hoffman*, 569 F. Supp. 2d 253, 257 (D.D.C. 2008) (Sullivan, J.) ("A cause of action for breach of fiduciary duty includes breaches of the duty of loyalty . . . .").

### a. Mr. Miller Owed a Duty of Loyalty to MDD

The parties do not dispute that Mr. Miller owed a fiduciary duty of loyalty to MDD during his employment under the principles of agency law. *See, e.g.*, Pls.' Mot. for Summ. J., ECF No. 113 at 23; Def.'s Opp'n, ECF No. 123 at 4. In the first round of summary judgment briefing, Plaintiffs argue that Mr. Miller owed a duty to MDD *after* his resignation based on the MDD Employee Handbook. Pls.' Opp'n, ECF No. 94 at 12. But Plaintiffs did not raise this argument in the second round of summary judgment briefing. *See generally* Pls.' Mot. for Summ. J., ECF No. 113. Instead, Plaintiffs limit their cross-motion for summary judgment to Mr. Miller's actions *while* he was employed at MDD. *See* Pls.' Reply, ECF No. 129 at 1-2.

The Court observes at the outset that the parties agree agency law applies to this claim. *See, e.g.*, Def. Miller's Mot.

for Summ. J., ECF No. 87 at 9; Pls.' Opp'n, ECF No. 94 at 10-11; Pls.' Mot. for Summ. J., ECF No. 113 at 22-25; Def. Miller's Opp'n, ECF No. 123 at 3-8. Under the common law of agency, "it has been established that employees—especially managers, corporate officers, and directors—owe an undivided and unselfish loyalty to the corporation such that there shall be no conflict between duty and self interest." *PM Servs. Co. v. Odoi Assocs., Inc.*, No. CIV.A. 03-1810 (CKK), 2006 WL 20382, at *27 (D.D.C. Jan. 4, 2006) (citations and internal quotations marks omitted); *see also* Restatement (Third) of Agency § 8.01 (2006) ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship.").

A threshold question is whether Mr. Miller was an "agent" of MDD. *See Nat'l R.R. Passenger Corp. v. Veolia Transp. Servs., Inc.*, 791 F. Supp. 2d 33, 46 (D.D.C. 2011) ("*Amtrak*"). Plaintiffs bear the burden to prove the existence of an agency relationship. *See Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) ("The existence of an agency relationship is a question of fact, for which the person asserting the relationship has the burden of proof."). "This jurisdiction has established a two-part test for determining whether such a relationship exists: (1) 'the court must look for evidence of the parties' *consent* to establish a principal-agent relationship,' and (2) 'the court must look for evidence that

the activities of the agent are subject to the principal's
*control*.'" *Alkanani v. Aegis Def. Servs., LLC*, 976 F. Supp. 2d
1, 11 (D.D.C. 2013) (emphasis in original) (citations omitted)).

As to the evidence of consent, the "facts indicat[e] that
[MDD] has manifested a desire for [Mr. Miller] to act on behalf
of [MDD]" and that "[Mr. Miller] has consented to act on behalf
of [MDD]." *Id.* Plaintiffs point out that Mr. Miller was the
"lead energy auditor" for MDD's "MSC contract and for other MDD
customers such as Siemen's and the U.S. Coast Guard." Pl.'s
Opp'n, ECF No. 6-7; *see also* Pls.' Mot. for Summ. J.,
ECF No. 113 at 23 (stating that Mr. Miller "serv[ed] as a Marine
Engineer and Lead Auditor for MDD"). Plaintiffs characterize
Mr. Miller's role as "pivotal" at MDD. Pls.' Mot. for Summ. J.,
ECF No. 113 at 12. It is undisputed that Mr. Miller performed
assignments on behalf of MDD. *See* Phillips Decl., ECF No. 94-1
at 2 ¶ 10 (stating that Mr. Miller "was on MDD assignment to
conduct a ship audit in Cape Canaveral, Florida"). In his own
words, Mr. Miller avers that he "worked [for MDD] almost
exclusively under a contract to provide engineering and program
management service to the Military Sealift Command ('MSC')
Energy Conservation Program . . . ." Miller Decl., ECF No. 98 at
4 ¶ 4; *see also* Pls.' SOMF, ECF No. 113 at 5 ¶ 6.

With respect to MDD's control of Mr. Miller, "[r]elevant
factors that are indicative of control include '(1) the

selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer.'" *Alkanani*, 976 F. Supp. 2d at 11 (quoting *Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000)). "[T]he right to control, rather than its actual exercise, is usually dispositive of whether there is an agency relationship." *Judah*, 744 A.2d at 1040 (citation omitted)). "In deciding this question, courts will look both to the terms of any contract that may exist and to the actual course of dealings between the parties." *Id.*

Here, neither party disputes that Mr. Miller was an at-will employee at MDD. *See, e.g.*, Def. Miller's Mot. for Summ. J., ECF No. 87 at 8; Pls.' Opp'n, ECF No. 94 at 6; Pls.' Mot. for Summ. J., ECF No. 113 at 23. Despite his employment status, Mr. Miller acknowledges that he signed the "Terms and Conditions of Employment." Def. Miller's Opp'n, ECF No. 123 at 12. That document classified him as an "Employee-Exempt[,]" and it outlined, *inter alia*, his compensation and pay period. Pls.' Ex. J, ECF No. 94-10 at 1. Mr. Miller avers that he performed work for MDD under certain contracts. Miller Decl., ECF No. 98 at 4 ¶¶ 4-5. Plaintiffs assert that Mr. Miller "was responsible for serving the ENCON needs of . . . [MDD's primary customer—OPLOG[,]" and that, at the request of OPLOG, MDD assigned Mr.

Miller to "the Carderrock project" where he "served as a marine engineer for OPLOG." Am. Compl., ECF No. 42 at 9 ¶ 33. In 2011, Mr. Miller was on a "ship audit assignment in Cape Canaveral, Florida, which he performed for MDD." Pls.' Mot. for Summ. J., ECF No. 113 at 19 (citing Pls.' SOMF, ECF No. 94 at 19 ¶ 10). Accordingly, the Court is persuaded that the record reflects that there was an agency relationship because Mr. Miller consented to act on behalf of MDD, and MDD had the right to control Mr. Miller's work.

Finally, Plaintiffs cite *Amtrak* for the proposition that an at-will employee owes a general duty of loyalty to his employer "[w]here a company enacts a 'policy prohibiting its employees from engaging in activities that create a conflict of interest' with the company . . . ." Pls.' Mot. for Summ. J., ECF No. 113 at 23 (quoting *Amtrak*, 791 F. Supp. 2d at 47). Mr. Miller does not challenge that proposition. *See* Def.'s Opp'n, ECF No. 123 at 4 ("[Mr.] Miller is limited only by the general rule of agency law that an at-will employee must act for the benefit of the principal in all matters concerning the subject of the agency for so long as the agency exists." (citing *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 32 (D.D.C. 2009))). Indeed, the court in *Amtrak* found that three at-will employees, including a senior analyst, owed a general duty of loyalty to a company where one employee was aware of and the

other two employees acknowledged a policy prohibiting them from engaging in activities that create conflicts of interest with the company. 791 F. Supp. 2d at 47-48; *see also Draim v. Virtual Geosatellite Holdings*, *Inc.*, 631 F. Supp. 2d 32, 39 (D.D.C. 2009) (indicating that "even in the absence of a written contract and even in an employment agreement that is at will, an employee must, as a matter of agency law, act solely for the benefit of her principal in all matters concerning her agency"). The Court therefore finds that Plaintiffs have established the first element of their breach of fiduciary duty claim because Mr. Miller owed a fiduciary duty of loyalty to MDD during his employment there.

In their opposition brief, Plaintiffs argue that "Mr. Miller continued to owe a fiduciary duty to MDD *after* he terminated his employment." Pls.' Opp'n, ECF No. 94 at 12 (emphasis added). Plaintiffs rely on the non-compete clause in the MDD Employee Handbook to support their position. *Id.; see also* Pls.' Ex. C, ECF No. 94-3 at 1. Mr. Miller responds that he owed no such duty to MDD after his resignation, and that he had no contractual obligations to MDD. Def. Miller's Mot. for Summ. J., ECF No. 87 at 10. Mr. Miller argues that he could not be bound by the non-compete clause because he never signed the MDD Employee Handbook. Def. Miller's Reply, ECF No. 99 at 2. In their cross-motion for summary judgment, Plaintiffs argue that

Mr. Miller's post-MDD employment conduct constitutes a breach of fiduciary duty as a result of the non-compete agreement. *Compare* Pls.' Mot. for Summ. J., ECF No. 113 at 28, *with* Pls.' Opp'n, ECF No. 94 at 12-13. Nevertheless, Plaintiffs state that their cross-motion for summary judgment "set[s] forth the facts evidencing that [Mr. Miller] was competing with MDD *while still employed at the company*." Pls.' Reply, ECF No. 129 at 1 (emphasis in original). Plaintiffs reiterate that the "basis for summary judgment, again, is with regards to the actions taken *while* [Mr.] Miller was still employed at MDD that injured Plaintiffs." *Id.* at 2 (emphasis added).

There is no dispute that Mr. Miller owed a fiduciary duty to MDD while he was employed there. As this Court has already decided, Mr. Miller was not bound by the clauses in the MDD Employee Handbook, including the non-compete clause therein. Mr. Miller correctly points out that "none of [his] post-termination activities can serve as the basis for [the breach of fiduciary duty] claim." Def. Miller's Opp'n, ECF No. 123 at 5; *see also Draim*, 631 F. Supp. 2d at 40 (An agent's "post-termination activities therefore cannot serve as the basis for any claim of breach of an agent's fiduciary duty to his principal [where the agent] went to work for a competitor and in fact competed against [his former principal]."). The Court therefore finds that Mr. Miller did not owe a fiduciary duty to

MDD *after* his resignation.[21]

### b. Breach

Having determined that Mr. Miller owed a duty of loyalty to MDD during his employment, the Court next considers whether Mr. Miller breached that duty. As an initial matter, Mr. Miller could compete with MDD after his resignation. *See* Def. Miller's Opp'n, ECF No. 123 at 4-5 (collecting cases); *see also* Pls.' Reply, ECF No. 129 at 1. Under District of Columbia law, "[a]n agent after termination of his employment, in the absence of an agreement to the contrary, may compete with his former principal, and he may take with him all the skill and information he has acquired, excluding only the property of his previous employer." *U.S. Travel Agency, Inc. v. World-Wide Travel Serv. Corp.*, 235 A.2d 788, 789 (D.C. 1967) (footnotes omitted); *see also Grp. Ass'n Plans, Inc. v. Colquhoun*, 466 F.2d 469, 474 (D.C. Cir. 1972) (recognizing "the existence of a common law right to compete" with a former employer and "the existence of a right to 'steal' clients absent a contractual relation to the contrary"). The question remains whether Mr.

---

[21] Because this Court has determined that the MDD Employee Handbook was not a contract and that Mr. Miller was not bound by the clauses therein, the Court need not address the parties' arguments with regard to the validity and reasonableness of the non-compete clause in the MDD Employee Handbook. *See, e.g.*, Pls.' Opp'n, ECF No. 94 at 13-14; Def. Miller's Reply, ECF No. 99 at 2, 6-8; Pls.' Mot. for Summ. J., ECF No. 113 at 17-18.

Miller's actions constitute a breach of his fiduciary duty to MDD while working there.

Mr. Miller argues that he is entitled to summary judgment because Plaintiffs' breach of fiduciary duty claim lacks merit as a matter of law. Def. Miller's Mot. for Summ. J., ECF No. 87 at 5. First, Mr. Miller contends that he did not "breach any fiduciary duty owed to MDD[,]" *id.* at 5-6, because he (1) never attended the meeting in Boston, *id.*; (2) did not know about the e-mail with his alleged role in the Proposed Business Plan or the proposed re-allocation funding at the time of his employment at MDD, *id.* at 9; and (3) "never solicited MDD contracts from OPLOG, CSC, or MSC[,]" *id.* at 8. Next, Mr. Miller argues that leaving MDD to work for AirClean to compete with MDD cannot constitute a breach of fiduciary duty because, as a matter of law, he was "entitled to make arrangements or plans to go into competition with [his] principal before terminating [his] employment." *Id.* at 9 (quoting *Amtrak*, 791 F. Supp. 2d at 49).

To the contrary, Plaintiffs contend that they are entitled to summary judgment because Mr. Miller breached the fiduciary duty by "[1] exposing confidential proprietary information, [2] soliciting MDD clients, and [3] competing directly with MDD, because such activities created a conflict of interest with MDD." Pls.' Mot. for Summ. J., ECF No. 113 at 24. Specifically, Plaintiffs contend that "[o]n departure, [Mr.] Miller

essentially took the work he had been performing on behalf of MDD for OPLOG, which was summarized in the MDD [SOW] that [he] previously prepared with OPLOG for MDD's contract prior to the $700,000 reallocation." *Id.* at 21. According to Plaintiffs, Mr. Miller breached his fiduciary duty to MDD by developing a proposed, "sophisticated business plan aimed at reallocating MDD contract funds and established a competing business, while continuing to be an employee of MDD, and successfully diverted funds allocated for MDD contracts to himself, under the guise of a new subcontractor." *Id.* at 11.

As the parties correctly observe, "an employee 'is entitled to make arrangements to compete' with his employer—even before terminating his employment—subject to several limitations." *Hedgeye Risk Mgmt., LLC v. Heldman*, 271 F. Supp. 3d 181, 188 (D.D.C. 2017) (quoting *Mercer Mgmt. Consulting, Inc. v. Wilde*, 920 F. Supp. 219, 233 (D.D.C. 1996)). "The employee, '[i]n preparing to compete, . . . may not commit fraudulent, unfair, or wrongful acts, such as misuse of confidential information.'" *Id.* (quoting *Mercer*, 920 F. Supp. at 234). "And the employee 'must refrain from actively and directly competing with [his existing] employer for customers and employees' through solicitation, while he is still employed." *Id.* (citation omitted).

In *Amtrak*, the court stated:

> Acts that have been deemed to constitute
> *preparation* rather than *actual competition*
> include "mere preparation to open a competing
> business[,] . . . [o]pening a bank account and
> obtaining office space and telephone
> service," *Harllee v. Prof'l Serv. Indus.,
> Inc.,* 619 So.2d 298, 300 (Fla. Dist. Ct. App.
> 1992), as well as "purchas[ing] a rival
> business and upon termination of employment
> immediately compet[ing]" with a former
> employer, *Gov't Relations,* 2007 WL 201264, at
> *11 (quoting *Mercer,* 920 F. Supp. at
> 233); *see also Jet Courier Serv., Inc. v.
> Mulei,* 771 P.2d 486, 494 (Colo. 1989).

791 F. Supp. 2d at 49 (emphasis added). "By comparison, acts

that have been found to constitute *actual* competition include

solicitation of business for an employee's personal endeavor,

which otherwise the employee had an obligation to obtain for an

employer, [and] competing with the employer for customers or

employees . . . ." *Id.* (emphasis in original) (citing

*Mercer,* 920 F. Supp. at 234; *Sci. Accessories Corp. v.

Summagraphics Corp.*, 425 A.2d 957, 965 (Del. 1980)). "The

ultimate determination of whether an employee has breached his

fiduciary duties to his employer by preparing to engage in a

competing enterprise must be grounded upon a thorough[]

examination of the facts of the particular case." *Furash & Co.,

Inc. v. McClave*, 130 F. Supp. 2d 48, 54 (D.D.C. 2001) (quoting

*Md. Metals, Inc. v. Metzner*, 282 Md. 31, 382 A.2d 564, 569–70

(1978)).

Guided by the principles of agency law espoused in *Amtrak*,[22] the Court will examine, in turn, the three separate acts that Plaintiffs contend constitute Mr. Miller's breaches of his fiduciary duty to MDD. *See* Pls.' Mot. for Summ. J., ECF No. 113 at 25-28. Before turning to those acts, the Court addresses the issue of whether Mr. Miller's role in the development of the Proposed Business Plan itself constitutes a breach of the fiduciary duty.

In *Amtrak*, the court addressed the issue of whether certain acts of at-will employees constituted "mere preparation" or "actual competition." 791 F. Supp. 2d at 49. There, Amtrak argued that the employees breached their fiduciary duties by

---

[22] The court in *Amtrak* examined the plaintiff's claim for aiding and abetting the breach of a fiduciary duty under District of Columbia law. 791 F. Supp. 2d at 47 n.19 (citation omitted). However, the District of Columbia Court of Appeals has not expressly recognized a cause of action for aiding and abetting the breach of fiduciary duty. *Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 711 (D.C. 2013) ("[W]e need not decide here whether a cause of action exists in the District of Columbia for aiding and abetting the breach of fiduciary duty . . . ."); *see also Halberstam v. Welch*, 705 F.2d 472, 479 (D.C. Cir. 1983) (stating that "[t]he separate tort of aiding-abetting has not yet, to our knowledge, been recognized explicitly in the District"). Here, Plaintiffs allege a claim for breach of fiduciary duty, and District of Columbia law recognizes "an independent tort for breach of a fiduciary duty." *Cumis Ins. Soc'y, Inc. v. Clark*, 318 F. Supp. 3d 199, 210 (D.D.C. 2018); *see also Randolph v. ING Life Ins. & Annuity Co.*, 973 A.2d 702, 709 (D.C. 2009) (recognizing that a breach of fiduciary duty claim is cognizable under D.C. law). Nonetheless, this Court will rely on the reasoning in *Amtrak* to analyze whether Mr. Miller breached his fiduciary duty to MDD in this case. *See* 791 F. Supp. 2d at 46-51.

competing with Amtrak—purported acts that were prohibited by the company's policy—because they: (1) permitted their names and résumés to be included in a competitor's bid proposal for a contract; (2) accepted the competitor's contingent offers for employment; and (3) agreed to withhold their names from Amtrak's bid. *Id.* at 48. Amtrak contended that those "employees did not merely prepare to compete" with Amtrak, *id.* at 49, but that they directly competed with Amtrak. *Id.* at 49. The competitor responded that the employees did not breach their fiduciary duties because they "did not solicit customers or employees for it, that it did not divert any Amtrak corporate opportunities, and it did not misuse any of Amtrak's trade secrets." *Id.* The competitor argued that "the employees *merely* prepared to go into competition with Amtrak by making plans to work for [the competitor] after their employment ended." *Id.* (emphasis in original).

In examining the facts and circumstances of that case, the court found that "the employees' conduct was not so egregious that it can be said to have constituted a breach of their fiduciary duties to Amtrak as a matter of law, but neither is it so benign to entitle [the competitor] to summary judgment on this issue." *Id.* at 50. The court also recognized that "a fact-finder could reasonably conclude that the employees' participation in the rival bid was more akin to preparation

rather than actual competition." *Id.* at 50. The court concluded that a material question of fact existed as to whether the employees breached their fiduciary duties of loyalty to Amtrak because a reasonable jury could find that the employees' participation in the competitor's bid was a breach of the fiduciary duties they owed to Amtrak. *Id.* at 50.

Here, the Proposed Business Plan is "more akin to preparation rather than actual competition." *Amtrak*, 791 F. Supp. 2d at 50. Mr. Miller does not deny that he developed the Proposed Business Plan to form a new company that would be positioned to compete with MDD after his resignation. *See* Def. Miller's Opp'n, ECF No. 123 at 9; *see also* Miller Decl., ECF No. 123-2 at 2 ¶ 6. Neither does Mr. Miller dispute that the Proposed Business Plan outlined a plan to work for both MDD and the new company concurrently. *See generally* Def. Miller's Opp'n, ECF No. 123. The record does not show that this proposal moved beyond the planning phase. *See* Pls.' SOMF, ECF No. 113 at 6 ¶ 13 (stating that the Proposed Business Plan "identified the government as a prospective customer"). There is no evidence in the record demonstrating that Mr. Miller provided the Proposed Business Plan to competitors or used the Proposed Business Plan for personal gain because the proposed company never transacted any business. *See, e.g.*, Miller Suppl. Decl., ECF No. 100-1 at 1 ¶¶ 2-3; Pls.' SOMF, ECF No. 113 at 6 ¶¶ 12-15; *cf. Sias v. Gen.*

*Elec. Info. Servs. Co.*, No. 80-1561, 1981 WL 186, at *4 (D.D.C. May 18, 1981) (finding that an employee breached his fiduciary duty where the employee established his own company and competed with his employer during his employment). The Court therefore finds that the creation and existence of the Proposed Business Plan alone does not constitute a breach of the fiduciary duty because Mr. Miller was not prohibited from making arrangements to compete with MDD while still employed there. *See, e.g.*, *Mercer*, 920 F. Supp. at 233 (recognizing that employees can make plans to compete with their employers while employed in the absence of unfair acts or injury to the employer); *Sci. Accessories Corp.*, 425 A.2d at 965 ("[Former employees'] concealment from [their former employer] of their plans to enter into competition with [the former employer] was not, without more, a violation of their fiduciary duty of loyalty.").

### i. Confidentiality

Plaintiffs argue that Mr. Miller breached his fiduciary duty by exposing MDD's proprietary and confidential information in violation of the confidentiality agreement in the MDD Employee Handbook and the "Terms and Conditions of Employment." As far as the Court can discern, the MDD Employee Handbook and the "Terms and Conditions of Employment" appear to be separate and distinct documents. *Compare* Pls.' Ex. A, ECF No. 42-1 *and* Pls.' Ex. B, ECF No. 42-1, *with* Pls.' Ex. 1, ECF No. 113-1. It

is uncontested that Mr. Miller signed the "Terms and Conditions of Employment," which contains a confidentiality provision. *E.g.*, Pls.' Ex. 1, ECF No. 113-1 at 2 § 7; Pls.' Ex. J, ECF No. 94-10.[23] By virtue of his signature, Plaintiffs contend that "Mr. Miller specifically agreed that strategic business plans and competitive type information would not be made available to any person or organization, not used for personal gain." Pls.' Opp'n, ECF No. 94 at 12; *see also* Pls.' Ex. J, ECF No. 94-10. Plaintiffs argue that Mr. Miller breached his fiduciary duty by failing to keep MDD's proprietary information confidential when he developed the Proposed Business Plan. Pls.' Mot. for Summ. J., ECF No. 113 at 25-26.[24] According to Plaintiffs, Mr. Miller

---

[23] The "Confidentiality" provision provides:

Because of the confidential nature of the information that you will handle, we request that all information be held confidential and not disclosed to anyone outside Marine Design Dynamics ("MDD") without written authorization. MDD may, from time-to-time, exchange confidential business information such as plans for future events, strategic plans, or other competitive-type information. As to such information, the employee shall not make it available to competitors or use such information for a personal gain. Also, while serving as a MDD employee, we request that you not assist any person or organization in competing with MDD, in preparing to compete against MDD or in hiring any employees away from MDD.

Pls.' Ex. 1, ECF No. 113-1 at 2 § 7.

[24] Plaintiffs assert that Mr. Miller drafted a SOW for Merrill-Dean to reroute $700,000 to AirClean by "copying, verbatim, MDD's [SOW] submitted for their OPLOG subcontract . . . ." Pls.' Mot. for Summ. J., ECF No. 113 at 20. Mr. Miller responds that "[MDD's] [SOW] is not confidential or proprietary" for three reasons. Def. Miller's Opp'n, ECF No. 123 at 10; *see also* Def. Miller's Reply, ECF No. 99 at 5. First, "[MDD's SOW] is made

improperly used his exposure to MDD's "confidential energy
management planning process as his own" because in the Proposed
Business Plan he touted his skills and more than "20 years of
engineering experience." *Id.* at 25.

Mr. Miller does not deny that he agreed to the terms in the
"Terms and Conditions of Employment," including its
confidentiality provision. Def. Miller's Reply, ECF No. 99 at 6.
Rather, Mr. Miller argues that "[t]here is no evidence that [he]
violated [the confidentiality] provision." *Id*. According to him,
the Proposed Business Plan—"an aborted business plan developed
in 2010 to start a company called East Coast Energy Engineering,
Inc."—was "a plan that never got off the ground, and certainly
caused no harm to Plaintiffs." Def. Miller's Opp'n, ECF No. 123
at 9. Further, Mr. Miller does not deny that the Proposed

---

part of the public record in the bidding process." Def. Miller's
Opp'n, ECF No. 123 at 10. Next, "[it] is a template containing
form language that is used by multiple companies, generally
derived from the government's requests for proposals." *Id.* at
10-11. "Finally, MDD's [SOW] was prepared by [Mr.] Miller **for
MDD.**" *Id.* at 11 (emphasis in original). Mr. Miller argues that
Plaintiffs were not "harmed by Air[C]lean's use of form language
from a previous contract[,]" Def. Miller's Reply, ECF No. 99 at
5, and that "[he] was not appropriating material of the employer
for his own use" because "he [was] simply relying on the
knowledge he acquired when working for MDD." Def. Miller's
Opp'n, ECF No. 123 at 11. Because of their failure to respond to
Mr. Miller's arguments that the SOW is not confidential or
proprietary, Plaintiffs have conceded these points. *See Campbell
v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 327 (D.D.C.
2018) ("Plaintiffs do not offer any response to this argument,
and thus concede it.").

Business Plan was located on MDD's work computers, which he contends "suggest[s] there was no effort to hide it." *Id.* at 10; *see also* Phillips Decl., ECF No. 94-1 at 2 ¶ 9 ("Two business plans were created on MDD's computers and were captured in the course-of-business back-up program.").

There is no evidence supporting Plaintiffs' contention that Mr. Miller exposed MDD's confidential information in the Proposed Business Plan. Mr. Miller was permitted to include the skills and experience that he gained from MDD in the Proposed Business Plan, and he could take all those skills with him to his next position. *See U.S. Travel Agency, Inc.*, 235 A.2d at 789. The question remains whether the development of the Proposed Business Plan is evidence that Mr. Miller committed "fraudulent, unfair, or wrongful acts, such as the misuse of confidential information . . . ." *Riggs Inv. Mgmt. Corp. v. Columbia Partners, L.L.C.*, 966 F. Supp. 1250, 1266 (D.D.C. 1997) (citing *Sci. Accessories*, 424 A.2d at 965). In *Riggs*, an agent agreed to "'treat in strict confidence' bank business, including the affairs of its customers, which he would learn in the course of his employment." *Id.* at 1265 n.5. The court concluded that the agent went "beyond his privilege to prepare for future competition" when he shared confidential information, such as the salary information of employees and fees paid by clients. *Id.* at 1265.

Here, there is no evidence that Mr. Miller shared the Proposed Business Plan, which allegedly included confidential information, with anyone outside of MDD. Neither party disputes that both versions of the Proposed Business Plan were created and located on MDD's computers. *See, e.g.*, Pls.' Opp'n, ECF No. 94 at 7; Pls.' Mot. for Summ. J., ECF No. 113 at 16; Def. Miller's Opp'n, ECF No. 123 at 10. Plaintiffs assert that the Proposed Business Plan "was retrieved from MDD email records." Pls.' Opp'n, ECF No. 94 at 7. But Plaintiffs do not present any evidence that Mr. Miller disseminated the two versions of the Proposed Business Plan to anyone other than within MDD to the then-current MDD employees. *See generally* Pls.' Mot. for Summ. J., ECF No. 113; Pls.'s Reply, ECF No. 129. Furthermore, Plaintiffs do not point to any specific language in the Proposed Business Plan that contains MDD's confidential information. The Court therefore finds that Plaintiffs have failed to demonstrate that Mr. Miller misused MDD's confidential information.[25]

---

[25] To the extent that Plaintiffs argue that Mr. Miller violated the confidentiality provision in the "Terms and Conditions of Employment" by using "information acquired while working for MDD to enrich himself and his next employer, AirClean," Pls.' Mot. for Summ. J., ECF No. 113 at 26, the Court rejects that argument because Plaintiffs have not identified the specific information that Mr. Miller allegedly acquired at MDD. Furthermore, Mr. Miller did not enter into a non-compete agreement; therefore, he was permitted to compete with MDD after his resignation, and he could take with him all the skills and information that he acquired at MDD to AirClean. *See U.S. Travel Agency, Inc.*, 235 A.2d at 789.

### ii. Non-Solicitation

Next, Plaintiffs argue that the Proposed Business Plan and Mr. Miller's solicitation of MDD's customers prove that Mr. Miller breached his fiduciary duty. Pls.' Mot. for Summ. J., ECF No. 113 at 26-27. Plaintiffs contend that the Proposed Business Plan identifies the federal government as a prospective client, which is "evidence of [Mr.] Miller's solicitation of the government for his own personal gain, rather than soliciting MDD business." *Id.* at 27. According to Plaintiffs, "[t]he Proposed Business Plan specifically identified the goal of obtaining a major government contract which, in essence, was successfully carried out when a portion of the $700,000 worth of MDD's funds were reallocated from MDD to [Mr.] Miller's subsequent employer, AirClean and the other former MDD employees." *Id.* at 27. Plaintiffs point out that Mr. Miller solicited MDD's customers, including CSC and OPLOG, before his resignation. Pls.' Opp'n, ECF No. 94 at 9. Plaintiffs contend that Mr. Miller's solicitation and his goal of obtaining a major government contract qualify as "unfair acts" that "injured" MDD. Pls.' Mot. for Summ. J., ECF No. 113 at 27 (quoting *Mercer*, 920 F. Supp. at 233). Finally, Plaintiffs argue that Mr. Miller's actions went beyond mere preparation because Mr. Miller "utilized MDD professional contacts to undermine MDD and fashion a lucrative opportunity at Plaintiffs' expense." Pls.' Opp'n, ECF No. 94 at

10.

Mr. Miller denies that he solicited MDD's customers during his employment at MDD. *See, e.g.*, Def. Miller's Opp'n, ECF No. 123 at 12; Miller Decl., ECF No. 98 at 5 ¶¶ 12-13. Mr. Miller maintains that he "never solicited any work from any MDD customer, or anyone else, the entire time he was employed by MDD." Def. Miller's Opp'n, ECF No. 123 at 12. According to him, "[a]ll of the work done by Air[C]lean was solicited by CSC after Mr. Miller resigned." Def. Miller's Reply, ECF No. 99 at 6. Mr. Miller avers that the "future CSC subcontract work worth $700,000 allegedly 'budgeted to MDD', and the $2.7 million budgeted for OPLOG work in 2012, was not confidential or proprietary business information, but rather, matters of public record." Miller Decl., ECF No. 123-2 at 2 ¶ 9. Finally, Mr. Miller argues that "[s]olicitation of MDD's customers alone could never give rise to liability because Miller never agreed not to solicit or compete." Def. Miller's Opp'n, ECF No. 123 at 11 (citing *Aetna Cas. & Sur. Co. v. Lee*, 229 F.2d 787, 790 (D.C. Cir. 1956)).

As previously stated, "[i]n preparing to compete, an employee may not commit fraudulent, unfair, or wrongful acts, such as . . . solicitation of the firm's customers, or solicitation leading to a mass resignation of the firm's employees." *Mercer*, 920 F. Supp. at 234. After termination, a

former employee cannot be held liable for soliciting her former employer's customers or competing with her former employer, absent an agreement to the contrary. *Aetna Cas. & Sur. Co.*, 229 F.2d at 788-89 (citing Restatement (First) of Agency § 393 cmt. e (1933)).

The Court is not persuaded that Mr. Miller solicited MDD's customers during his employment there. While the Proposed Business Plan states that a long-term goal of the proposed company ("East Coast Energy Management, Inc.") was to secure major governmental and commercial contracts, Pls.' Ex. 2, ECF No. 113-2 at 7, Plaintiffs have not presented evidence that Mr. Miller solicited the federal government while employed by MDD. Neither have Plaintiffs provided facts that would lead to an inference that Mr. Miller solicited the federal government or MDD's other customers while he was employed at MDD. The Court disagrees with Plaintiffs' contention that because a portion of the $700,000 of "MDD's funds" were reallocated from MDD to AirClean, this suggests that the Proposed Business Plan was in fact carried out because there is nothing in the record indicating that the Proposed Business Plan was shared with anyone outside of MDD. Furthermore, Plaintiffs do not contest Mr. Miller's averment that the future CSC subcontract work, which was worth $700,000, was a matter of public record. *See generally* Pls.' Reply, ECF No. 129. Nor do Plaintiffs dispute

that MDD had no right to future subcontracts with CSC. *See* Def. Miller's Reply, ECF No. 99 at 8; *see generally* Pls.' Mot. for Summ. J., ECF No. 113. Plaintiffs' allegation—that Mr. Miller conspired with others to influence OPLOG to reallocate $700,000 of work from MDD to competitors—is unsupported by any evidence in the record. Further, Plaintiffs concede that Mr. Miller did not attend the meeting in Boston where government employees allegedly decided to eliminate MDD from OPLOG's fiscal year 2012 budget. *See* Pls.' Mot. for Summ. J., ECF No. 113 at 18-19.

Plaintiffs' other argument—that Mr. Miller drafted a SOW to redirect the CSC subcontract from MDD to AirClean—also fails. *See id.* at 19-20. Mr. Miller drafted the SOW when he was an employee of MDD in order for MDD to secure the OPLOG work. Miller Decl., ECF No. 123-2 at 3 ¶ 17. After his resignation from MDD, Mr. Miller, as an employee of AirClean, used the public version of MDD's SOW to draft a SOW for AirClean. Def. Miller's Opp'n, ECF No. 123 at 9-11. Analyzing the facts and inferences in Plaintiffs' cross-motion in the light most favorable to Mr. Miller, the Court finds that the undisputed facts do not support a finding that Mr. Miller solicited MDD's customers during his employment at MDD. *See James Madison Project*, 344 F. Supp. 3d at 386 ("When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each party's motion in the

88

light most favorable to the non-moving party.").

### iii. Direct Competition

Under the "Terms and Conditions of Employment," "[MDD] request[ed] that [Mr. Miller] not assist any person or organization in competing with MDD" during his employment. Pls.' Ex. 1, ECF No. 113-1 at 2 § 7. Neither party disputes that Mr. Miller was permitted to make arrangements to compete with MDD, *see* Pl.'s Mot. for Summ. J., ECF No. 113 at 25, and that the "failure to disclose plans to enter into competition is not itself necessarily a breach of fiduciary duty[,]" Pls.' Mot. for Summ. J., ECF No. 113 at 24. Rather, the parties disagree about whether Mr. Miller "was competing with MDD *while still employed at the company*." Pls.' Reply, ECF No. 129 at 1 (emphasis in original).

Plaintiffs argue that the Proposed Business Plan shows Mr. Miller's actions to directly compete with MDD. Pls.' Mot. for Summ. J., ECF No. 113 at 28. Mr. Miller contends that "[t]he [Proposed] [B]usiness [P]lan gives no indication of any intent to compete with MDD for government contract work." Def. Miller's Opp'n, ECF No. 123 at 10. Mr. Miller maintains that "the [Proposed] [B]usiness [P]lan never came to fruition" and the proposed company "never performed any work, or earned any revenue." *Id.* The Court agrees.

"To survive a summary judgment motion, [Plaintiffs] need

only produce "more than a 'mere existence of a scintilla of evidence' in support of its position," so that a "jury could reasonably find for the non-moving party." *Amtrak*, 791 F. Supp. 2d at 51 (quoting *Threadgill v. Spellings*, 377 F. Supp. 2d 158, 160 (D.D.C. 2005) (quoting *Anderson*, 477 U.S. at 252)). Plaintiffs have not presented a scintilla of evidence that Mr. Miller directly competed with MDD while employed there. Plaintiffs do not deny that East Coast Energy Management, Inc., the proposed company, never transacted any business. *See generally* Pls.' Reply, ECF No. 129. The undisputed facts demonstrate that the Proposed Business Plan was a proposal that was never sent to anyone outside of MDD and provides no support for Plaintiffs argument that Mr. Miller directly competed with MDD while he was employed there. Because Plaintiffs have failed to present any evidence demonstrating that Mr. Miller engaged in any business activity in competition with MDD, there is no issue of genuine fact that would make summary judgment in favor of Plaintiffs appropriate on this element of the breach of fiduciary duty claim. *See Amtrak*, 791 F. Supp. 2d at 51.

### c. Proximate Cause

The Court's analysis with respect to the breach of fiduciary duty claim ends with the third and final element: proximate cause. Plaintiffs allege that they lost approximately $2.5 million, Am. Compl., ECF No. 42 at 44 ¶ 178, in part,

because Mr. Miller "continu[ed] to solicit the business of OPLOG for himself and his new employer AirClean." *Id.* at 44 ¶ 177. Plaintiffs assert that OPLOG budgeted $2.7 million for MDD in fiscal year 2012, but Mr. Miller played a role in redirecting $700,000 of OPLOG work away from MDD. Pls.' SOMF, ECF No. 113 at 7-8 ¶¶ 18-22.

Plaintiffs' burden is to prove that Mr. Miller's breach proximately caused their injuries. *See Gadaire*, 197 F. Supp. 3d at 8-9. "To establish proximate cause, the plaintiff must present evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C. 2005) (quoting *District of Columbia v. Wilson*, 721 A.2d 591, 600 (D.C. 1998)). Mr. Miller correctly states that he "cannot be held liable for breach of fiduciary duty unless Plaintiffs can prove they lost business as a result of his alleged misconduct." Def. Miller's Reply, ECF No. 99 at 9 (citing *Maxwell v. Gallagher*, 709 A.2d 100, 103 (D.C. 1998)). Plaintiffs cannot establish a causal connection between their alleged damages in the amount of $2.5 million and Mr. Miller's alleged misconduct because Plaintiffs have not demonstrated that Mr. Miller breached his fiduciary duty owed to MDD. Accordingly, the Court **GRANTS** the

Federal Defendants' cross motion for summary judgment as to

Count VI and **DENIES** the Plaintiffs' motion for summary judgment

as to Count VI.

### 3. Mr. Miller Is Entitled to Summary Judgment on Plaintiffs' Civil Conspiracy Claim

Plaintiffs argue that Mr. Miller conspired with Mr. Muras,

Mr. Stammnitz, and Mr. Mazzocco to leave MDD and to take MDD's

business for themselves in their new ventures. *Phillips II*, 894

F. Supp. 2d at 96. Mr. Miller denies that he "conspire[d] with

any of his co-workers to leave MDD," "work[ed] for any of them

after he left, or solicit[ed] any MDD contracts." Def. Miller's

Mot. for Summ. J., ECF No. 87 at 6. Plaintiffs must establish

the necessary elements for civil conspiracy under District of

Columbia law:

> (1) an agreement between two or more persons;
> (2) to participate in an unlawful act, or in
> a lawful act in an unlawful manner; and (3) an
> injury caused by an unlawful overt act
> performed by one of the parties to the
> agreement (4) pursuant to, and in furtherance
> of, the common scheme.

*Griva v. Davison*, 637 A.2d 830, 848 (D.C. 1994) (internal

citations omitted). "Civil conspiracy, of course, is not

actionable in and of itself but serves instead 'as a device

through which vicarious liability for the underlying wrong may

be imposed upon all who are a party to it, where the requisite

agreement exists among them.'" *Hall v. Clinton*, 285 F.3d 74, 82

(D.C. Cir. 2002) (quoting *Riddell v. Riddell Wash. Corp.*, 866
F.2d 1480, 1493 (D.C. Cir. 1989)).

Plaintiffs have presented no facts to establish the first
element: an agreement between two or more persons. Plaintiffs
urge this Court to consider the Proposed Business Plan because
it allegedly "evidences the explicit agreement between [Mr.]
Miller and [Mr.] Mazzocco to start a new business together and
the early conniving with their 'influential' government
contracts to redirect MDD contracts." Pls.' Mot. for Summ. J.,
ECF No. 113 at 29. But Plaintiffs concede that Mr. Miller did
not attend the meeting in Boston where Mr. Mazzocco,
Mr. Stammnitz, and Mr. Muras allegedly entered into an agreement
to conspire to terminate the CSC-MDD subcontract. *See id.* at 18-
19, 29. Thus, the Proposed Business Plan does not provide any
support for Plaintiffs' contention that Mr. Miller conspired
with others to injure MDD.

In the alternative, Plaintiffs argue that Mr. Miller was
"complicit." Pls.' Opp'n, ECF No. 94 at 15. While "[p]roof of a
tacit, as opposed to explicit, understanding is sufficient to
show agreement[,]" *Halberstam*, 705 F.2d at 476, Plaintiffs have
identified no evidence of a tacit understanding. To support
their position, Plaintiffs primarily rely on their allegations
that Mr. Miller's "behavior in taking advantage of all the
opportunities presented to him by the other conspirators, and

the roundabout way in which [Mr. Miller] left MDD, and the continued performance of the exact same tasks, under the same contracts that he performed for MDD, at AirClean and MSC . . . ." Pls.' Mot. for Summ. J., ECF No. 113 at 29 (arguing that Mr. Miller "wrongfully agreed and contributed to MDD's loss of the business reallocated to AirClean and to the success of the entire *de facto* debarment alleged in the Verified Amended Complaint."); *see also* Am. Compl., ECF No. 42 at 20-21, 46 ¶¶ 67, 188. However, "allegations in a complaint unsupported by evidence cannot serve as the basis for opposing a motion for summary judgment." *Council on Am.-Islamic Relations Action Network, Inc. v. Gaubatz*, 82 F. Supp. 3d 344, 356 (D.D.C. 2015) (holding that plaintiffs failed to meet their burden at the summary judgment stage that a defendant conspired with his co-defendant because plaintiffs relied on allegations of an agreement between the defendant and his co-defendant without evidence of an agreement). The Court therefore finds that Plaintiffs have not established the first element.

Even assuming, *arguendo*, that Plaintiffs can prove the first element, Plaintiffs cannot establish the second element. "[C]ivil conspiracy depends on the performance of some underlying tortious act." *Griva*, 637 A.2d at 848. Plaintiffs contend that their claim for breach of fiduciary duty is the underlying tortious act. *See* Pls.' Opp'n, ECF No. 94 at 15; *see*

*also* Am. Compl., ECF No. 42 at 46 ¶ 191 (alleging that Mr. Miller is "vicariously liable for the underlying tort of breach of fiduciary dut[y]"). Plaintiffs argue that Mr. Miller left MDD to compete for the same contracts at AirClean and MSC "in violation of his covenant not compete." Pls.' Opp'n, ECF No. 94 at 15. But under that theory, Plaintiffs fail to make out a claim for civil conspiracy for two reasons. First, Mr. Miller was not bound by the non-compete clause in the MDD Employee Handbook because it was not an enforceable contract between him and MDD. Next, Plaintiffs have not demonstrated that Mr. Miller breached his fiduciary duty owed to MDD. Mr. Miller correctly points out that "to state a claim for civil conspiracy, the Plaintiff must show that the defendants committed a breach of fiduciary duty." Def. Miller's Mot. for Summ. J., ECF No. 87 at 11. The underlying breach of fiduciary duty against Mr. Miller is not viable; thus, Plaintiffs cannot rely on Mr. Miller's alleged breach of his fiduciary duty as the underlying tortious act. *See Riddell*, 866 F.2d at 1494 ("[A]s a matter of substantive law, one cannot be liable for a conspiracy that does not have as its object an actionable wrong."). The Court therefore finds that Mr. Miller is entitled to summary judgment

on Plaintiffs' civil conspiracy claim. *See Hall*, 285 F.3d at 82.[26]

## IV. Conclusion

For the reason set forth above, the Court **GRANTS** the Federal Defendants' Renewed Motion to Dismiss, or in the alternative, for Summary Judgment as to Counts I, II, and IX, ECF No. 88, and **DENIES** Plaintiffs' Motion for Partial Summary Judgment as to Count I, ECF No. 107. The Court **DENIES AS MOOT** Plaintiffs' Motion for Entry of Order for Summary Judgment, ECF No. 132. The Court **GRANTS** Defendant Matthew Miller's Motion for Summary Judgment as to Counts VI and VIII, ECF No. 87, and **DENIES** Plaintiffs' Motion for Summary Judgment as to Counts VI

---

[26] In its prior Opinion, the Court found that Plaintiffs stated plausible claims for breach of fiduciary duty and civil conspiracy to withstand a motion to dismiss. *Phillips I*, 894 F. Supp. 2d at 95-96. Although the Court grants Mr. Miller's motion for summary judgment as to Counts VI and VIII, the Court does not reach the merits of the breach of fiduciary duty and civil conspiracy claims with respect to Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras. *See, e.g.*, *Sloan ex rel. Juergens v. Urban Title Servs., Inc.*, No. CIV.A. 06-01524 CKK, 2011 WL 1137297, at *8 (D.D.C. Mar. 27, 2011) ("So long as the underlying fraud count . . . remains viable, Plaintiff is free to rely upon civil conspiracy as a theory to establish [defendants'] liability for the underlying fraud."); *de Lupis v. Bonino*, No. CIVA 07-01372 (RBW), 2010 WL 1328813, at *10 (D.D.C. Mar. 31, 2010) (holding that a plaintiff could maintain a conspiracy claim against defendants because it had been adequately pled). Accordingly, Plaintiffs may maintain their breach of fiduciary duty and civil conspiracy claims against Mr. Mazzocco, Mr. Stammnitz, and Mr. Muras.

and VIII, ECF No. 113. A separate Order accompanies this

Memorandum Opinion.

**SO ORDERED.**

**Signed:    Emmet G. Sullivan**
**            United States District Judge**
**            July 15, 2019**